14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

SEP 25 PM 3: 21

|  |  |  |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICHAEL MORGAN, JAY | ) | Case No. 07-C-0251-S |
| EHRFURTH, JOHN WILEY, and | ) | |
| KEVIN REILLY, | ) | Hon. John Shabaz |
| | ) | |
| Defendants. | ) | **PLAINTIFF'S MEMORANDUM IN** |
| | ) | **SUPPORT OF ITS MOTION FOR** |
| | ) | **PARTIAL SUMMARY JUDGMENT** |
| | ) | **PURSUANT TO F.R.C.P. 56** |
| | ) | |

ORIGINAL

## INTRODUCTION

Plaintiff Sierra Club, by its Attorneys Garvey McNeil & McGillivray, S.C., respectfully submits the following memorandum in support of its motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 for a finding as a matter of law on liability and a finding as a matter of law as to a partial remedy in Plaintiff's favor.

The Charter Street Heating Plant on the University of Wisconsin-Madison campus ("Charter Street") is violating the Clean Air Act ("Act"). The violations include the replacement of major components of the boilers at Charter Street without applying for and receiving the necessary permits and without complying with stringent emission limits that apply when such modifications are made. Through this case, Plaintiff, Sierra Club, asks the Court to declare that these actions violated the Act and order the

Defendants to comply with the Act by 1) obtaining the necessary permits from the Wisconsin DNR and 2) meet stringent emissions standards at Charter Street.

## STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate if the evidence on record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Court explained in *Anderson v. Liberty Lobby*, the summary judgment "standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986) (emphasis in original). "Genuine" issues are those upon which "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Material" facts are identified by the substantive law of the case. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted). Facts that go to the legal elements of the claims are material. Those that do not, are not material.

On summary judgment, the moving party demonstrates there is no genuine issue of material fact for trial by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). The burden then shifts to the non-moving party to establish, beyond the pleadings, that

there is a genuine issue for trial. *Id.* at 324. In considering summary judgment, all inferences must be drawn in the light most favorable to the non-moving party, giving him the benefit of all conflicts in the evidence. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). However, the non-moving party may "not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (internal quotations omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) (citation and internal quotation marks omitted).

Here, there are no material facts in dispute based on the relevant law and Plaintiff is entitled to a judgment as a matter of law. Therefore, the Court should find that Defendants violated the Act and order a partial remedy in Plaintiff's favor. The only issue remaining for trial is the length of time Defendants should be afforded to come into compliance with the Act.

## JURISDICTION AND VENUE

This case is a citizen suit pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and therefore raises a federal question for which this Court has subject matter jurisdiction. 28 U.S.C. § 1331; 42 U.S.C. § 7604(a). Venue is appropriate in the Western District of Wisconsin because this is where Defendants reside, Charter Street is located,

and the events or omissions giving rise to the claims occurred.  PFOF ¶¶ 7-10; 28 U.S.C. § 1391(b); 42 USC § 7604(c)(1).

Sierra Club served its Notice of Intent to Sue letter, pursuant to 42 USC § 7604(b)(1), on the Defendants on December 4, 2004.  PFOF ¶¶ 2-3.  Although the Act authorizes a plaintiff to sue without providing notice for certain claims, and after waiting sixty days after giving notice for other claims, 42 U.S.C. § 7604(b), Sierra Club waited for five months for Defendants to respond.  PFOF ¶¶ 4-5.  Receiving no formal response, Sierra Club filed this lawsuit on May 3, 2007.  PFOF ¶ 5.

## FACTS[1]

The State of Wisconsin, through the Department of Administration, the University of Wisconsin System Administration, and the University of Wisconsin-Madison ("UW-Madison"), own and operate Charter Street.  PFOF ¶ 27.  Charter Street consists of five boilers, four of which burn coal and one of which burns natural gas and oil.  PFOF ¶ 28.  Charter Street began operation in 1959 with three second-hand coal-fired boilers, bought as surplus from a defunct Detroit auto factory.  PFOF ¶¶ 35-36, 62-64.  Another coal-fired boiler was added in 1964.  PFOF ¶¶ 65-66.  Although the Defendants have other boilers that burn natural gas and oil and that can feed steam and chilled water into the distribution system connected to the coal-fired boilers at Charter

---

[1] Sierra Club provides a summary of background facts in this section.  For a complete recitation of facts, Sierra Club relies on its Proposed Findings of Fact filed with this memorandum of law.

Street, PFOF ¶¶ 29-34, 67-71, they elect to dispatch the four coal-fired boilers first. PFOF ¶¶ 37-40.

Charter Street emits large amounts of air pollution into the middle of Madison. For example, in 2004, Charter Street emitted over 819 tons of carbon monoxide, 1,648 tons of sulfur dioxide, 801 tons of nitrogen oxide, 70 tons of particulate matter, and 35 tons of particulate matter smaller than 10 microns ("PM10"). PFOF ¶ 97. As discussed below, modern pollution control would reduce these emissions by as much as 90% percent.

Charter Street's four coal-fired boilers, Boilers 1 through 4, are generally similar in design. The central component of each boiler is a firebox in which fuel is burned and the energy from the combustion process is transferred to water to produce steam. The firebox is a large four-sided box, each covered with assemblies of tubes, known as "waterwalls." PFOF ¶ 74. "Stokers," or "feeders" project the coal fuel into the bottom of the firebox. PFOF ¶ 75. Steam is created in the waterwall tubes and in the generating tube banks, where the hot exhaust gases pass outside of the tubes containing water. PFOF ¶¶ 78-79. Another major boiler component is a "superheater," which hangs from the ceiling of the boiler in the path of hot exhaust gases rising from the firebox. PFOF ¶ 80. Each boiler at Charter Street also includes an "economizer," which is located outside of the firebox, but along the path of hot gases leaving the boiler. PFOF ¶ 81. The waterwalls, superheater and economizer consist of banks of tubes filled with water

that, in combination with the other plant components, create and raise the temperature of steam before its leaves the boiler. PFOF ¶¶ 74-84.

Between 1996 and 2004 Defendants undertook five major projects totaling more than $1.7 million to replace major components of the Charter Street boilers. PFOF ¶¶ 188, 226, 273, 302, 381, 384. These projects included:

1. The replacement of the entire rear wall of 73 waterwall tubes at Boiler 4 in 1996. PFOF ¶¶ 184-208.

2. The replacement of the economizer and sootblowers on Boilers 1, 2 and 3 in 2002. PFOF ¶¶ 209-259.

3. The replacement of all three stoker feeders (fuel feeders) on Boiler 1 in 2002. PFOF ¶¶ 260-294.

4. The replacement of a 7 foot section on each of the 67 sidewall tubes on Boiler 4 in 2001. PFOF ¶¶ 295-312.

5. The replacement of the entire superheater, the entire generating tube bank, and other components on Boilers 1, 2 and 3, and the replacement of all five stoker feeders on Boiler 4 in 2004. PFOF ¶¶ 313-408.

As set forth below, when a major stationary source of air pollution like Charter Street, makes a non-routine, physical change that leads to significant increases in annual emissions of certain pollutants it must obtain a permit and emission limits from the permitting agency. However, none of the five projects at issue obtained a permit. Had a permit been obtained, it would have been required to install pollution control equipment to reduce sulfur dioxide and nitrogen oxides emissions by at least 88 percent. There is no dispute that Charter Street currently lacks such modern pollution controls.

## ARGUMENT

I.    **THE STATUTORY STRUCTURE OF THE CLEAN AIR ACT, THE PREVENTION OF SIGNIFICANT DETERIORATION PROGRAM, AND THE ACT'S IMPLEMENTING REGULATIONS.**

A.    **Regulatory Framework Under the Act's Prevention of Significant Deterioration ("PSD") Program.**

The Act is designed to protect and enhance the quality of the nation's air and in doing so promote the public health and welfare and the productive capacity of the United States' population. 42 U.S.C. § 7401(b)(1). The Act is Congress' attempt to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again." H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356; *see also Wis. Elec. Power Co. v. Reilly,* 893 F.2d 901, 909 (7th Cir. 1990) (hereinafter "*WEPCO*"). It establishes programs and activities to achieve that goal. Relevant to this litigation is the Prevention of Significant Deterioration ("PSD") program, 42 U.S.C. §§ 7470-7492, and the operating permit program located in Title V of the Act, 42 U.S.C. §§ 7661-7661f.

The PSD program prevents the deterioration of air quality in areas, such as Dane County, that currently attains the National Ambient Air Quality Standards, by requiring that the construction of any new or modified sources of air pollution is only authorized after a careful evaluation and only when the new or modified pollution source is subject to stringent pollution control limits.[2] *Nat'l Parks Conservation Ass'n v.*

_____

[2] Only the PSD program for attainment areas applies in this case. The Clean Air Act also contains a parallel regulatory scheme for areas where the air quality has not attained EPA's

7

*Tennessee Valley Auth.*, 480 F.3d 410, 412 (6th Cir. 2007).    Because Congress anticipated that all sources in existence when it passed the 1977 Clean Air Act Amendements would "fac[e] retirement in 10-15 years," H.Rep. No. 94-1175 at 159 (1976); H.Rep. 95-294 (1977), reprinted in 1977 U.S.C.C.A.N. 1077, 1265, it provided a temporary reprieve by "grandfathering" existing sources.  *United States v. S. Indiana Gas and Elec. Co.*,  2002 WL 31427523, *2 (S.D.Ind. 2002) ("When Congress enacted the Clean Air Act in 1970, and subsequently amended it in 1977, it determined that existing pollution sources would be 'grandfathered.'").   In other words, existing sources would not be required to immediately install technology to comply with the Act's emission limits.  This reprieve was to be short lived, since Congress provided that sources in existence when the PSD program was enacted would be included with the program when they were modified. *Id.; WEPCO,*  893 F.2d at 909 ("But Congress did not permanently exempt existing plants from these [PSD] requirements; section 7411(a)(2) provides that existing plants that have been modified are subject to the Clean Air Act programs at issue here."); *Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1980); *United States v. Murphy Oil U.S.A., Inc.,* 155 F. Supp. 2d, 1117, 1137 (holding that Congress provided 'grandfather' provisions for facilities existing when the 1977 Amendments were passed, "but anticipated that they would incorporate the newly required controls as they underwent modifications or replacement.") (*citing WEPCO*, 893 F.2d at 909).

---

standards ("nonattainment").  42 U.S.C. §§ 7501-7515.  These two programs are referred to as "New Source Review," or "NSR."

Therefore, for sources in existence when the PSD program was created, like

Charter Street, the PSD program applies—requiring permits and modern pollution

controls-- when the source undergoes any physical change.  42 U.S.C. §§ 7475(a)(1)

(applying requirements to sources "on which construction is commenced"), 7479(2)(C)

(defining "construction" to include modifications), 7411(a)(4) (defining modification as

"any physical change…"); *S. Indiana Gas*,  2002 WL 31427523, *2 ("'modifications' of

existing sources would be required to comply with the [PSD] program[]. The CAA

defines modification as 'any physical change' that increases total emissions.") (internal

citations omitted).   The implementing regulations provide that, prior to commencing

any "major modification," a source must obtain a permit and comply with best

available control technology ("BACT")[3] limits.  40 C.F.R. §§ 52.21(i), (j)(3) (1996); Wis.

Admin. Code § NR 405.07(1), NR 405.08(3), NR 406.03 (2006).[4]  To determine if an

existing source undertakes the type of changes that are considered a "modification,"

---

[3] BACT is a pollution limit "based on the maximum degree of reduction of each pollutant
subject to regulation," that is achievable with the "best" pollution control option for the facility
being permitted.  42 U.S.C. §§ 7475(a)(4), 7479(3); Wis. Admin. Code § NR 405.02(7).  BACT has
been described as one of the most important elements of the Clean Air Act's permitting
program. *In re Knauf Fiber Glass, GmbH,* 8 E.A.D. 121, 131 (E.A.B. 1999).

[4] Pursuant to Clean Air Act section 161, 42 U.S.C. § 7471, Wisconsin adopted the PSD program
into its State Implementation Plan ("SIP") on June 28, 1999, and the Wisconsin Department of
Natural Resources has been authorized to issue PSD permits in Wisconsin under that SIP.  Wis.
Admin. Code ch. NR 405; 40 C.F.R. § 52.2569, *et seq.*  (A SIP is all of the federally-adopted state
regulations limiting air pollution).  However, prior to June 28, 1999, the Wisconsin DNR issued
PSD permits under federal law pursuant to 40 C.F.R. § 52.21 and a delegation of authority from
the United States Environmental Protection Agency.  The 1996 version of 40 C.F.R. § 52.21 is
cited throughout this brief as the applicable law during one of the modifications at Charter
Street and prior to Wisconsin's SIP-based PSD program being approved by USEPA.  The
remaining modifications are subject to the Wisconsin SIP, which includes the 2006 version of
Wis. Admin. Code ch. NR 405.  Only the version of NR 405 in effect prior to 2007 is relevant to
this case.

9

thereby triggering the permitting and pollution control requirements of PSD, five terms must be applied: 1) Major Source; 2) Major Modification, 3) Physical Change, 4) Significant Net Emission Increase, and 5) Routine Maintenance, Repair and Replacement ("RMRR").

### 1.   Major Source

The relevant portions of the PSD program only apply to "major emitting facilities," 42 U.S.C. § 7475(a), which the Act defines to include "fossil fuel boilers of more than two hundred and fifty million British thermal units per hour heat input," which emit or have the potential to emit more than 100 tons per year of any air pollutant.  42 U.S.C. § 7479(1).  The implementing regulations use the term "major stationary source," rather than "major emitting facility," but apply the same definition. 40 C.F.R. § 52.21(b)(1)(i); Wis. Admin. Code §§ NR 405.02(22)(a)1., NR 405.07.

### 2.   Major Modification

The PSD program requires that major stationary sources obtain a PSD permit and comply with BACT emission limits as of the time it undergoes a "major modification."  42 U.S.C. §§ 7475(a)(1), (4), 7479(2)(C); *see also* Wis. Admin. Code §§ NR 405.07(1), NR 405.08(3).  A "major modification," is defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant…."  40 C.F.R. § 52.21 (b)(2)(i) (1996); Wis. Admin. Code § NR 405.02(21). In other words, a major emitting facility must obtain a PSD permit and comply with BACT emission limits if it: (1) undergoes any

physical change; and (2) the change "results in" an increase in air pollution. *WEPCO*, 893 F.2d at 907; *Murphy Oil*, 155 F. Supp. 2d at 1137.

### 3. Physical Change

As noted above, the definition of major modification—and therefore application of the PSD program—applies to physical changes. The PSD program applies to *every* physical change, without limitation. *New York v. Envtl. Protection Agency*, 443 F.3d 880, 886 (D.C.Cir. 2006) (holding that Congress applied PSD to every physical change, not merely to "physical changes exceeding a certain magnitude." (citing *Ala. Power*, 636 F.2d at 400)). This includes even "the most trivial activities—the replacement of leaky pipes, for example…" *WEPCO*, 893 F.2d at 905, *id.* at 908-09 ("any physical change means precisely that."); *see also New York v. EPA*, 443 F.3d 880, 885-87 (D.C. Cir. 2006) (holding that Congress' use of the phrase "any physical change" was intended to apply to the broadest possible category of changes); *New York*, 413 F.3d at 40-42; *United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 901 (S.D. Ind. 2007) ("The CAA defines the term 'modification' broadly as 'any physical change… which increases the amount of any air pollutant emitted…'" (*citing WEPCO,* 893 F.2d at 905; *Ala. Power Co.,* 636 F.2d at 400)).

### 4. Significant Net Emission Increase

While the term "physical change" is broad and without limitation, the PSD program's scope is limited by applying to only those physical changes that result in a "significant net emissions increase." 40 C.F.R. § 52.21 (b)(2)(i) (1996); Wis. Admin. Code § NR 405.02(21). The definition of a "significant net emissions increase" consists of two

concepts: (1) whether there is a net increase; and (2) whether the amount of such increase is "significant."

i.    *Determining a net emission increase.*

The term "net emission increase" is defined as a math formula. 40 C.F.R. § 52.21(b)(3)(i) (1996); Wis. Admin. Code § NR 405.02(24)(a). Ignoring the "netting" provisions, which require considering certain contemporaneous increase and decreases not at issue in this case, the formula is simple: the "increase in actual emissions from a particular physical change." *Id.* Notably, the definition of "actual emissions" differs for pre-change emissions and post-change emissions. 40 C.F.R. § 52.21(b)(21); Wis. Admin. Code § NR 405.02(1). Pre-change "actual" emissions are "[i]n general,… the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation." 40 C.F.R. § 52.21(b)(21)(ii); Wis. Admin. Code § NR 405.02(1)(a).

PSD is a *pre*-construction program and its applicability must be determined *before* commencing a major modification. Therefore, unlike pre-change emissions, which have already occurred, post-change emissions must be projected. As a result, the use of the term "actual" for determining post-change emissions cannot be read literally. Rather, post-change "actual" emissions are a presumption of future emissions. As a matter of both law and policy, the applicable regulations presume the post-change "actual" emissions to be equal to the source's potential to emit after the physical change. 40 C.F.R. § 52.21(b)(21)(iv); Wis. Admin. Code § NR 405.02(1)(c); *see* 57 Fed. Reg. at 32,316-

12

17; 45 Fed. Reg. 52,676, 52,677 (August 7, 1980) (explaining that determination of PSD

applicability requires the source to "quantify the amount of the proposed emissions

increase. This amount will generally be the *potential to emit* of the new *or modified unit.*"

(emphasis added)); *Puerto Rican Cement Co., Inc. v. EPA*, 889 F.2d 292, 296-97 (1st Cir.

1989) (holding that the calculation of a "net emissions increase" is based on the different

definition of "actual" emissions for pre-change and post-change emissions and

applying the source's post-change potential to emit as its post-change "actual"

emissions); *United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1105 (W.D.Wis.

2001); *Murphy Oil*, 155 F. Supp. 2d at 1137, 1140-43; *see also New York v. U.S. E.P.A.*, 413

F.3d 3, 15 (D.C.Cir. 2005) (holding that under EPA's rules an increase occurs "if... a

source's past annual emissions (typically measured by averaging out the two 'baseline'

years prior to the change) are less than future annual emissions (*measured by calculating*

*the source's potential to emit after the change*)." (emphasis added)).

    The regulations define post-change "actual" emissions as the potential to emit

when the emission unit has not "begun normal operations."  40 C.F.R. § 52.21(b)(21)(iv);

Wis. Admin. Code § NR 405.02(1)(c).  As USEPA and the Wisconsin DNR's PSD experts

have explained, the meaning of "begun normal operations" is equivalent to the

definition of a "physical change" that does not meet one of the regulatory exemptions in

40 C.F.R. § 52.21(b)(2)(iii) and Wis. Admin. Code § NR 405.02(21)(b)[5], i.e., it is a non-

---

    [5] Wis. Admin. Code § NR 405.02(21)(b) provides that certain physical and
operational changes are excluded from PSD, including routine maintenance,
repair and replacement.  This is discussed further below.

exempt physical change.  Put another way, an existing source begins "normal

operations" anew after each non-exempt physical change.

> In brief, under the current regulations, changes to a unit at a major stationary source that are non-routine or not subject to one of the other major source NSR exemptions are deemed to be of such significance that pre-change emissions for the affected units should not be relied on in projecting post-change emissions.  For such units, 'normal operations' are deemed not to have begun following the change, and are treated like new units.  Put another way, the regulatory provision for units which have 'not begun normal operations' reflects an initial presumption that a unit that has undergone a non-routine physical or operational change will operate at its full capacity year-round.

63 Fed. Reg. 39,857, 39,858 (July 14, 1998).  DNR also consistently applies this test to

non-electric-utility air pollution sources, including to Charter Street.  PFOF ¶¶ 103-113.

Therefore, for units that undergo non-exempt physical changes, the PSD

regulations determine an emission increase by subtracting the pre-change, two-year

average annual emissions from the post-change "potential to emit."  This test is referred

to as the "actual-to-potential" test.  "Potential to emit" is defined as the maximum

emissions under a pollution source's physical and operational design and under any

federally enforceable pollution limits.  40 C.F.R. § 52.21(b)(4); Wis. Admin. Code § NR

405.02(25); *Murphy Oil*, 155 F. Supp. 2d at 1137.

ii.    *Determining if an emission increase is significant.*

A "significant net emission increase," is any increase in emissions—as calculated

in the method described above-- that exceeds a specified threshold value set forth in

Wis. Admin. Code § NR 405.02(27)(a), Table A and 40 C.F.R. § 52.21(b)(23) (1996).

*United States v. Ohio Edison*, 276 F. Supp. 2d 829, 862 (S.D. Ohio 2003). In short, an

increase in sulfur dioxide or nitrogen oxide emissions of 40 tons, or more, annually is

"significant." Wis. Admin. Code § NR 405.02(27)(a), Table A and 40 C.F.R. §

52.21(b)(23) (1996). For carbon monoxide, the threshold is 100 tons per year. *Id.* For

particular matter and particulate matter less than 10 microns the significance thresholds

are 25 and 15 tons, respectively. *Id.*

### 5. Routine Maintenance, Repair and Replacement

The Act and the PSD program regulations define "modification" as including

<u>any</u> physical or operational change without limitation. 42 U.S.C. § 7411(a)(4); Wis.

Admin. Code § NR 405.02(21). Because this definition, read literally, applies the PSD

program to even the replacement of a screw during day-to-day maintenance at a

pollution source, USEPA and DNR have adopted regulations which provide that

"routine maintenance, repair, and replacement" ("RMRR") activities are exempt from

the definition of modification. 40 C.F.R. §§ 51.165(a)(1)(v)(C), 51.166(b)(2)(iii),

52.21(b)(2)(iii) (1996); Wis. Admin. Code § NR 405.02(21)(b)(i); *see also* 57 Fed. Reg.

32313, 32316-19 (July 21, 1992) (explaining the need for the routine maintenance

exemption to avoid PSD "encompass[ing] the most mundane activities at an industrial

facility (even the repair or replacement of a single leaky pipe, or a change in the way the

pipe is utilized."); *WEPCO*, 893 F.2d at 905 (noting that "the potential reach of these

modification provisions is apparent: the most trivial activities- the replacement of leaky pipes, for example- may trigger the modification provisions…").

Because RMRR constitutes an agency's exception from a requirement prescribed by Congress, it may only apply to a very limited category of *de minimus* changes. *Alabama Power*, 636 F.2d at 400; *Ohio Edison*, 276 F. Supp. 2d at 855; *In re Tennessee Valley Authority*, 9 E.A.D. at 392-93 (citing *O'Neil v. Barrow County Bd. of Comm'rs*, 980 F.2d 674 (11th Cir. 1993); *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982)).  In fact, because it has the potential to undermine Congress' intent that all sources eventually be subject to the PSD program and stringent pollution limits, the Seventh Circuit has warned that the RMRR exemption cannot be interpreted in such as way as to "open vistas of indefinite immunity from the provisions of … PSD." *WEPCO*, 893 F.2d at 909; *see also Ohio Edison*, 276 F. Supp. 2d at 855; *In re TVA*, 9 E.A.D. at 410-11 (rejecting an interpretation of RMRR that would "constitute 'perpetual immunity' for existing plants, a result flatly rejected by Congress and the circuit courts in *Alabama Power* and *WEPCO*").

Therefore, beginning with the premise that RMRR must be narrowly construed to avoid an unlawful infringement on separations of powers through an agency exception to a statutory requirement, courts have identified three hallmarks of the RMRR exemption:

> First, the exemption applies to a *narrow range of activities*, in keeping with the EPA's limited authority to exempt activities from the [CAA].  Second, the exemption applies only to activities that are *routine for a generating unit*.  The exemption does not turn on whether the activity is prevalent within the industry as a whole.   Third, *no activity is*

16

> *categorically exempt.* EPA examines each activity on a case-by-case basis, looking at the nature and extent, purpose, frequency, and cost of the activity.

*United States v. S. Indiana Gas and Elec. Co.*, 245 F.Supp. 2d 994, 1008 (S.D. Ind. 2003)

(emphasis added, original emphasis omitted) (hereinafter "*SIGECO*").

i.      The WEPCO <em>Test for the RMRR</em>

The Seventh Circuit has established a four-part test to assess whether a project falls within the narrow routine maintenance exemption: (1) the nature and extent of a change; (2) the purpose for the change; (3) the frequency of the change; and (4) the cost of the change. *WEPCO*, 893 F.2d at 909-11. District Courts in the Seventh Circuit have uniformly applied the four-factor *WEPCO* test. *United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 933-948 (S.D.Ind. 2007); *United States v. Southern Indiana Gas & Electric Co.*, 245 F. Supp. 2d 994, 1008 (S.D.Ind. 2003); *United States v. Southern Indiana Gas & Electric Co.*, 2003 WL 446280, *2 (S.D.Ind. Feb. 18, 2003); *United States v. Southern Indiana Gas & Electric Co.*, 258 F. Supp. 2d 884, 886 (S.D.Ind.2003); *see also Ohio Edison*, 276 F. Supp. 2d at 834.

A project that, by its nature and extent is not routine maintenance, includes a project that is approved by management, planned by a central office, uses outside contractors, and involves replacement of an entire component; as opposed to a project that is approved and implemented by plant staff and merely fixes a portion of a component. *Ohio Edison*, 276 F. Supp. 2d at 834, 859; *In re TVA*, 9 E.A.D. at 481, 484-85, 490-91, 493-94. A project which includes modifying or replacing numerous parts and

17

redesigned, custom, or "upgraded" parts is not routine maintenance. *Cinergy*, 495 F. Supp. 2d at 934.

A project that has a purpose of improving operations, by extending the operational life of the unit or resulting in fewer needed shutdowns to perform repairs is not routine maintenance. *WEPCO*, 893 F.2d at 911-12 (holding that a project that rehabilitates aging units as an alternative to retiring them is not routine); *Cinergy*, 495 F. Supp. 2d at 935 (finding a project non-routine based, in part, on the fact that the purpose was to "'improve[] operating efficiency' with less [sic] potential outages."); *Ohio Edison*, 276 F. Supp. 2d at 858, 860 (finding a project non-routine that "reduc[ed] forced outages and improv[ed] availability and reliability of the unit(s)").

Projects that "normally occur once or twice during a unit's expected life cycle" are not routine. *WEPCO*, 893 F.2d at 912. A project is not routine if it is paid for with funds other than a plant's operating and maintenance budget. *Ohio Edison*, 276 F. Supp. 2d at 859. Similarly, a project for which expenses are "not budgeted as maintenance expenses," are not routine. *Id.* at 862. Additionally, costs that are treated as capital expenditures on a balance sheet are not routine. *Cinergy*, 495 F. Supp. 2d at 933; *Ohio Edison*, 276 F. Supp. 2d at 834.

In short, routine maintenance "occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense." *Ohio Edison*, 276 F. Supp. 2d at 834 (citing *WEPCO*, 893 F.2d 901). Non-routine and, therefore

non-exempt, projects include "capital improvements which generally involve more expense, are large in scope, often involve outside contractors, involve an increase of value to the unit, are usually not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet." *Id.*

> ii. *USEPA And DNR Have Adopted This Four-Part Test.*

Both the Wisconsin DNR and the USEPA have interpreted the routine maintenance exemption narrowly and adopted the 4-part test for routine maintenance from *WEPCO.* 67 Fed. Reg. 80,290, 80,292-93 (Dec. 31, 2002) (describing the routine maintenance exemption as "a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work as well as other factors to arrive at a common sense finding."); *SIEGCO*, 245 F. Supp. 2d at 1019 (quoting a USEPA determination for Wisconsin Electric's Port Washington plant that the exemptions from the definition of "modification" — including routine maintenance — are "very narrow.")

The DNR follows USEPA's four-factor test for determining routine maintenance. PFOF ¶ 101-102.

Courts afford due deference to USEPA's and DNR's long-standing interpretation of their PSD regulations, including the definition of "routine maintenance" is due deference. *SIEGCO*, 245 F. Supp. 2d at 1007 (*citing Lyng v. Payne*, 476 U.S. 926, 939 (1986); *WEPCO*, 893 F.3d at 907; *Homemakers N. Shore, Inc. v. Bowen*, 832 F.2d 408, 411 (7th Cir. 1987)).

19

In addition, a determination of whether a project is routine maintenance and exempt from the PSD program is a legal question that can be resolved in a motion for summary judgment. *United States v. Cinergy Corp.*, 495 F. Supp. 2d 909, 931 (S.D.Ind. 2007) (*citing Nat'l Parks Conservation Ass'n*, 413 F. Supp. 2d at 1287).

> iii.    *Defendants Have the Burden To Demonstrate RMRR*

Routine maintenance is an affirmative defense. *United States v. Cinergy*, 2006 WL 372726, *4 (S.D.Ind. Feb. 16, 2006) (*citing United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967)); *Ohio Edison*, 276 F. Supp. 2d at 856. Therefore, the Defendants have the burden of raising and proving the defense. *Id.; see also In re Tennessee Valley Authority*, 9 E.A.D. 357, 391 n.31, 2000 WL 1358648 (EAB Sept. 15, 2001), rev'd on other grounds *Tenn. Valley Auth. v. U.S. Ent'l. Protection Agency*, 278 F.3d 1184 (11th Cir. 2002).

## II.    CHARTER STREET IS IN VIOLATION OF THE CLEAN AIR ACT BECAUSE IT WAS MODIFIED WITHOUT FIRST OBTAINING A PSD PERMIT.

As set forth above, the PSD program of the Clean Air Act requires major sources to obtain a PSD permit prior to commencing a modification that results in a significant net emission increase. Charter Street did not obtain a PSD permit for the following projects:

1.    The replacement of all 73 waterwall tubes comprising the rear wall of Boiler 4 in 1996.

2.    The replacement of the entire economizer and sootblowers on each of the Boilers 1, 2 and 3 in 2002.

3.      The replacement of all three stoker feeders (fuel feeders) on
        Boiler 1 in 2002.

4.      The replacement of a 7 foot section on each of the 67 sidewall
        tubes on Boiler 4 in 2001.

5.      The replacement of the entire superheater, the entire generating
        tube bank, and other components on Boilers 1, 2 and 3, and the
        replacement of all five stoker feeders on Boiler 4 in 2004.

PFOF ¶¶ 204-205, 255-256, 291-292, 309-310, 392-393.

## A. Charter Street Plant is a "Major Source" Subject to the PSD Program

The Act applies the PSD program to "major emitting facilities," and the

implementing regulations define this term as "major stationary sources." 42 U.S.C. §§

7475, 7479(1); Wis. Admin. Code § NR 405.02(a)2. The term "major stationary source,"

or "major emitting facility" includes every "fossil fuel boiler[] (or combinations thereof)

totaling more than 250 mmBtu[6]/hour heat input" that has the potential to emit at least

100 tons of any contaminant regulated under the Act annually. 42 U.S.C. § 7479(1); Wis.

Admin. Code § NR 405.02(22)(a)1. Charter Street contains five fossil fuel boilers with a

combined heat input of approximately 1,000 mmBtu and has a potential to emit greater

than 100 tons per year of carbon monoxide (CO), particulate matter (PM), particulate

matter less than 10 microns in diameter (PM10), sulfur dioxide (SO2) and nitrogen oxide

(NOx). PFOF ¶¶ 28, 60-67, 85-86. Charter Street is a major emitting facility subject to

the PSD program. 42 U.S.C. §§ 7475, 7479(1); Wis. Admin. Code § NR 405.02(a)2.

---

[6] mmBtu = Million British Thermal Units.

21

**B.  The Projects At Charter Street Were Physical Changes.**

The PSD program defines a modification as any physical change that increases emissions.  42 U.S.C. §§ 7411(a)(4) ("modification means any physical change...."), 7479(2)(C) (incorporating 42 U.S.C. § 7411(a)(4) into the PSD program); Wis. Admin. Code § NR 405.02(2)(21) ("major modification means any physical change..."). This applies to *every* physical change, without limitation.  *New York*, 443 F.3d at 886 (finding "any" physical change is not limited to "changes exceeding a certain magnitude." (citing *Alabama Power*, 636 F.2d at 400)).  As the Seventh Circuit noted in WEPCO, this includes even "the most trivial activities." 893 F.2d at 905, *id*. at 909.  The five projects were all physical changes.

    1.    **1996 Changes to Boiler 4:**  This project replaced all 73 waterwall tubes and casings on Charter Street Boiler 4.  These tubes are 22 feet long and comprise the entire wall of the boiler.  PFOF ¶¶ 184-187.

    2.    **2002 Changes to Boilers 1, 2 and 3:**  The project in 2002 on Boilers 1, 2 and 3, included removing and replacing the entire economizers and sootblowers.  The economizers are large components made up of tubes through which water passes.  The economizer replacement required a crane. PFOF ¶¶ 209-225.

    3.    **2002 Changes to Boiler 1:**  At the same time that the economizer was being replaced on Boiler 1, all three stoker feeders were replaced.  The feeders

are the portion of the boiler that move the coal fuel into the boiler for combustion.  PFOF ¶¶ 260-268.

4.    **2001 Changes to Boiler 4:**  This project involved replacing the lower portion of all 67 sidewall tubes on the North side of Boiler 1.  The section of each replaced tube measured seven feet long.  PFOF ¶¶ 295-300.

5.   **2004 Changes to Boilers 1, 2, 3 and 4:**  This project involved replacing the entire superheater on Boilers 1, 2 and 3; the entire generating bank sections on Boilers 1, 2 and 3; all five stoker feeders on Boiler 4; and other physical components.  PFOF ¶¶ 313, 320, 328-329.

These projects are, by definition, physical changes—well beyond the "the most trivial activities" the Seventh Circuit found to be sufficient to constitute physical changes under the Act.  *WEPCO,* 893 F.2d at 905, 909.

### C.  Each Project Resulted in a Significant Net Emission Increase.

Physical changes that result in a "significant net emission increase" trigger the requirement to obtain a PSD permit.  A "net emission increase" is defined as a math formula.  40 C.F.R. § 52.21(b)(3)(i) (1996); Wis. Admin. Code § NR 405.02(24)(a).   The formula is simple: "increase in actual emissions from a particular physical change."  *Id.* Notably, the definition of "actual emissions" differs for pre-change emissions and post-change emissions.  40 C.F.R. § 52.21(b)(21); Wis. Admin. Code § NR 405.02(1).  Pre-change "actual" emissions are "[i]n general,… the average rate, in tons per year, at which the unit actually emitted the air contaminant during a 2-year period which

23

precedes the particular date and which is representative of normal operations."  40

C.F.R. § 52.21(b)(21)(ii); Wis. Admin. Code § NR 405.02(1)(a).

Post-change "actual" emissions are a presumption of future emissions.  The

applicable regulations presume post-change "actual emissions" to be the potential to

emit[7] of units that have not "begun normal operation."  40 C.F.R. § 52.21(b)(21)(iv); Wis.

Admin. Code § NR 405.02(1)(c); *see* 57 Fed. Reg. at 32,316-17; *Puerto Rican Cement*, 889

F.2d at 296-97.  A source, other than an electric utility, that undertakes a physical

change, which does not fit one of the categories of exempt changes, 40 C.F.R. §

52.21(b)(2)(iii); Wis. Admin. Code § NR 405.02(21)(b), has not "begun normal

operations."  Therefore, increases from a change are determined by the difference

between its average annual historic emissions and its potential to emit.

> In brief, under the current regulations, changes to a unit at a
> major stationary source that are non-routine or not subject to
> one of the other major source NSR exemptions are deemed
> to be of such significance that pre-change emissions for the
> affected units should not be relied on in projecting post-
> change emissions.  For such units, 'normal operations' are
> deemed not to have begun following the change, and are
> treated like new units.  Put another way, the regulatory
> provision for units which have 'not begun normal
> operations' reflects an initial presumption that a unit that
> has undergone a non-routine physical or operational change
> will operate at its full capacity year-round.

63 Fed. Reg. 39,857, 39,858 (July 14, 1998).

---

[7] "Potential to emit" is defined as the maximum emissions under a pollution source's physical
and operational design and under any federally enforceable pollution limits.  40 C.F.R. §
52.21(b)(4); Wis. Admin. Code § NR 405.02(25); *Murphy Oil*, 155 F. Supp. 2d at 1137.

24

Applying the "actual-to-potential test," each of the five projects at issue resulted in a net emission increase greater than the threshold for a "significant net emission increase."  PFOF ¶¶ 86-88, 92-96, 206-208, 257-259, 293-294, 311-312, 407-408; 40 C.F.R. § 52.21(b)(3)(i) (1996); Wis. Admin. Code § NR 405.02(24)(a).

### D.  The Changes Do Not Qualify For The RMRR Exemption.

Defendants claim an affirmative defense that the projects are routine maintenance, repair and replacement and are, therefore, exempt from the PSD program. Answer Am. Compl at 19-20 ¶ 4.  Defendants bear the burden of proof on this affirmative defense.  *Cinergy*, 2006 U.S. Dist. LEXIS 8774, *13-*14 (S.D.Ind. 2006) (*citing United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967)); *Ohio Edison*, 276 F. Supp. 2d at 856.  Summary judgment is appropriate where the nonmoving party fails to demonstrate a genuine issue of material fact supporting its affirmative defense.  *See e.g., Wildey v. Springs*, 1993 WL 350195, *3 (N.D. Ill. Sept. 7, 1993) (applying the standard for summary judgment to a non-movant's failure to raise a disputed issue as to his affirmative defense).  As demonstrated below, there is no dispute of material fact as to Defendants' routine maintenance exemption affirmative defense.  The projects at issue are fundamentally different from routine maintenance and, therefore, any minor dispute between the parties regarding facts are not material to the ultimate legal conclusions.

Boilers sometimes need to be repaired.  Charter Street is no exception.  PFOF ¶ 134.  However, there are different degrees of maintenance and repair projects at coal-

fired boilers.  PFOF ¶ 121.  In general, maintenance and repair falls into three categories: (1) routine maintenance; (2) major maintenance; and (3) capital projects.  PFOF ¶ 122. *Routine* maintenance tasks involve little advance planning, costs in the low thousands of dollars or less, and do not require management approval.  PFOF ¶¶ 124-127.  In other words, it is the everyday fixes, or maintenance that is done a regular basis.  PFOF ¶ 123. In contrast, *major* maintenance projects and capital projects typically cost more than routine maintenance, are planned months in advance, take a few weeks to a few months to complete, require management approval, and are separately budgeted for.  PFOF ¶¶ 128-131.

A number of different people and entities are involved in maintenance and repair projects at Charter Street.  At the line level, there is a UW-Madison campus staff at Charter Street.  PFOF ¶¶ 158, 164-165, 170.  The plant manager and two superintendents oversee this staff, including approving maintenance projects to be undertaken by the staff and paid for with an annual operating and maintenance budget for Charter Street.  PFOF ¶¶ 159-168.  No management approval above the plant manager is necessary for these routine maintenance projects.  PFOF ¶¶ 162-163, 167-168. However, there are certain projects that the Charter Street staff cannot handle.  PFOF ¶¶ 180-183.  Large projects, like the replacement of entire steam tube banks are beyond the manpower of the Charter Street staff and must involve the state Department of Administration.  PFOF ¶ 183.

The Department of Administration ("DOA") oversees operation of the state's heating plants, including Charter Street.  PFOF ¶ 13.  One of DOA's employees, the State Heating Plant Engineer, supervises the plants and oversees the staff who conduct projects at the plants.  PFOF ¶¶ 15-16.  The DOA is involved in certain projects at Charter Street, but not the day-to-day repairs or processing of work orders.  PFOF ¶ 146-149.  The DOA, through the Division of State Facilities, is involved in projects that cost more than $40,000.  PFOF ¶ 150.  Maintenance projects costing more than $150,000 involve additional procedures and must be approved from a specific fund for state facilities by the Building Commission of Wisconsin.  PFOF ¶¶ 152-157.  The Building Commission appropriates money for planning, improvement, major maintenance and renovation.  PFOF ¶¶ 140-145.

## 1.  The 1996 Project on Boiler 4 Was Not RMRR

The 1996 project involved replacing all 73 sidewall tubes and casing that comprises the entire rear wall of Boiler 4.  PFOF ¶¶ 184-185.  This project is fundamentally different than routine maintenance tasks, which usually consist of annual inspections as occasionally repairing or plugging an individual leaky tube.  PFOF ¶¶ 198-203. Outside contractors were hired to complete the project, which included a boiler shutdown of at least 146 days.  PFOF ¶¶ 187.  This was significantly longer than the typical three to five day outage at Charter Street every four to six month for repairs.  PFOF ¶ 187.

27

The project cost $97,300.00, which was much greater than the "few dollars to a few thousand dollars" cost of a routine repair. PFOF ¶¶ 124, 126, 188-189. The cost was paid for with capital funds from the Building Commission and not from the annual operating and maintenance budget for the plant. PFOF ¶ 190.

The project was infrequent — occurring approximately ever thirty years. PFOF ¶¶ 193-196. Even if the boiler has expected life of 60 years, this replacement occurs only a few times during the entire life of a boiler. PFOF ¶¶ 194-195. This is infrequent and not routine. PFOF ¶ 197; *WEPCO*, 893 F.2d at 912.

2.  The 2002 Project to Replace the Economizers on Boilers 1, 2 and 3 was not RMRR.

The project to replace the economizers and sootblowers on Boilers 1, 2 and 3 in 2002 was overseen by an outside engineering firm, was completed by an outside contractor, and used a crane to remove and replace the entire economizer on each of the boilers. PFOF ¶¶ 209, 212-214. The work was beyond what could have practically been done by the staff of the plant. PFOF ¶ 215. This project was fundamentally different from normal repairs to the economizers, which involved patching or replacing a single tube over a three to eight day period once per year. PFOF ¶¶ 219-224, 249-254. Planning for this project began years before the actual work was completed. PFOF ¶ 210-211. Boilers 1, 2 and 3 were shut down for this project for 118 days, 94 days, and 55 days, respectively. PFOF ¶ 216. This was well beyond the typical three to five day shutdown that is typical every four to six months. PFOF ¶¶ 216-217.

28

The project was reviewed by the University of Wisconsin System Administration's Office of Capital Planning and Budget, and was paid for with funds approved by the Building Commission and not from the annual operating and maintenance budget for the plant.  PFOF ¶¶ 228-230, 232.  In fact, the $733,899.00 cost of this project exceeded the entire $700,000.00 annual operating and maintenance budget for the plant.  PFOF ¶¶ 226, 231.  This is a much greater cost than even the largest routine maintenance project.  PFOF ¶ 227.

Replacing an entire economizer is not a routine, or even a frequent event.  At this boiler, the economizer replacement occurs approximately once every 24 years—or twice if the boiler lasts 60 years.  PFOF ¶¶ 234-235.  The sootblowers had never previously been replaced.  PFOF ¶ 239.  This is much less frequent than a routine repair.  PFOF ¶¶ 236, 241; *WEPCO*, 893 F.2d at 912.

Replacing the economizers was intended to improve operation of the boiler.  The existing economizers were experiencing numerous leaks and were worn out and could no longer maintain the necessary operating conditions.  PFOF ¶¶ 242-243.  Additionally, the existing economizers that were installed in 1978 had a flawed finned-tube design that would plug with coal dust.  PFOF ¶¶ 244-246.  The new economizers had a different design to improve their performance and the operation of the boilers.  PFOF ¶ 246.

### 3.  The 2002 Feeder Replacement on Boiler 1 Was Not RMRR.

The project to replace the feeders on Boiler 1 in 2002 occurred during the same shutdown period as the economizer replacement on that boiler.  PFOF ¶ 264.  Therefore, these two projects could more appropriately be considered a single project.  However, whether the projects are considered together or separately, the replacement of all three feeders on Boiler 1 is not RMRR standing alone.  PFOF ¶ 290.  The project replaced the three existing 19-inch feeders with new 27-inch feeders of a different design—replacing overthrow feeders with underthrow feeders.  PFOF ¶¶ 260-262.  The project involved a 118-day shutdown of the boiler, compared to typical feeder repairs that took between four hours and three to five days every four to six months.  PFOF ¶¶ 263-267.

The feeders at Charter Street are replaced every 25 years—meaning only two or three replacements if the boiler lasts 60 years.  PFOF ¶¶ 269-271.  This is less often than routine repairs.  PFOF ¶ 272.

The cost of the feeder replacement was $90,700.00.  PFOF ¶ 273.  This is more than the tens to thousands of dollars cost of a typical routine repair.  PFOF ¶¶ 124, 126, 274.  The project was paid for with capital funds from the Building Commission and not from the annual operating and maintenance budget for Charter Street.  PFOF ¶¶ 275-277.

The replacement of the feeders on Boiler 1 with a different design was expected to improve operation of the boiler.  Prior to the replacement, the feeders were becoming clogged and preventing delivery of fuel to the boiler.  PFOF ¶¶ 279-284.

30

4.  The 2001 Partial Wall Replacement on Boiler 4 Was Not RMRR.

The project on Boiler 4 in 2001 replaced seven feet of steam tubes on each of the 67 tubes that make up the North side of the boiler.  PFOF ¶ 295.  This project was done by outside contractors because the Charter Street maintenance staff was not qualified to do it.  PFOF ¶¶ 297-300.  The boiler was shut down for 57 days to undertake this project.  PFOF ¶ 300.

This type of repair is expected to occur only two to three times during the entire life of the boiler, and had never been done before in a single project at any of the Charter Street boilers.  PFOF ¶¶ 296, 301.

The project cost approximately $77,000.00 and was paid for through the Division of State Facilities from a fund established by the Building Commission.  PFOF ¶¶ 302-304.  The project was capitalized for accounting principles and was not paid for through the annual operating and maintenance funds for the plant.  PFOF ¶¶ 304-305.  The project was expected to increase the reliability of the boiler and avoid steam tube leaks. PFOF ¶¶ 306- 308.

5.  The 2004 Project to Replace Superheaters and Generating Banks on Boilers 1, 2 and 3 and All Five Feeders on Boiler 4.

In 2004, Charter Street underwent a project that replaced the entire superheater and generating tube bank on each of Boilers 1, 2 and 3.  PFOF ¶ 313.  The project was overseen by an outside consulting firm, performed by outside contractors, involved replacing over 2000 tubes-- over 40% of the steam tubes in each of the boilers-- and was

31

described in Charter Street documents as an "overhaul" of the boilers.  PFOF ¶¶ 313-314, 317, 329, 337-340.  The project took over two years, including the planning process.  PFOF ¶¶ 315-316.  The project also involved replacing all five fuel feeders on Boiler 4 with feeders of a different design.  PFOF ¶¶ 320-322.  The project involved a boiler shutdown period of 109 days, 81 days, 74 days, and 37 days for Boilers 1, 2, 3 and 4, respectively.  PFOF ¶¶ 324, 342.  In contrast, typical maintenance shutdown periods last three to five days.  PFOF ¶¶ 325-326, 344.  The length of the project was longer than routine maintenance tasks.  PFOF ¶¶ 327, 343-345.

The project cost $788,899.00 to replace the superheaters and generating banks on Boilers 1, 2 and 3, and another $193,000.00 to replace the feeders on Boiler 4.  PFOF ¶¶ 381, 383.  This cost exceeds the annual $700,000.00 operating and maintenance budget for Charter Street and was paid for with fund approved by the Building Commission.  PFOF ¶¶ 385, 387-390.  Requests for the funding involved the Office of Capital Planning and Budget and the funds were treated as capital expenditures for accounting purposes.  PFOF ¶¶ 389-391.  In short, the cost was much greater than routine maintenance and repair costs.  PFOF ¶¶ 381-382, 386.

After this lawsuit was filed, the DNR looked at the portion of this project that replaced the economizers and superheaters on Boilers 1 through 3.  PFOF ¶¶ 98.  DNR concluded that the project was not RMRR and found Charter Street to be in violation of the Act.  PFOF ¶¶ 99-102, 118.  In fact, the DNR previously told the Department of

Administration that replacing just 21 superheater tubes at the state-owned boiler at the Waupun prison would not be RMRR.  PFOF ¶ 119.

### E.  The Court Should Order Defendants To Obtain The Required PSD Permit.

For the reasons set forth above, the Charter Street underwent a major modification for each of the five projects.  Each project was a physical change that resulted in a significant net emission increase.  Therefore, Charter Street was required to have a PSD permit before each project commenced.  42 U.S.C. §§ 7475(a)(1), 7479(2)(C); Wis. Admin. Code. §§ NR 405.07, 405.08.  Because no permit was obtained, the plant is in violation of the Act, the Court should order Defendants to obtain the necessary PSD permit to comply with the Act.

### III.    PLAINTIFF IS ENTITLED TO A FINDING AS A MATTER OF LAW THAT CHARTER STREET MUST COMPLY WITH BACT.

Count Two in Plaintiff's Amended Complaint alleges a violation of the Act based on the failure of Charter Street, as a modified source, to comply with Best Available Control Technology (BACT) emission limits.  Am.Compl. ¶¶ 151-155.  The Act and its implementing regulations provide that every major modification is required to apply BACT to each emission unit at which a net emission increase would occur.  Wis. Admin. Code § NR 405.08(3); see also 42 U.S.C. § 7475(a)(4) (prohibiting commencement of a modification unless the source is subject to BACT for each pollutant).  This is in addition to the corollary prohibition on commencing a major modification without complying with all of the requirements of the PSD program—which includes BACT. Wis. Admin. Code § NR 405.07(1) (prohibiting construction unless all of the PSD

33

requirements are met); *see also* 42 U.S.C. § 7475(a)(1).   The requirement that a major

modification complies with BACT "by its terms creates an ongoing obligation to apply

BACT, regardless of what terms a preconstruction permit may or may not contain."

*U.S. v. East Kentucky Power Coop.*, __ F. Supp. 2d __, 2007 WL 954753 (E.D. Ky, March 27,

2007), see also *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410,418 (6th

Cir. 2006) ; *New York v. Niagara Mohawk Power Corp.*, 263 F.Supp. 650, 653 (W.D.N.Y.

2003) ("Under 42 U.S.C. § 7475(a), no major emitting facilities… may be constructed

unless… the proposed facility [is] subject to the best available control technology

('BACT') for each pollutant subject to regulation…." (footnotes omitted)).  The "fail[ure]

to apply BACT is actionable, and this cause of action manifests itself anew each day a

plant operates without BACT limits on emissions."  *Nat'l Parks Conservation Ass'n*, 480

F.3d at 419.  In other words, the requirement to apply BACT is a separate, additional

requirement to the requirement to obtain a PSD permit that should also, ultimately,

incorporate BACT limits.

## A. Background and Application of BACT

BACT is a case-by-case determination for each regulated pollutant emitted from

a major emitting facility.  42 U.S.C. § 7479(3); Wis. Admin. Code § NR 405.02(7).  EPA

and DNR have adopted a systematic "top-down" BACT analysis process for setting

BACT limits.  PFOF ¶ 410-412; United State Environmental Protection Agency, *New

Source Review Workshop Manual* (Draft October 1990) ("*NSR Manual*"), available at

http://www.epa.gov/nsr/publications.html (last visited Sept. 24, 2007); [8]*see also In re RockGen Energy Center*, 8 E.A.D. 536, 541-42 (EAB 1999) (stating DNR uses the top-down method discussed in the *NSR Manual*).  BACT is both an emission limit, and a monitoring requirement to assure that the source is continuously achieving the maximum achievable control from the applicable pollution controls.  42 U.S.C. § 7479(3) (defining BACT as "an emission limit based on the maximum degree of reduction…"); *NSR Manual* at B.2 (same), B.56 (requiring BACT to "be enforceable as a practical matter," including compliance verification procedures and monitoring).

The filterable particulate matter BACT limit should be no higher than 0.012 pounds of particulate mater per million British thermal units (lb/MMBtu) and at least 98% control.  PFOF ¶ 416.  The BACT limit for PM/PM10 also includes monitoring through a continuous emission monitor, annual stack testing, installation of leak detection system, and constant monitoring of the operating parameters of the control device.  PFOF ¶ 417.

The BACT limit for SO2 emissions at Charter Street is a limit no higher than 0.065 lbs/MMBtu and at least 96% reduction of SO2.  PFOF ¶ 418.  BACT for SO2 also includes compliance assurance through the use of a continuous emissions monitor and

---

[8] Although the NSR Manual is labeled as a "draft," it has never been finalized and is used in its current form by permitting agencies, including EPA, in establishing BACT limits. *See e.g., Sierra Club v. U.S. EPA*, ___F.3d ___, 2007 WL 2406857, *1 (7th Cir., Aug. 24, 2007) (citing to draft *NSR Manual*).

constant monitoring and recording of the operating parameters of the scrubber.  PFOF ¶ 419.

The BACT emission limit for NOx emissions at Charter Street is a limit no higher than 0.05 lbs/MMBtu and at least an 88% reduction in NOx.  PFOF ¶ 420.  A BACT limit also includes monitoring of emissions through the use of a continuous emission monitor and constant monitoring of the operating parameters of the NOx control system.  PFOF ¶ 421.

**B.  Charter Street Should Be Ordered to Comply With BACT.**

For the reasons set forth above in Section II, Charter Street underwent major modifications.  It is undisputed that Charter Street does not currently comply with BACT emission limits.  PFOF ¶¶ 416-426.  The only pollution controls currently on Charter Street is a fabric filter baghouse installed in the late 1980s.  PFOF ¶ 425.  The current lack of pollution controls for sulfur dioxide, nitrogen oxide, and carbon monoxide does not constitute BACT for Charter Street.   PFOF ¶¶ 416-426.  BACT for Charter Street assumes a scrubber for sulfur dioxide emission control that removes at least 96 percent of SO2 and a selective catalytic reduction device that removes at least 88 percent of nitrogen oxides.  PFOF ¶¶ 416, 418, 420, 422.  Moreover, BACT for particulate matter is a rate no higher than 0.012 lb/MMBtu.  PFOF ¶ 416.  Even with a 1980s vintage baghouse, Charter Street did not meet this emission rate during a 2005 stack test.  PFOF ¶ 426.  Applying BACT to Charter Street would result in the following emission reductions from current permitted levels:

36

- PM/PM10        1,610 tons per year

- SO2           3,929 tons per year

- NOx           1,013 tons per year

PFOF ¶ 424.  The Court should order that Charter Street install all necessary pollution

controls and meet BACT emission limits for particulate matter, sulfur dioxide, and

nitrogen oxides as a partial remedy to which Sierra Club is entitled as a matter of law.

IV.     **SIERRA CLUB IS ENTITLED TO A DECISION AND ORDER REQUIRING DEFENDANTS TO APPLY FOR AN OPERATING PERMIT REVISION.**

Count 4 of Sierra Club's Amended Complaint alleges a violation of Section 502(a)

of the Act, 42 U.S.C. § 7661(a), and chapter NR 407 in the Wisconsin SIP.  Wis. Admin.

Code ch. NR 407.  In addition to the PSD program, the Act requires all major sources to

apply for and obtain an operating permit.  *Id.*  This program, known as Title V of the

Act, requires a source to apply for a revised operating permit any time it makes a

modification that is not authorized by the existing operating permit.  42 U.S.C. §§

7661b(c) and (d); Wis. Admin. Code §§ NR 407.04(1)(b), 407.13.

Each of the modifications above required an application to revise the operating

permit for Charter Street, in addition to a PSD permit.  *Id.*  Defendants have not applied

for an operating permit revision for any of the five projects at issue in this case.  PFOF

¶¶ 204-205, 255-256, 291-292, 309-310, 392-394.  Therefore, Sierra Club is entitled to a

declaration that Charter Street is in violation of the Act and the Court should order the

Defendants to submit a complete application to revise the operating permit for the plant

for each of the five modifications.

## V.    SIERRA CLUB HAS ARTICLE III STANDING TO BRING THIS CASE TO PROTECT ITS SUBSTANTIVE AND PROCEDURAL RIGHTS AND THE INTERESTS OF ITS MEMBERS.

A plaintiff has standing under the Constitution when: (1) the plaintiff has

suffered an injury in fact that is (a) concrete and particularized and (b) actual or

imminent, (2) there is a causal connection between the injury and the conduct

complained of, and (3) it is likely that the injury will be redressed by a favorable

decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130,

2136 (1992).   Furthermore, "environmental plaintiffs have standing when they are use

the affected area or have aesthetic and recreational interests that are lessened by

violations of the Act. *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S. Ct.

1361 (1972)).

In addition, a plaintiff can have standing when his or her procedural rights are

threatened or frustrated. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8, 112 S.Ct.

2130 (1992); *Sierra Club v. Johnson*, 436 F.3d 1269, 1279 (11th Cir. 2006) (holding that Sierra

Club has standing to challenge procedural omissions when granting a Title V air permit

where the omissions "could have led to improvements in the [facility's] permit, which,

in turn, could have reduced the harm caused by the air pollution emitted from the…

plant").

Sierra Club has standing to bring this action on behalf of its members because it has members who have standing to sue in their individual capacity. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000). Sierra Club's mission is to preserve protect and enhance the natural environment. PFOF ¶ 19 In this case Sierra Club and its members have suffered an injury in fact because Defendants are operating Charter Street without modern pollution controls and releasing large amounts of unlawful air pollution. Sierra Club's members live, work, attend college and recreate around Charter Street. PFOF ¶¶ 20-26. Sierra Club's members have reasonable concerns about the air pollution from Charter Street, the impact such pollution may have on their health, as well as impacts on visibility and other aesthetic concerns. PFOF ¶¶ 21-25. This satisfies Article III standing. *Laidlaw*, 528 U.S. at 184-85; *N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 325-326 (2nd Cir. 2003) (holding that an environmental group's "members' allegations about health effects of air pollution and of uncertainty as to whether EPA's actions expose them to excess air pollution are sufficient to establish injury-in-fact…"); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156-57 (4th Cir. 2000); *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 520 (4th Cir. 2003).

Sierra Club and its members also have standing because Defendants violated their procedural rights. By failing to apply for the necessary permits prior to making the physical changes, Defendants denied Sierra Club and its members the opportunity to participate in the permitting process. For example, the Act provides that before a

PSD permit can be issued the public has a right to receive a copy of a draft PSD permit, submit comments, testify at a public hearing, and otherwise participate in administrative proceedings that precede and precede the issuance of PSD permits. 42 U.S.C. § 7475(a)(2); Wis. Stat. §§ 285.61(3)-(8), 285.62(3)-(5), 285.81; Wis. Admin. Code § NR 405.15(1)-(2)(f); *Sierra Club*, 436 F.3d at 1279 (holding that administrative procedures, had they been properly followed, could have lead to a reduction in harmful air pollution, thus satisfying the redressability requirement); *Nat'l Parks Conservation Assoc. v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005).

This Court can remedy the injury suffered by Sierra Club and its members by issuing an order requiring Defendants to apply for a PSD permit and a revised operating permit, and by ordering Defendants to install modern pollution controls and meet BACT emission limits. For all of these reasons, Sierra Club has standing to bring this lawsuit.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment declaring that Charter Street is in violation of the Act, ordering Defendants to obtain a PSD permit, ordering Defendants to comply with BACT emission limits, and ordering Defendants to apply for a revised operating permit should be granted.

Dated this 25th day of September, 2007.

Respectfully submitted

GARVEY, MCNEIL & MCGILLIVRAY, S.C.

David C. Bender
Wis. Bar No. 1046102
Pamela R. McGillivray
Wis. Bar No. 1034194
Carlos A. Pabellon
Wis. Bar  No. 1046945
Thomas G. Halloran
Wis. Bar No. 1015944
634 West Main Street, Suite 101
Madison, WI 53703
Tel. 608.256.1003
Fax 608.256.0933


SIERRA CLUB
Bruce E. Nilles
Wis. Bar No. 1026351
122. W. Washington Ave, Suite 830
Madison, WI 53703
Tel. 608.257.4994

Attorneys for Sierra Club