

**32**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SEP 25  PM 4: 17

RE... US. ST COURT
7 D. W!

SIERRA CLUB,

      Plaintiff,

v.                             Case No. 07-C-0251-S

MICHAEL MORGAN, in his official capacity
as the Secretary of the Wisconsin Department of
Administration,

JAY EHRFURTH, in his official capacity as the
State Heating Plant Engineer for the Wisconsin
Department of Administration,

JOHN WILEY, in his official capacity as the
Chancellor of the University of Wisconsin-
Madison,

KEVIN REILLY, in his official capacity as the
President of the University of Wisconsin
System,

      Defendants.

---

BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

      The defendants, Michael Morgan, Jay Ehrfurth, John Wiley and Kevin Reilly, by

their counsel, Attorney General J.B. Van Hollen and Assistant Attorneys General Thomas J.

Dawson and Thomas L. Dosch, respectfully submit their brief in support of their motion for

summary judgment and dismissal of all claims.

## STATEMENT OF THE CASE

This action is a citizen enforcement action brought pursuant to Clean Air Act (CAA) Section 304, 42 U.S.C. § 7604.[1]  AC (Amended Complaint) ¶¶ 14, 150, 155, 161, 167.  Specifically, the citizen suit is brought against defendants under 42 U.S.C. § 7604(a)(3) related to the alleged modification and subsequent operation of the coal-fired boilers in the Charter Street Power Plant without appropriate CAA "Prevention of Significant Deterioration" or "PSD" pre-construction permits.  AC ¶¶ 150, 155, 161, 167.  Plaintiff alleges defendants, by making the modifications without required permits, violated CAA sections 165 and 502, 42 U.S.C. § 7475(a) (AC ¶¶ 28, 141, 152, 154), 7661b(c) and (d) (AC ¶¶ 165, 166), and their counterpart federally adopted Wisconsin State Implementation Plan (SIP) provisions in Wis. Stat. §§ 285.60 and 285.62, and Wis. Admin. Code §§ NR 406.03 and 407.04  (AC ¶¶ 157, 165, 166).[2]

By this motion, defendants seek summary judgment dismissing the case and judgment in favor of defendants on three independent grounds founded in the Clean Air Act, specifically:  1) defendants are not proper parties to this action because they did not perform and did not have a hand in the alleged illegal activities; 2) the projects done on the Charter Street Plant were not "modifications" that required a permit because they

---

[1] Hereinafter, generally the United States Code citations will be used unless in quotations.

[2] "Once approved by the EPA, a SIP has the force and effect of federal law, thereby permitting the Administrator to enforce it in federal court."  *Clean Air Council v. Mallory*, 226 F. Supp. 2d 705, 718 (E.D.Pa. 2002) (citations omitted).  Defendants agree that the same principle would apply to citizen enforcement suits brought under the Clean Air Act.

constituted "routine maintenance, repair and replacement"; and 3) the projects did not constitute modifications because they were neither a "physical change" of the Charter Street Heating Plant, nor did they cause a "significant net emissions increase" from the Charter Street Plant.[3]

Defendants demonstrate in this brief that the material facts relating to these grounds are undisputed and that the defendants are entitled to dismissal and judgment as a matter of law.

## SUMMARY JUDGMENT STANDARDS

Under Fed. R. Civ. P. 56(c), summary judgment "shall be rendered forthwith if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Rule 56(e).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

---

[3] The defenses raised by this summary motion are those the defendants believe to be based on facts which will not be disputed.  Of course the defendants reserve any and all other defenses for trial including, defenses with respect to which the material facts may be disputed, including without limitation the "permit shield" and project exemptions under Wisconsin Administrative Code § NR 406.04.

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there

be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242,

247-48 (1986). While a material fact is one that is "outcome determinative under the

governing law", *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990), a

genuine issue as to that material fact is raised only "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The

opposing party "may not rest upon the mere allegations or denials" in the pleadings but

"must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e).

The movant always bears the initial responsibility of informing the district court of the

basis for its motion and identifying those parts of the record and the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of fact. But the movant does

not have the burden to show absence of a genuine issue as to elements on which the

nonmovant has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 324-25. The

mere existence of some alleged factual dispute does not defeat a "properly supported

motion for summary judgment; the requirement is that there be no *genuine* issue of

*material fact*." *Anderson*, 477 U.S. at 248 (emphasis in original). A dispute concerning

facts not material to a determinative issue does not preclude summary judgment. *Donald*

*v. Polk County*, 836 F.2d 376, 379 (7th Cir. 1988). As to materiality, the substantive law

will identify which facts are material. Only disputes over facts that might affect the

outcome of a suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson,* 477 U.S. at 248.

## JURISDICTION OF THE COURT AND VENUE

This court has subject matter jurisdiction over the claims set forth in the amended complaint in this action pursuant to 42 U.S.C. § 7604(a), 28 U.S.C. § 1331, and 28 U.S.C. § 2201.

This court is the proper venue for the case under 28 U.S.C. § 1391(b).

## FACTS

The undisputed material facts relating to each of the arguments presented are set forth in defendants' findings of facts (DFOF), supported by cited portions of affidavits and other evidence to support them. The specific material facts supporting each argument in favor of summary judgment are provided in the context of each argument below.

## BACKGROUND

The 7th Circuit Court of Appeals explains the PSD program requirements of the Clean Air Act, which forms the legal backdrop for this case, as follows:

> Congress enacted the Clean Air Act Amendments, Pub.L. No. 91-604, 84 Stat. 1676, to establish minimum air quality standards that would regulate the emission of certain pollutants into the atmosphere. To this end, Congress instructed the EPA to develop National Ambient Air Quality Standards ("NAAQS") that would specify the maximum permissible concentration of air pollutants in different areas across the country.

In section 111 of the 1970 Amendments, Congress required the EPA to promulgate New Source Performance Standards ("NSPS") in order to regulate the emission of air pollutants from new sources. These standards addressed hourly rates of emission and, in addition to new sources, applied to modifications of existing facilities that created new or increased pollution. Indeed, section 111(a)(2) of the Act stated that NSPS would apply to

> any stationary source, the construction *or modification* of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

42 U.S.C. § 7411(a)(2) (emphasis supplied). Congress then defined "modification" as

> *any physical change* in, or change in the method of operation of, a stationary source *which increases the amount of any air pollutant emitted* by such source or which results in the emission of any air pollutant not previously emitted.

42 U.S.C. § 7411(a)(4) (emphasis supplied).

Subsequently, faced with only varying degrees of success in controlling pollution in different parts of the country, Congress enacted the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (codified at 42 U.S.C. §§ 7401-7642 (1982)). . . Congress added a program for the Prevention of Significant Deterioration ("PSD"), concerned with increases in total annual emissions, to ensure that operators of regulated sources in relatively unpolluted areas would not allow a decline of air quality to the minimum level permitted by NAAQS. Air quality is preserved in this program by requiring sources to limit their emissions to a "baseline rate"; regulated owners or operators in areas that have attained NAAQS must obtain a permit before constructing or modifying facilities. 42 U.S.C. § 7475(a)(1). Congress also essentially adopted its NSPS definition of "modification" for the PSD program. 42 U.S.C. § 7479(2)(C).

From this statutory framework, the EPA promulgated regulations for both the NSPS and PSD programs. In this case, its regulations concerning modifications are central. The EPA defines "modification" in substantially the same terms used by Congress:

- 6 -

[A]ny physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies shall be considered a modification within the meaning of section 111 [42 U.S.C. § 7411] of the Act.

40 C.F.R. § 60.14(a) (1988). To determine whether a physical change constitutes a modification for purposes of NSPS, the EPA must determine whether the change increases the facility's hourly rate of emission. 40 C.F.R. § 60.14 (1988). For PSD purposes, current EPA regulations provide that an increase in the total amount of emissions activates the modification provisions of the regulations. 40 C.F.R. § 52.21(b)(3) (1988).

*Wis. Elec. Power Co. v. Reilly (WEPCO)*, 893 F.2d 901, 904-905 (7th Cir. 1990).

*See also, U.S. v. Ohio Edison*, 276 F. Supp. 2d 829, 849-851 (S.D. Ohio 2003), in

which that court observed:

Congress chose to "grandfather" existing pollution sources from the NSPS and NSR provisions at the time the statute was enacted. . . . Congress did not, however, intend that such existing sources be forever spared the burden and expense of installing pollution control devices. As Congress required, compliance with the CAA is triggered when an existing source makes a "modification" which results in an increase in emissions, unless a regulatory exemption applies to the activity.

*Id., at* 850.

## ARGUMENTS

I.    DEFENDANTS ARE NOT PROPER PARTIES TO THIS CITIZEN SUIT ACTION UNDER THE CLEAN AIR ACT AND THE CASE MUST BE DISMISSED.

A.    Governing Standards.

This action is brought by plaintiff pursuant to the citizen enforcement suit provision of the federal Clean Air Act (CAA) Section 304, 42 U.S.C. § 7604.  AC (Amended Complaint) ¶¶ 14, 150, 155, 161, 167. Specifically, plaintiff alleges the citizen

suit is brought against defendants under 42 U.S.C. § 7604(a)(3) related to the alleged

construction, modification, and subsequent operation of the boilers in the Charter Street

Power Plant without appropriate CAA permits.  AC ¶¶ 150, 155, 161, 167.

     42 U.S.C. § 7604(a)(3) states:

". . . any person may commence a civil action on his own behalf—

. . .

     (3) against any person who proposes to construct or constructs any
new or modified major emitting facility without a permit required under
part C of subchapter I of this chapter (relating  to significant  deterioration
of  air  quality) . . . or who is alleged . . . to be in violation of any condition
of such permit.

Plaintiff allege defendants, by making the modifications without required permits,

violated CAA sections 165 and 502, 42 U.S.C. § 7475(a) (AC ¶¶ 28, 141, 152, 154),

7661b(c) and (d) (AC ¶¶ 165, 166), and their counterpart federally adopted Wisconsin

State Implementation Plan (SIP) provisions in Wis. Stat. §§ 285.60 and 285.62, and Wis.

Admin. Code §§ 406.03 and 407.04   (AC ¶¶ 157, 165, 166).[4]   The cited Wisconsin

statutory provisions apply to any "person" who conducts the same activities.[5]

_____

[4] "Once approved by the EPA, a SIP has the force and effect of federal law, thereby
permitting the Administrator to enforce it in federal court." *Clean Air Council v. Mallory*,
226 F. Supp. 2d 705, 718 (E.D.Pa. 2002) (citations omitted).  Defendants agree that the
same principle would apply to citizen enforcement suits brought under the Clean Air Act.

[5]  Under  CAA  section  302(e),  42  U.S.C. § 7602(e), "The term 'person' includes an
individual, corporation, partnership, association, State, municipality, political subdivision
of a  State, and any agency, department, or instrumentality of the United States and any
officer, agent, or employee thereof."  Under Wis. Stat. § 285.01(33), "'Person' means an
individual,  owner,  operator,  corporation,  limited  liability  company,  partnership,
association, municipality, interstate agency, state agency or federal agency."  Under Wis.
Admin. Code § NR 400.02(123), "'Person' means any individual, corporation, company,
cooperative,  operator,  tenant,  lessee,  syndicate,  partnership,  co-partnership,  firm,

The issue presented here is whether any one of the defendants are "any person who proposes to construct or constructs any new or modified major emitting facility without a permit" under U.S.C. § 7604(a)(3) or Wis. Stat. §§ 285.60, 285.61, and 285.62.[6] Defendants assert they are not. Related to whether defendants are persons who made the modifications and operated the plant without required permits is whether they are "owners or operators" of the plant. 42 U.S.C. § 7475(a) designates the person responsible for carrying out its provisions as an "owner or operator." *See* § 7475(a)(3), (7) ["persons who own or operate"], (d)(C)(iii), (D)(i). The entire Act is replete with the term and imposes obligations with respect to them.

"Owner or operator" is not defined in this section, but is defined in another section of the Clean Air Act and in other regulatory provisions. 42 U.S.C. § 7411(a)(5) states, "For the purposes of this section: . . . The term 'owner or operator' means any person who owns, leases, operates, controls, or supervises a stationary source" for the purposes of standards of performance for new stationary sources. In 40 C.F.R. § 51.100(f), "Owner or operator means any person who owns, leases, operates, controls, or supervises a facility, building, structure, or installation which directly or indirectly result or may

---

association, trust, estate, public or private institution, joint stock company, political subdivision of the state of Wisconsin, state agency, interstate agency, federal agency, or any legal successor, representative, agent or agency of the foregoing."

[6] *E.g.*, *see People of State of Illinois v. Commonwealth Edison Co.*, 490 F.Supp. 1145, 1148 (D.C.Ill. 1980) and *People v. Celotex*, 516 F.Supp. 716, 719 (D.C.Ill. 1981), holding that "responsible corporate officers" are not "persons" who can be the subject of citizen suits under 42 U.S.C. § 7604.

result in emissions of any air pollutant for which a national standard is in effect."  A definition identical to the statutory definition is found in 40 C.F.R. § 61.02 for purposes of the hazardous air emissions program.  "Owner and operator" is used in Wis. Stat. ch. 285, but is not defined there.  Under Wis. Admin. Code § 400.02(113), "'Operator' means any person who leases, controls, operates or supervises a facility, an air contaminant source, or air pollution control equipment."

In the context of several hazardous air emissions enforcement cases, the courts discuss the attributes of "operators" who are potentially liable under the Clean Air Act.  In *U.S. v. Walsh,* 783 F.Supp. 546, 548-549 (W.D.Wash. 1991), the court stated that "because the statute and the regulations in question impose strict liability,[7] the Court would be reluctant to impose liability unless it was clear that Mr. Walsh was *substantially in control or substantially supervised* the various projects in question. . . I believe that what was intended here was a person having *significant or substantial or real control and supervision* over a project before he or she could be found liable under these regulations if they were not an owner."  (Emphasis added.)  On review, the court of appeals affirmed, noting that in an earlier ruling, "the district court concluded that Walsh 'had the *ability to correct* the work, he was the person having the necessary control to be an operator under

---

[7] "The CAA imposes strict liability upon owners and operators who violate the Act." *U.S. v. Anthony Dell'Aquila, Enterprises and Subsidiaries,* 150 F.3d 329, 332 (3d Cir. 1998), citing *United States v. B & W Inv. Properties,* 38 F.3d 362, 367 (7th Cir. 1994).

the statute.'" *U.S. v. Walsh*, 8 F.3d 659, 662 (9th Cir. 1993) (emphasis added). In

addition, the court noted:

> Walsh was vice president of Savage Enterprises and *responsible for the overall supervision of the project*. He signed the Notice of Intent to Remove Asbestos. The foreman of the project, Van Pham, took *directions* from Walsh. If there were problems of calls by workers or inspectors, Walsh admits that he would have dealt with them. Walsh also testified in a hearing before the Department of Labor and Industries of the State of Washington that he was *responsible for the project*. An inspector for the Port of Seattle dealt with Walsh and believed that he was the project superintendent. The court concluded that Walsh held himself out as being in charge and *was in fact in charge*.

*Id*. at 662-663 (emphasis added).   The district court's rationale was followed in *U.S. v.*

*Anthony Dell'Aquilla, Enterprises and Subsidiaries*, 150 F.3d 329, 332-333 (3d Cir.

1998), invoking the *Walsh* district court's rationale and analogous federal Superfund law:

> In *United States v. Bestfoods,* 524 U.S.51, 118 S.Ct. 1876, 1886-87, 141 L.Ed.2d 43, (1998), the Supreme Court stated that:
>
> . . . under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition[of operator] for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
>
> Although the Court was there addressing the definition of "operator" in CERCLA, and not the CAA, the purposes of the two statutes is the same, and the language in question is nearly identical. Accordingly, the Court's gloss on the CERCLA definition is relevant to our inquiry.

150 F.3d at 334.

Lastly, in *U.S. v. Pearson*, 274 F.3d 1225, 1231 (9th Cir. 2001), the court states,

"In determining the scope of authority necessary to meet the definition of 'supervisor'

under the CAA, we have held that 'substantial control' is the governing criterion. . . .
Under the CAA, a defendant need not possess ultimate, maximal, or preeminent control
over the actual asbestos abatement work practices. Significant and substantial control
means having the ability to direct the manner in which work is performed and the
authority to correct problems." (Citations omitted).

       B.     Defendants' Authority And Actions Related To The Charter
            Street Plant.

The following is a summary of the authority and actions of defendants vis-à-vis the
Charter Street Heating Plant.

       1.     UW Chancellor John D. Wiley.

Defendant Chancellor John D. Wiley's authority and actions related to the Charter
Street Plant, as little and indirect as they are, are put forth in DFOF ¶¶21-30.

In sum, Chancellor Wiley does not, and persons to whom he delegates authority do
not: a) have the authority to hire or fire outside contractors who perform work at the
plant; b) have the authority to oversee the project management, to direct the manner in
which the work is performed, or to correct any problems that may arise, with respect to
any significant construction, renovation or maintenance projects at the plant; c) have the
ability to appropriate or allocate funding for any significant construction, renovation or
maintenance projects at the plant; d) determine the manner of operation of the Plant,
including the schedule of maintenance and repairs; or e) have the authority or

responsibility to obtain environmental permits with respect to the plant, or make decisions regarding compliance with environmental regulations at the plant. DFOF ¶30.

### 2.    UW President Kevin P. Reilly.

President Reilly's authority, duties, and actions are similar to Chancellor Wiley's as they relate to the Charter Street Plant. *See* DFOF ¶¶31-42. In sum, President Reilly shows he does not: a) operate, control or supervise the Charter Street Heating Plant or any project involving the Charter Street Heating Plant; b) exercise any significant, substantial, or real control over the source of the alleged pollution; c) have responsibility for hiring and firing outside contractors, or others, who have signed contracts related to the six projects identified in the above-captioned matter; d) have responsibility as the project manager, nor does he regularly visit the property or witness the work being performed; e) manage, direct or conduct operations specifically related to potential pollution or make decisions regarding compliance with environmental regulations; f) have the authority or responsibility to obtain environmental permits; g) have any ownership or leasehold interest in the Charter Street Heating Plant; h) have the ability to appropriate or allocate funding for any significant construction, renovation or maintenance projects at the Charter Street Heating Plant. DFOF 42.

### 3.    DOA Secretary Michael L. Morgan.

Defendant Michael L. Morgan is the Secretary of the Department of Administration (DOA), whose responsibilities include implementation of duties assigned to the Department under Chapter 16 of the Wisconsin Statutes. DFOF ¶¶1-2. DOA

Secretary Morgan does not own or lease the Charter Street Heating Plant ("the Plant"). DFOF ¶7. DOA Secretary Morgan is not an operator of the Charter Street Heating Plant in that he does not immediately supervise or direct individuals who perform work at the Plant; he does not regularly visit the Plant, witness or direct work being done at the Plant, or perform work at the Plant. DFOF ¶8.

Without prior approval from the Building Commission, Legislature, and/or University of Wisconsin for a project's funding, the DOA Secretary cannot hire or fire contractors to do work at the Plant, sign contracts for work at the Plant, or exert significant or substantial control or responsibility over the Plant. DFOF ¶9. Secretary Morgan was not Secretary of the Department of Administration at any of the times pertinent to any of the allegations regarding the Plant set forth in the Amended Complaint in this case. DFOF ¶3.

Secretary Morgan is a non-voting advisory member of the State Building Commission, and through his delegated representative, the Administrator of the Division of State Facilities, does not have authority to initiate or approve funding for a project that requires Building Commission approval. Because the Building Commission grants initial approval of all capital projects, the DOA Secretary alone does not have authority to initiate or approve funding for capital projects. DFOF ¶4. DOA Secretary Morgan is not authorized to initiate a building project of the types described in the Amended Complaint in this case. DFOF ¶5. DOA Secretary Morgan is not authorized to initiate a building

project of the type that would be necessary to effectuate the remedies requested in the Amended Complaint. DFOF ¶6.

4.    Power Plant Team Leader Jay A. Ehrfurth.

Defendant Jay A. Ehrfurth is employed by the State of Wisconsin, Department of Administration ("DOA") within the Division of State Facilities ("DSF") as an Enterprise Architect/Engineer Supervisor – Power Plant Team Leader. His title is State Chief Power Plant Engineer. DFOF ¶10. He assumed these duties on November 5, 2001, and has served in that capacity from that date to the present. DFOF ¶11. Ehrfurth was not the Power Plant Team Leader/Chief Power Plant Engineer when four of the six projects at the Charter Street Heating Plant set forth in the Amended Complaint were approved. Before he joined DOA in November 2001, he worked in the private sector. DFOF ¶12.

Since November 2001, as Power Plant Team Leader/Chief Power Plant Engineer, Ehrfurth's responsibilities include supervising a staff of three Project Managers ("PM") and an Environmental Engineer. The Power Plant Engineering Team provides engineering and technical support to the central state-owned power plants. DFOF ¶13.

The responsibilities of an Environmental Engineer include making recommendations as to compliance of central state-owned power plants with environmental regulations. DFOF ¶14. The responsibilities of a PM include general management of a construction project's scope, budget, and schedule. DFOF ¶15. Many projects also have a construction representative provided by the Department of Administration's Division of State Facilities, who is more directly in charge of ensuring

that a project stays within its approved scope, budget, and schedule during the construction phase, and over whom Ehrfurth does not have authority. DFOF ¶16. As Power Plant Team Leader/Chief Power Plant Engineer, Ehrfurth would not be authorized to initiate a building project of the types described in the Amended Complaint in this case. DFOF ¶17. It is Ehrfurth's understanding that, as Power Plant Team Leader/Chief Power Plant Engineer, he would not be authorized to initiate a building project of the type that would be necessary to effectuate the remedies contemplated in the Amended Complaint in order to correct the alleged violations. DFOF ¶18. Ehrfurth does not own or lease the Charter Street Heating Plant. It is his understanding that it is owned by the Board of Regents of the University of Wisconsin. DFOF ¶19.

As Power Plant Team Leader/Chief Power Plant Engineer, Ehrfurth does not operate the Charter Street Heating Plant. He does not immediately supervise or direct individuals who perform daily work or construction activities at the Plant. He does not regularly witness daily work or construction activities being performed at the Plant. He does not direct or perform daily work or construction activities done at the Plant. Without prior approval from the Building Commission, Legislature, and/or University of Wisconsin for a project's funding, Ehrfurth cannot hire or fire contractors to do work at the Plant, sign contracts for work at the Plant, or exert significant or substantial control or responsibility over the Plant. DFOF ¶20.

5.   The owner of the plant is the UW System Board of
     Regents.

The University of Wisconsin System Board of Regents owns the Charter Street

Heating Plant and its underlying land.  DFOF ¶¶46-47, 190.

C.   Defendants Neither Constructed Nor Proposed To Construct
     The Charter Street Plant Projects, Nor Are They Owners Or
     Operators Of The Charter Street Plant.

Applying the statutory, regulatory and case law standards, it is clear defendants

Morgan, Reilly, Wiley and Ehrfurth were not and are not persons who proposed, or who

had the exclusive, primary, determinative, or significant authority to propose, to construct

or who constructed any facility, let alone a new or modified major emitting facility, at the

Charter Street Plant within the meaning of § 42 U.S.C. § 7604(a)(3).  Nor are they

"owners or operators" of the Charter Street Plant who own, lease, operate, control, or

supervise any component of the Charter Street Plant, or who exercised any significant,

substantial or real control and supervision over any of the projects that are the subject of

plaintiff's Amended Complaint.

The owner of the Charter Street Heating Plant is the UW System Board of

Regents, not any of the defendants.  The Board of Regents are the closest analogue to the

corporate owner of a power plant, who are commonly the defendants in the reported

cases.  The plaintiff cannot sue the owner, the Board, because of sovereign immunity and

the Eleventh Amendment.  *See Joseph v. Board of Regents of University of Wisconsin

System*, 432 F.3d 746, 748 (7th Cir. 2005); *Romco, Ltd. v. Outdoor Aluminum, Inc.*, 725

F. Supp. 1033 (W.D. Wis. 1989). *Accord, Walker v. University of Wisconsin Hospitals*, 198 Wis. 2d 237, 243, 542 N.W.2d 207, 210 (Ct. App. 1995) ("There is no question that the board of regents is an arm or agency of the state for sovereign immunity purposes").

As shown above, none of the defendants is a "person who proposes to construct or constructs any new or modified major emitting facility without a permit" under 42 U.S.C. § 7604(a)(3), or Wis. Stat. §§ 285.60, 285.61, and 285.62. None of them have the authority to propose or construct a new or modified facility, as that authority is dispersed, and with the buck stopping collectively at the Legislature, Governor, Department of Administration and State Building Commission – with no one entity with the ability to pull off the projects alone. The proposal or construction of government projects is not analogous to the process in the private corporate sector.

The defendants are neither "owners" nor "operators" of the plant under 42 U.S.C. § 7475(a), either as the law defines them, or on whose shoulders the law imposes its requirements and prohibits its violation. No defendant is a "person who owns, leases, operates, controls, or supervises a stationary source" for the purposes of standards of performance for new stationary sources under 42 U.S.C. § 7411(a)(5). No defendant is a "person who owns, leases, operates, controls, or supervises a facility, building, structure, or installation which directly or indirectly result or may result in emissions of any air pollutant for which a national standard is in effect" under 40 C.F.R. § 51.100(f).

No defendant is an "operator" under Wis. Admin. Code § 400.02(113), meaning "any person who leases, controls, operates or supervises a facility, an air contaminant

- 18 -

source, or air pollution control equipment." No defendant "was *substantially in control or substantially supervised* the various projects in question. . . having *significant or substantial or real control and supervision* over a project before he or she could be found liable under these regulations if they were not an owner." *U.S. v. Walsh,* 783 F.Supp. at 548-549 (emphasis added). Because no defendant was "in charge" or had the "'the *ability to correct* the work, he was (not) the person having the necessary control to be an operator under the statute.'" *U.S. v. Walsh,* 8 F.3d at 662 (emphasis added). No defendant was "someone who directs the workings of, manages, or conducts the affairs of a facility." *U.S. v. Anthony Dell'Aquilla, Enterprises and Subsidiaries,* 150 F.3d at 332-334, citing *United States v. Bestfoods,* 524 U.S.51 (1998). No defendant had "substantial control", that is, "the ability to direct the manner in which work is performed and the authority to correct problems." *U.S. v. Pearson,* 274 F.3d at 1231. Without a "clear" showing of substantial control over the Charter Street Plant and its operation, this court should be equally reluctant to impose liability on defendants as the court was in *U.S. v. Walsh,* 783 F.Supp. at 548 -549.

Thus, even if it had a case, plaintiff has picked the wrong defendants to sue. Judgment should be entered in favor of defendants, and the case dismissed.

II.    THE PROJECTS ARE NOT MODIFICATIONS REQUIRING PSD APPROVAL BECAUSE THEY WERE ROUTINE MAINTENANCE, REPAIR OR REPLACEMENT ("RMRR").

A.    Introduction.

This portion of defendants' argument deals with the routine maintenance exclusion from the definition of a "modification" that would otherwise require PSD review and approval. If, upon review of the undisputed material facts, the court reaches the legal conclusion that the projects at issue in this case are "routine maintenance, repair or replacement" (RMRR) under the law, then there is no violation of the Clean Air Act, and judgment should be entered for defendants. Defendants contend the projects are RMRR and, therefore, judgment should be entered for them.

B.    Governing Law.

1.    The Clean Air Act Context of the RMRR Rule.

"In 1970, Congress enacted the Clean Air Act Amendments, Pub.L. No. 91-604, 84 Stat. 1676, to establish minimum air quality standards that would regulate the emission of certain pollutants into the atmosphere." *WEPCO*, 893 F.2d at 904. "In section 111 of the 1970 Amendments, Congress required the EPA to promulgate New Source Performance Standards ('NSPS') in order to regulate the emission of air pollutants from new sources." *Id.*

"These standards . . . applied to modifications of existing facilities that created new or increased pollution." *Id.* "Congress then defined 'modification' as any physical change in, or change in the method of operation of, a stationary source which increases the

- 20 -

amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted. 42 U.S.C. § 7411(a)(4)." *Id.* (block quote and emphasis omitted).

". . . Congress enacted the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (codified at 42 U.S.C. §§ 7401-7642 (1982)). Congress revised the NSPS so that regulated sources of pollution would have to use 'the best system of continuous emission reduction which (taking into consideration the costs of achieving such emission reduction, and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated. . . .' 42 U.S.C. § 7411(a)(1)(C)." *Id.*

> In addition, Congress added a program for the Prevention of Significant Deterioration ("PSD"), concerned with increases in total annual emissions, to ensure that operators of regulated sources in relatively unpolluted areas would not allow a decline of air quality to the minimum level permitted by NAAQS. Air quality is preserved in this program by requiring sources to limit their emissions to a "baseline rate"; regulated owners or operators in areas that have attained NAAQS must obtain a permit before constructing or modifying facilities. 42 U.S.C. § 7475(a)(1). Congress also essentially adopted its NSPS definition of "modification" for the PSD program. 42 U.S.C. § 7479(2)(C).

*Id.*, 893 F.2d at 904-905.

"From this statutory framework, the EPA promulgated regulations for both the NSPS and PSD programs. In this case, its regulations concerning modifications are central. The EPA defines 'modification' in substantially the same terms used by Congress:

> [A]ny physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which

a standard applies shall be considered a modification within the meaning of section 111 [42 U.S.C. § 7411] of the Act.

40 C.F.R. § 60.14(a) (1988)." *WEPCO*, 893 F.2d at 905. *See also*, *U.S. v. Ohio Edison*, 276 F. Supp. 2d 829, 849-850 (S.D. Ohio 2003).  "[T]o trigger the PSD's permitting requirement and the requirement to install pollution controls, two criteria must be satisfied:  (1) there must be a 'physical change' and (2) there must be a 'significant net emissions increase.'" *United States v. Duke Energy Corporation*, 278 F. Supp. 2d 619, 629 (M.D.N.C. 2003).

　　　　2.　　The Routine Maintenance Repair and Replacement (RMRR) Rule.

"Even at first blush, the potential reach of these modification provisions is apparent: the most trivial activities–the replacement of leaky pipes, for example–may trigger the modification provisions if the change results in an increase in the emissions of a facility. As a result, the EPA promulgated specific exceptions to the modification provisions:

　　　　The following shall not, by themselves, be considered modifications under this part:
　　　　(1) Maintenance, repair, and replacement which the Administrator determines to be routine for a source category . . .
　　　　(2) An increase in production rate of an existing facility, if that increase can be accomplished without a capital expenditure on that facility.
　　　　(3) An increase in the hours of operation . . . .

40 C.F.R. § 60.14(e) (1988) (NSPS program); *see* 40 C.F.R. § 52.21(b)(2)(iii) (1988)

(PSD program)." *WEPCO*, 893 F.2d at 905.[8]  "Excluded from the definition of

modification are projects involving only 'routine maintenance, repair or replacement.' 40

C.F.R. § 52.21(b)(2)(iii)(a)." *Ohio Edison*, 276 F. Supp. 2d at 834, 854.

> Since the inception of NSR, RMRR has been excluded from the definition
> of "modification.". . . Heretofore, EPA applied the RMRR exclusion
> through "a case-by-case determination by weighing the nature, extent,
> purpose, frequency, and cost of the work as well as other factors to arrive at
> a common sense finding." . . . Consistent with *Alabama Power Co. v.
> Costle*, 636 F.2d 323 (D.C.Cir.1979), which recognized EPA's discretion to
> exempt from NSR "some emission increases on grounds of *de minimis* or
> administrative necessity," *id.* at 400, EPA has for over two decades defined
> the RMRR exclusion as limited to "de minimis circumstances."

*New York v. E.P.A.*, 443 F.3d 880, 883-884 (D.C. Cir. 2006).

If, by EPA definition, a project constitutes "routine, repair or replacement," then it

cannot constitute a "physical change" or "modification" that increases emissions for PSD

purposes.  In the event a project is routine, the court need not determine whether the

project caused an actual increase in emissions under either the statute or rule.  The inquiry

is ended.  "The NSR programs are triggered by (1) modifications (any physical change)

that (2) increase pollutant emissions. Routine maintenance projects (even if they increase

emissions) are exempt from the CAA's definition of modification . . . ." *U.S. v. Southern*

--------

[8] Please note that the "Equipment Replacement Provision ('ERP')" portion of the rule, 40
CFR § 52.21(cc), which states categorically that the replacement of components with
identical or functionally equivalent components that do not exceed 20% of the
replacement value of the process unit and does not change its basic design parameters is
not a change and is within the RMRR exception, was declared invalid by the court in *New
York v. E.P.A.*, 443 F.3d 880, 884, 890 (D.C. Cir. 2006).

*Indiana Gas and Elec. Co.*, 245 F. Supp. 2d 994, 1008 (S.D.Ind. 2003); *WEPCO*, 893 F.2d at 910.

EPA's administration of the RMRR exclusion, however, has been, to put in mildly, uneven. One court recently referred to it as an "[a]bysmal breakdown in the administrative process." *Ohio Edison*, 276 F. Supp. 2d at 832 (regarding the government's failure to address "at what point plants built before 1970 must comply with new standards"). Discovery conducted in this action has revealed that when the head of the Wisconsin Department of Natural Resources' (DNR's) PSD permitting program conducted a poll of DNR air permitting staff in 1999 (*i.e.*, 22 years after Congress first required PSD), he was informed that DNR had consistently taken the position that the replacement of steam tubes in coal fired boilers was PSD-exempt routine maintenance, repair or replacement. [DFOF ¶¶167-171][9] Nevertheless, and without either publicly explaining its shift in policy on the issue or promulgating any rules on the subject, DNR issued a Notice of Violation (NOV) to Charter Street several weeks after the Sierra Club filed this lawsuit. In this lawsuit the plaintiff Sierra Club would deny the defendants the benefit of the Wisconsin RMRR exclusion in Wis. Admin. Code § NR §§ 405.02(21)(b), 406.04(2) & (4)(g), and 406.07(2), despite the fact that for many years the State itself interpreted the exclusion otherwise.

---

[9] Furthermore, DNR witnesses testified that, to the best of their recollection, DNR had never brought a PSD enforcement action against a coal-fired boiler operator for replacing steam tubes without a PSD permit, even though they understood that every such facility has made such replacements. DFOF ¶171.

3.    The Burden Is On Plaintiffs To Show The Charter Street Projects Were Not RMRR.

Contrary to two courts finding that the RMRR exception to the definition of "modification" is an "exemption" and affirmative defense that imposes on defendants the burden of showing they fall within it's protection,[10] the 7th Circuit got it right by recognizing the RMRR's plain meaning as an exception to the definition of "modification," which is plaintiffs burden to prove.

> EPA regulations define "modification" as "any physical or operational change to an existing facility which results in an increase in the emission rate to the atmosphere of any pollutant to which a standard applies." 40 C.F.R. § 60.14(a) (1988). . . . [T]he EPA has, in addition, used its regulations to exempt a number of activities from the broader definition. The exemption that may be relevant here is accomplished by the following language:

> The following shall not, by themselves, be considered modifications under this part:

> (1) Maintenance, repair, and replacement which the Administrator determines to be routine for a source category. . . .

40 C.F.R. § 60.14(e) (1988). *See* 40 C.F.R. § 52.21(b)(2)(iii).

*WEPCO*, 893 F.2d at 910. *See also*, *New York v. E.P.A.*, 443 F.3d at 883-884; Wis. Admin. Code § NR 405.02(21) (RMRR exception to "physical change" component of "major modification").

---

[10] *See U.S. v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 856 (S.D. Ohio 2003); *U.S. v. East Kentucky Power Cooperative*, ___ F. Supp. 2d ___, 2007 WL 959162 (E.D.Ky. 2007) at 17-18. Even the court in *Ohio Edison* recognizes, "The regulations provide certain exceptions to the definition of 'physical change.'" 276 F. Supp. 2d at 850.

Because plaintiff has the burden of proving defendants have undertaken an illegal modification, and RMRR is an exclusion from the definition of modification, the burden is on plaintiff to prove the work at issue does not fall within the RMRR exception to that definition. *U.S. v. Duke Energy Corporation*, 278 F. Supp. 2d 619, 639-640 (M.D.N.C. 2003), citing *EEOC v. Chicago Club*, 86 F.3d 1423, 1429-31 (7th Cir. 1996) (stating that there is an "important distinction between an exception to the prohibition of a statute and an exclusion from the definition of entities covered by [the] statute").

Even if the burden were to fall on defendants, they show here that the work done on the Charter Street Plant fits within the RMRR exception.

> 4.    The Four-Plus Factors Test For Determining What Work Is Routine.

"First, routine maintenance, repair, and replacement is not defined by the EPA in the regulations." *SIGECO*", 245 F. Supp. 2d at 1013-1014; *Ohio Edison*, 276 F. Supp. 2d at 853.   Confronted with the lack of definition or specificity for what work is routine under the rule, the 7th Circuit Court of Appeals looked to an ad hoc EPA "Clay

Memorandum"[11] in which EPA "dismissed WEPCO's contention that the program was routine and was therefore exempt from the requirements of NSPS and PSD." *WEPCO*, 893 F.2d at 906. According "substantial deference to an agency's interpretation of its own regulations, especially with respect to technical and complex matters," *id.* at 910 (citations omitted), the court said:

> In this connection, to determine whether proposed work at a facility is routine, "EPA makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." Clay Memorandum at 3. The EPA considered all these factors in determining that the Port Washington project was not routine . . . .

*Id.*, at 910-911. From this dubious genesis, and taking on a life of its own, was born what became known as the so-called "four-factor *WEPCO* test", *Ohio Edison*, 276 F. Supp. 2d at 853, n. 10, 855 ("taking into account the nature and extent of the activity, as well as its purpose, frequency and cost"), 862. More accurately, it should be termed "the multi-factor analysis for the RMRR exclusion." *U.S. v. Cinergy Corp.*, 495 F.Supp.2d 909, 932 (S.D.Ind.2007).

Despite EPA's failure to adopt them as administrative rules, some courts have accepted these factors to apply in individual cases out of deference to the EPA's use of them, at least as not being inconsistent with the Clean Air Act. *Id. See also U.S. v. East*

_____

[11] The court cites to a September 9, 1988, Memorandum from Don R. Clay, Acting Assistant Administrator for Air and Radiation of the EPA, to David A. Kee, Director of Air and Radiation Division, Region V, in which he preliminarily concluded that the project in that case would subject the plant to both NSPS and PSD requirements. [Clay Memorandum]. *WEPCO*, 893 F.2d at 906.

*Kentucky Power Cooperative*, ___ F. Supp. 2d ___, 2007 WL 959162 (E.D.Ky. 2007), and that court's review of *WEPCO* at 8; review of *SIGECO*, at 9; review of *Ohio Edison Co.* at 11, and review of *Duke Energy Corp.* at 12. "The RMRR analysis is a common sense approach that involves a fact intensive inquiry, on a case-by-case basis, of several factors such as a project's nature and extent, its purpose, the frequency of the repair or replacement, and the project's cost. . . . Further, no single factor is dispositive." *U.S. v. Cinergy Corp.*, 495 F. Supp. 2d 909, 930-931 (S.D.Ind. 2007) (citations omitted); *SIGECO*, 245 F. Supp. 2d at 1015-1016.

Qualifiers of the factors abound. "While *the analysis required* to distinguish between a modification sufficient to trigger compliance from routine maintenance, repair and replacement *is complex*, the distinction is hardly subtle. Routine maintenance, repair and replacement occurs regularly, involves no permanent improvements, is *typically* limited in expense, is *usually* performed in large plants by in-house employees, and is treated for accounting purposes as an expense. In contrast to routine maintenance stand capital improvements which *generally* involve more expense, are large in scope, *often* involve outside contractors, involve an increase of value to the unit, are *usually* not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet." *Ohio Edison Co.*, 276 F. Supp. 2d at 834 (emphasis added). "Although routine maintenance is not defined in the regulations, . . . the use of the word 'routine' puts the reader on notice that *irregular and unusual* activities may not qualify." *Ohio Edison*, 276 F. Supp. 2d at 853-854 (emphasis added). "When coal-fired

- 28 -

generating plants undertake activities at a unit which are not frequent, which come at a great cost, which extend the life of the unit and, which require the unit to be placed out of service for a number of months,[12] such activities can hardly be considered 'routine.'" *Id.*, 276 F. Supp. 2d at 855.

a.      Nature and extent factor.

The "nature and extent" factors are most often grouped by the courts as one. *See WEPCO*, 893 F.2d at 911; *Ohio Edison*, 276 F. Supp. 2d at 855 ("In considering whether activities at coal-fired units are exempt from CAA compliance as routine maintenance, repair or replacement, the EPA reviews the activities on a case-by-case basis, taking into account the nature and extent of the activity, as well as its purpose, frequency and cost."). Prominent factors in determining whether a project is routine or not is whether "the nature and extent of the . . . projects were of a grand scale, as contrasted with regularly, anticipated maintenance," *Ohio Edison*, 276 F. Supp. 2d at 858, it will result in "extensive renovation," *WEPCO*, 893 F.2d at 905, "an altered plant," *id.* at 908, that may be "unprecedented," *id.* at 911, *Ohio Edison*, 276 F. Supp. 2d at 858.

Non-routine projects can and do involve significant design changes that extend plant life. The court found in *Ohio Edison*, "The entire furnace on Unit 5 was *replaced with a unique spiral tube design* furnace. The furnace was the first of its kind on a coal-

---

[12] As typical in the utility sector and private industry, the actual time to complete projects is measured and done utilizing full twenty-four-hour days. DFOF ¶¶65, 115, 127, 141, 153.

fired unit in the United States.  While it is undisputed that the new furnace was required

to remedy design problems with the original furnace, the installation of a one-of-a-kind

spiral tube furnace cannot be considered routine." 276 F. Supp. 2d at 858.  "The forms

further reflect that the benefits achieved would extend the life (lives) of the unit(s) for

thirty years." *Id.  See also*, *Cinergy*, 495 F. Supp. 2d at 915 ("CG & E's stated goal of

these programs was to 'restore these existing units to like-new condition, capable of

operating an additional 20-25 years with levels of availability and efficiency similar to the

units' original condition.'  CG & E anticipated that these programs would effect [sic]

'nearly every piece of equipment, component or system on the unit.'") (citations omitted).

*East Kentucky Power Co-op., Inc.*, 2007 WL 959162 also involved a significant

design change that could increase energy and emissions capacity.  "EKPC made $20

million worth of physical changes to allow for *additional* steam production, including

'uprating' or *increasing the capacity rating* of the boiler at the Spurlock Unit 2." *Id.* at 3

(emphasis added).  "As for the Dale plant, Dale Unit 4 was converted from a 'pressurized

unit' to a 'balanced draft' unit during an outage in 1994.  In 1995, there was a separate

outage to install low nitrogen oxide burners, replace the turbine, and repair or replace

some worn pressurized parts. According to the EPA, these major components were *not*

*simply replaced* but were also *significantly upgraded* with larger components." *Id.*

(emphasis added, footnote omitted).  Similarly, "Ohio Edison intended and achieved a

*significant increase in the operation and output* of the units." *Ohio Edison*, 276 F. Supp.

2d at 834 (emphasis added).

b.    Purpose factor.

The purpose factor usually involves the analysis of whether the modification was intended to extend the life of a plant beyond its expected design life. In *WEPCO*, the 7th Circuit recognized, "The need for some repairs along the line is a given in determining in the first instance the life expectancy of a plant." 893 F.2d at 912. But, WEPCO's renovations to extend the 50-year life expectancy of its utility boilers from their retirement dates of 1992 and 1999 to 2010, played prominently in upholding EPA's determination that the projects were not routine. *Id*. "WEPCO admits that the plans for extensive renovation 'represent a life extension of the units from their planned retirement dates' . . . " *Id*. WEPCO, 893 F.2d at 912. "[T]he plans for extensive renovation 'represent a *life extension* of the units from their *planned retirement dates*.'" *Id.,* (emphasis in original, quoting WEPCO letter). *See also, Ohio Edison*, 276 F. Supp. 2d at 839, 860-861; *Cinergy Corp.*, 495 F. Supp. 2d at 915-917, 935.

c.    Frequency factor.

Certainly, "'[work items] falling into the category of *repetitive maintenance that are normally performed* during scheduled equipment outages" are routine maintenance. *WEPCO*, 893 F.2d at 911, quoting from WEPCO admission (emphasis added by court). Routine work that occurs often can be an easy call as routine. "WEPCO was an easy case on routine maintenance . . . ." *Ohio Edison*, 276 F. Supp. 2d at 860.

It is noteworthy that in the cases where courts reviewed temporally infrequent projects held to be not routine, that factor was not solely dispositive or primary. The

same infrequent projects were also extremely large, expensive, involved changes that increased capacity, and were often plant life-extending. *WEPCO*, 893 F.2d at 911-912; *Ohio Edison*, 276 F. Supp. 2d at 858-862. *See also*, *Cinergy Corp.*, 495 F. Supp. 2d at 935-936 (Projects "involved the replacement of many original components that had never been replaced and have not been replaced in the twenty years since the project", or since the project concluded, respectively. "As with the other Beckjord projects, there is no evidence that the industry was performing projects of a similar scope and magnitude on a regular basis.").

The frequency factor, is just that – a factor, which can be misleading if not considered in context. Frequent for what kind activity? It's an "easy case" to conclude that 5000-mile oil changes for autos are routine. However, just as an auto maintenance manual typically requires a timing belt replacement only every 60,000 miles (twice, at most thrice, in the auto's lifetime), the infrequency of it makes it no less routine maintenance. For example, even though there is often a period of years between the work, boiler "tubes require regular repair and replacement." *Ohio Edison*, 276 F. Supp. 2d at 836. *See also id*. at 838. The factor of what is "regular" or "frequent" is relative to the work to be done.

          d.      Cost factor.

          (1)      Cost factor for private industry.

The extent and type of costs of projects are deemed relevant in the RMRR analysis. The *WEPCO* court looked at cost totals without considering their type. The

context of the costs was for life extension of the plant, however. 893 F.2d at 912. Other courts consider, also with qualification, high capitalized costs as tending against a routineness finding, while low expense costs tend toward a routineness finding. "In contrast to routine maintenance stand capital improvements *which generally involve more expense, are large in scope*, *often* involve outside contractors, involve an increase of value to the unit, are *usually* not undertaken with regular frequency, and are treated for accounting purposes as capital expenditures on the balance sheet." *Ohio Edison*, 276 F. Supp. 2d at 834 (emphasis added).

How the expenses are labeled is less important than what they really are. "A substantial betterment means that the expenditure makes the asset more useful, extends its life, or adds value to the service that can be rendered from the asset. . . . Under the USOA [Uniform System of Accounts], a maintenance expense does not extend the life of an asset and therefore would not be capitalized. . . . [C]osts incurred to achieve greater future benefits are capitalized, whereas costs that simply maintain a given level of service are expensed." *Ohio Edison*, 276 F. Supp. 2d at 859.

> In order for a cost to be capitalized, one of three conditions must be present: the useful life of the asset must be increased; the quantity of units produced from the asset must be increased; or the quality of the units produced must be enhanced. An ordinary repair that simply maintains an asset does not satisfy these criteria and is therefore treated as an expense.

*Id.*, 276 F. Supp. 2d at 859-860 (citation to Generally Accepted Accounting Principles [GAAP] omitted).

- 33 -

The non-routine renovation project in *WEPCO* "cost at least $70.5 million." 893 F.2d at 912. In *Ohio Edison*, the company undertook eleven construction projects at seven units found not to be routine, with a total cost of $136.4 million. 276 F. Supp. 2d at 834. The aggregate capitalized costs, in 1992 dollars, of the replacement projects were $93.4 million. *Id.*, at 861. The smallest project (Activity 11 on Unit 7) was $1.15 million, shadowed by Activity 10 on the same unit at $25.4 million. *Id.* Similar costs of improvement projects in the millions of dollars, have resulted in court findings that they were not routine. *See Cinergy*, 495 F. Supp. 2d 909.

> (2) Cost factor for Wisconsin state government.
>
> (i)    Applicable Wisconsin law.

Counsel for defendants could find no RMRR case law that discusses the distinctions between the private industry cost factors and those that may be unique to government. However, there are significant legal and practical distinctions that should qualify the application of the RMRR case law to this case.

Under Wis. Stat. § 36.11(1)(b), the UW System Board of Regents "may purchase, have custody of, hold, control, possess, lease, grant easements and enjoy any lands, buildings, books, records and all other property of any nature which may be necessary and required for the purposes, objects and uses of the system authorized by law." The Wisconsin State Building Commission is established under Wis. Stat § 13.48(2), and consists of the Governor, three state senators, three state representatives and one citizen

member.  Under Wis. Stat. § 13.48(10)(a), "No state board, agency, officer, department, commission or body corporate may enter into a contract for the construction, reconstruction, remodeling of or addition to any building, structure, or facility, in connection with any building project which involves a cost in excess of $150,000 without completion of final plans and arrangements for supervision of construction and prior approval by the building commission."  Under Wis. Stat. § 20.924, the Building Commission, "[s]hall authorize the . . . repair, remodeling or improvement to any existing building, structure or facility costing in excess of $500,000 . . . only if that project is enumerated in the authorized state building program."  Maintenance, repair, and renovation projects that are not enumerated specifically by name in the state building program are enumerated as a category, which is entitled "all agency projects."  DFOF ¶172. Under Wis. Stat. § 16.87(2), contracts for engineering, architecture, or construction services over $10,000, must be approved and executed by the Secretary of the Department of Administration.  Contracts or construction services in excess of $150,000, also require approval from the Governor ($100,000 prior to 2006).  *Id.* at (3).

(ii)    Wisconsin law in practice for state projects.

When maintenance of University buildings is necessary, University of Wisconsin employees request approval from the Department of Administration, Division of State Facilities, the Wisconsin State Building Commission, and/or the Board of Regents for the maintenance projects to be performed.  DFOF ¶192.

Maintenance, repair, and renovation projects, in excess of $150,000 and funded totally by general purpose revenue, are submitted by UW institutions to the UW System Administration Office of Capital Planning and Budget, which upon review and approval, submits them to the Department of Administration, Division of State Facilities. Upon review and approval, the Department of Administration, Division of State Facilities thereafter submits these projects to the Wisconsin State Building Commission for approval. DFOF ¶193. Maintenance, repair, and renovation projects, in excess of $150,000 and funded by any amount of program revenue, first require the approval of the UW System Board of Regents before they can be submitted for approval to the Department of Administration, Division of State Facilities, which upon review and approval thereafter submits these projects to the Wisconsin State Building Commission for approval. DFOF ¶194. Regardless of revenue source, small maintenance projects, those under $150,000, are submitted for approval by University of Wisconsin campus employees directly to the Department of Administration, Division of State Facilities. DFOF ¶195. Which of these factors were operative for the Charter Street projects, as well as the RMRR case cost factors, are discussed separately below with respect to each of the six projects.

> e.     All factors must be considered in context to reach a common sense finding.

It bears repeating that "to determine whether proposed work at a facility is routine, 'EPA makes a case-by-case determination by weighing the nature, extent, purpose,

frequency, and cost of the work, *as well as other relevant factors*, to arrive at a *common-sense finding*.'" *WEPCO*, 893 F.2d at 910 (emphasis added).  Just as none of the factors are dispositive, and are just that – factors to be considered – routine maintenance, repair and replacement projects must be viewed in their proper context.  All the cases we can find on the issue appear to involve privately owned electric utility facilities, which have significant differences in size, components, operating conditions, and life spans than the Charter Street Plant.  DFOF ¶164.

While it may be that "nothing in *WEPCO* suggests that any project smaller than WEPCO will automatically qualify as routine maintenance," *SIGECO*, 245 F. Supp. 2d at 1017, it is equally true that any project larger, less frequent or more expensive than lubricating boiler parts or replacing dust collection filters will automatically be deemed not routine.  Nothing in the case law suggests that replacement projects analogous to replacing a worn out auto water pump at 70,000 miles, or a timing belt at a required 60,000-mile/5 year interval at a cost of several hundreds of dollars are not routine.  Failure to do either can result in auto failure and shorten the auto's life.  Neither are the equivalent of an engine block or transmission failure, or engine overhaul, which in the context of the auto's age and value at the time, would put the repair beyond routine.

Unlike *WEPCO*, *SIGEGO*, and *Ohio Edison*, there was no application of the factors by EPA in this case for making an EPA finding whether the work done at Charter Street was "routine."  Thus, the court must make the finding without deference to a non-

existent EPA review. If the Court chooses to use the "four factor" test, all factors must be taken into account and a common sense determination made.

C.     The Determination Of What Work Is Routine Is A Legal Determination To Be Made By The Court, Not By Experts.

"[T]he ultimate question of whether the changes were 'routine' within the meaning of the RMRR exemption is a question of law for the Court requiring application of statutes and case law." *Cinergy Corp.*, 495 F. Supp. 2d at 931 *citing Nat'l Parks Conservation Ass'n, Inc. v. TVA*, 413 F. Supp. 2d 1282, 1287 (N.D.Ala. 2006). "This is true despite the fact that the parties' designated 'experts' have-not surprisingly-reached different conclusions on this question of law. While one could find those opinions interesting, or even informative, the ultimate conclusions on whether Cinergy's projects were 'routine' are inadmissible and will not be considered by the Court." *Id.* at 931-932 (citations omitted).

D.     The Charter Street Plant Projects.

Taking into account all factors relevant, defendants contend the Charter Street Power Plant projects that are the subject of the Amended Complaint are routine maintenance, repair and replacement and, therefore, do not fit within the definition of a modification that requires construction permits pursuant to PSD review.

1.     Factors common to all Charter Street projects.

The history and description of the Charter Street Plant and its boilers are described in DFOF ¶¶45-61, 159, including Ehrfurth Affidavit Attachments 3, 4.

Although there are significant differences between the construction and operation of electric utility boilers and of heating plant boilers such as at Charter Street, the two have common components, albeit on different scales and designs. One court succinctly describes the operation and components of an electric utility boiler, with several elements common to Charter Street, as follows.

> The boiler is a large building-like structure in which coal is burned inside the furnace and the energy from the combustion process is transferred to water to produce steam. The steam is then directed to the turbine where it is further converted to mechanical energy in the form of a spinning turbine shaft, which in turn drives the generator that produces electricity. The walls, roof and floor of the boiler are comprised of tubes, as are the other major components of the boiler, *i.e.*, the economizer, primary superheater, secondary superheater and reheater. The components are made up of densely packed assemblies of tubes that incrementally raise the temperature of the steam before it leaves the boiler to generate electricity.

*Ohio Edison*, 276 F. Supp. 2d at 836. *See* DFOF ¶54. Although Charter Street's primary function is to produce steam for direct distribution for heating within the system it serves, some steam is also used to drive turbines for production of chilled water and air compression. DFOF ¶¶48-51.

The expected life span of the coal fired spreader stoker boilers at Charter Street is sixty-plus years. DFOF ¶¶68, 99, 116, 143, 162. The lifespan of the coal-fired Charter Street Heating Plant boilers "is dependent on several factors, including the manufacturer's representations, lifespan of similar boilers, the operational facts such as run time, steaming rates verses boiler capacity, proper feedwater treatment, number of boiler cycles (on-off), operator training/knowledge and so on." DFOF ¶162. Determinative of boiler lifespan are the main components that structurally and operationally make up the boiler

proper. For the reasons explained at DFOF ¶163, the need to replace the boiler steam drum or mud/lower drums are life-span determinative, and their failure would signify the end of the life of a boiler. In order to physically change out the drums, the boiler would have to be totally disassembled from a tube, refractory, and casing perspective. *Id.*

Because the CSHP boilers are of the "industrial type," they differ greatly from electric utility type boilers. Because of this, CSHP boilers are loaded at a level less than maximum capacity and experience more downtime because of the inability to shift loads to other plant boilers. What this means is that an industrial boiler's expected lifespan will be greater than a utility boiler because of less operational strain and run times.[13] This, in large part, is why an industrial type boiler such as at CSHP can expect a sixty-plus year lifespan. DFOF ¶¶163-164.

All of the projects performed at the Charter Street Plant were like-kind replacements, DFOF ¶¶69, 103, 116, 140, 143, 154, 165, 182, none were intended to or did increase throughput coal capacity, DFOF ¶¶69, 95, 103, 111, 116, 131, 140, 143, 154, and none had either the purpose or effect the extension of the lifespan of any of the boilers. DFOF ¶¶68, 101, 116, 130, 143, 154, 166, 187. None of the projects involved replacement of the steam or mud drums that would have heralded the end of the boilers' lives. In contrast, "WEPCO proposed to replace rear steam drums on units 2, 3, 4 and 5. Each of the steam drums measured sixty feet in length, 50.5 inches in diameter and 5.25

---

[13] The "average service life of a coal-fired boiler is typically 30 to 40 years." *Ohio Edison*, 276 F. Supp. 2d at 839.

inches in thickness." *Ohio Edison*, 276 F. Supp. 2d at 852, *citing WEPCO*, 893 F.2d at 907.[14]

> 2.    Charter Street Plant boiler steam tube replacements.

There are two boiler tube replacement projects that are the subject of this case. *See* AC ¶¶ 38-52 (Project 1, 1996), 81-96 (Project 4, 2001). They are described in DFOF ¶¶63-77, 125-135.

> a.    Boiler steam tubes and functions

The purpose and operation of the tubes in the Charter Street boilers are described in DFOF ¶¶40, 64, including illustrations in Ehrfurth Affidavit Attachment 2-1 to -4. As described by one court with respect to electric utility boilers,

> The walls, roof and floor of the boiler are comprised of tubes, as are the other major components of the boiler, i.e., the economizer, primary superheater, secondary superheater and reheater. The components are made up of densely packed assemblies of tubes that incrementally raise the temperature of the steam before it leaves the boiler . . . .[15]

---

[14] "Were we to hold that the replacement of major generating station systems-including steam drums and air heaters-does not constitute a physical change (and is therefore not a modification), the application of NSPS and PSD to important facilities might be postponed into the indefinite future." *Ohio Edison*, 276 F. Supp. 2d at 852.

[15] At Charter Street, the floor has no tubes, and the boilers have no secondary superheaters or reheaters.

*Ohio Edison*, 276 F. Supp. 2d at 836.

        b.     Project 1 (Boiler 4 rear wall tubes (1996)).

This 1996 project is described in DFOF ¶¶63-78. At Charter Street, Project 1 replaced all rear wall tubes with associated casing on Boiler 4. The replacement was required by code to repair tubes that had worn to thickness below code. The total downtime attributable to the project was the equivalent of 15 24-hour days or less had the private utility practice of utilizing full twenty-four-hour days been utilized. The cost of the project in 1996 was $97,300, less than 1% of the boiler's value of $38 million, and was expensed (not capitalized) according to GAAP.

        c.     Project 4 (Boiler 4 sidewall tubes (2001)).

This 2001 project is described in DFOF ¶¶124-135. At Charter Street, Project 4 replaced a 7-foot segment of 67 25-feet-tall side wall tubes with associated casing on Boiler 4. The replacement was required because the tubes had bulged and created an unsafe condition of reduced wall metal thickness. This was the first time this set of sidewall tubes were repaired. The total downtime attributable to the project was the equivalent of 13 24-hour days or less had full twenty-four-hour days been utilized. The cost of the project in 2001 was $77,000, less than 0.3% of the boiler's replacement cost of $38 million, without classification as expensed or capitalized according to GAAP.

d.    Other facts common to both Projects 1 and 4 boiler steam tube replacements.

Rear walls, side walls or front walls physically make up the respective sides of the boiler's furnace area and perform the same function in the boiler.  They are all located in the boiler furnace area which is a high heat flux zone with high air turbulence and high solid fuel particle flow.  This area of the boiler tends to incur higher tube surface erosion due to impingement of particles to tube surface.  Tubes can tend to fail in this area due to improper water quality, flame impingement or slag build-up, thus causing tubes to overheat, weaken and fail over time.  Although these factors can be controlled, they are not totally unavoidable.  Thus, these repairs are expected within the lifespan of a boiler. DFOF ¶¶70, 132.

This is consistent with the court's finding in *Ohio Edison*, 276 F. Supp. 2d at 836:

The tubes that comprise the waterwalls and major components are in constant contact with the flue gas and/or combusting coal. Leaks in the tubes are caused by thermal cycling (heating up and cooling down), external corrosion from exposure to caustic agents, erosion from high flue gas velocities and entrained ash particles and internal corrosion caused by poor water quality. *As a result, the tubes require regular repair or replacement.*

(Emphasis added).

Projects to repair worn out tubes are expected to occur two to three times within the lifespan of the boiler, DFOF ¶¶70-73, 129, 132, 133, had been performed at this plant four times before, and several times each in the other boilers DFOF ¶¶70-73, 129, 132, 133.  Prior to Project 1 in 1996, Boiler 4 replaced the entire rear wall with tubes in 1979. DFOF ¶73.  Similarly, Charter Street Plant Boilers 1, 2 and 3 replaced the first eleven feet

of their rear walls (twenty-nine tubes) in 1985, and Boiler 5 replaced eighty-four tubes (forty-two per side) which defines the entire sidewall tubes in 1998. DFOF ¶73. Boilers 1, 2 & 3 had the first seven to eight feet of their side walls and tubes replaced in the mid-to-late 1970's with a boiler age of roughly eighteen to twenty years. The plant has also replaced various water wall tubes throughout the life of these boilers at various times. DFOF ¶133.

Both projects were in-kind replacements, not intended to and without the effect of increasing fuel throughput or production, and were done to maintain boilers function within their lifespans. No design change was made, and neither boiler capacity or emissions capacity were changed. The overall purpose of both projects was to maintain the pressure retaining integrity of the boiler by repairing anticipated normal wear and tear on the boiler tubes. The work was performed by outside contractors due to the certification requirements for welding boiler parts, not due to the projects' scale (*see* discussion, *infra*). DFOF¶¶68-73, 126-132.

         e.     WDNR has regarded boiler steam tube replacement projects as RMRR.

The Wisconsin DNR developed and enforces the federally approved SIP, which plaintiff seeks to enforce in this case. Thus, it is relevant and significant that in the decades that DNR has administered the federal RMRR rule and sate SIP-approved RMRR rule, WDNR has consistently held that various boiler tube replacements, including "wholesale replacements," in boilers of the type alleged in plaintiff's amended complaint,

are routine. Dosch Affidavit ¶3, Hanson Deposition Exhibits 62-67; DFOF ¶167. In 1999, WDNR Construction Permit Team Leader Jeffrey C. Hanson, P.E., conducted a survey of WDNR air regulatory staff, in which "the results of my survey indicate that the department has not treated the replacement or repair of boiler steam tubes as projects that would require an air permit." For example, "NSP French island (electric generating facility) replaces boiler tubes routinely. There have been times they do a *wholesale replacement* project that has included a slight adjustment in the size or number of tubes. Since the rated heat capacity is unchanged, and they are only looking at the efficiency, I have not had any concern with their work." WDNR's conclusion that economizer tube and superheater tube replacement is routine maintenance. *Ibid.*

As late as January 2007, cognizant of its conclusions that these projects have been considered by DNR as routine, DNR staff characterized reversing its position as getting stuck to a "tar baby." DFOF ¶171, Dosch Affidavit ¶¶3, 4, Hanson Deposition Exhibit 51 at OR 123. DNR air bureau staffer Jeff Hanson remarked to fellow staff, "If we do decide to get into this deeply, we are entering a nebulous area." Hanson reminded his colleagues, "Sent letter to Jim Weinbauer of Consolidated Papers stating we have not done permitting on steam tubes in the past. If we pursue this we are acting against ourselves. Uncertain territory." *Id.* at OR 122.

- 45 -

3.    The Stoker Feeder Replacements (Projects 3 and 5).

There are two fuel stoker feeder replacement projects that are the subject of this case. *See* AC ¶¶ 68-80.  Stoker feeder replacement Projects 3 and 5 are described in DFOF ¶¶109-123, 138-143, 175, 181-182.

a.    Charter Street Plant stoker feeders and functions.

The purpose and operation of the stoker feeders in the Charter Street Plant are described in DFOF ¶¶109-112, 181 including diagrams in Ehrfurth Affidavit Attachment 2-1 to 2-4.  As described, the feeders stoke the boiler with fuel for combustion.  "The feeders are located on the front of the boiler above the grate.  The fuel enters from the top by gravity and is moved through the feeder by a horizontal chain to the front face of the feeder.  The front portion of the feeder has a shaft with blades that rotate such that the fuel drops down into the blades and is swept out into the boiler in an underthrow motion. The fuel is distributed in an arced pattern to land on the grate towards the rear wall of the boiler.  The grate travels towards the front of the boiler as the fuel combusts."  DFOF ¶¶109, 110.  Feeders are a high maintenance high wear item associated with the boiler.  In order to maintain proper combustion characteristics, the feeders require, and are expected to undergo periodic replacement.  DFOF ¶¶117-120.

b.    Project 3 - Boiler 1 stoker feeder replacement (2002).

This 2002 project is described in DFOF ¶¶109-112, 115-122, 181-182.  Project 3 replaced the overthrow feeders on Boiler 1.  The project consisted of the replacement of

- 46 -

three overthrow feeders (manufactured by Zurn, nominal 18 inch) with three underthrow feeders. DFOF ¶¶109, 110. Even though the replacement feeders had an overall larger width dimension than the feeders they replaced, they have a smaller capacity fuel throughput. The replaced Zurn feeders (18" overall width) had a 9,000 pound per hour throughput design. The new Detroit Stoker feeders (27" overall width) have an 8,100 pound per hour throughput design. DFOF ¶¶111, 112, 181. Because feeder throughput has a bearing on boiler capacity, and because the new feeders have a reduced throughput, the boiler capacity and emissions were not increased. The new feeders were installed because the original feeders were no longer manufactured due to safety concerns. In order to allow the plant to burn paper pellets (alternate fuel) at a reasonable level (as listed in the air permit) the feeders needed to be replaced. This work was meant to allow the boiler to continue to properly function through its expected lifespan. DFOF ¶¶111, 112, 181. The total downtime attributable to the project was the equivalent of 27 24-hour days or less had full twenty-four-hour days been utilized. DFOF ¶115. The entire project was performed by in-house maintenance personnel, not by outside contractors. DFOF ¶¶117-119. The cost of this project was approximately $90,700 in 2002, less than 0.4% of the boiler replacement cost of $25 million. The State Controller's Office within the Wisconsin Department of Administration has classified this project as a Building & Improvements project, and is was capitalized according to Generally Accepted Accounting Principles. DFOF ¶¶121, 122.

c.    Project 5 - Boiler 4 stoker feeder replacement (2004).

This 2004 project is described in DFOF ¶¶80, 137-143, 145-146, 181-182. Project 5 replaced the overthrow feeders on Boiler 4. The project consisted of the replacement of five overthrow feeders (manufactured by Detroit Stoker, nominal 27 inch) with five underthrow feeders. DFOF ¶137. The existing feeders had to be replaced because the operational parts were worn out and they could not be properly guarded according to OSHA safety regulations. The ability to procure replacement parts was becoming difficult. CSHP replaced the old feeders with feeders of the same width and manufacturer (Detroit Stoker). Any feeder differences are attributable to the old feeders no longer being manufactured. They were also different to allow CSHP to burn the fuels it is permitted to burn at their permitted limits while maintaining the boilers' permitted MMBtu/hr input requirements. Because feeder throughput has a bearing on boiler capacity, and because the new feeders are equal in dimensional footprint, the boiler capacity and emissions were not intended to, and were not, increased. This project was a like-kind replacement. DFOF ¶¶80, 138-140, 181-182. The total downtime attributable to the project was the equivalent of 9 24-hour days or less had full 24 hour days been utilized. DFOF ¶141. The cost of this project was approximately $193,000 in 2004, slightly more than 0.5% of the boiler replacement cost of $38 million. The State Controller's Office classified this project as a Building & Improvements project, and is was capitalized according to GAAP. DFOF ¶¶145-146.

d.     Other facts common to both feeder replacements.

The purpose of both projects was to allow the boilers to continue to properly function through their expected lifespan and to maintain the boiler's fuel feeding capabilities with the various types of fuels as allowed by CSHP's DNR permit. The projects were like-kind replacements and were not intended to, and did not, increase fuel throughput or production.

As for frequency, feeder replacements are not uncommon or unexpected. This kind of feeder replacement can be expected to be performed within the life of the boiler. DFOF ¶120. Charter Street Heating Plant has a record of feeder replacements of roughly every 25 years due to the operational parameters of the boilers. Feeder replacements have been performed in the plant and on Boiler 1 before. Boiler 1 had its feeders replaced twice, once in 1985 and again in 2002 (the subject of this case). Boiler 4 had its first feeder change-out in 2004 (the subject of this case). With respect to feeder replacements not the subject of this suit, Boilers 2 and 3, each have had their feeders replaced twice, once each in 1985 and once each in 2004. Both entire projects were performed by in-house maintenance personnel, not by outside contractors.

4.     Charter Street Plant 2002 Economizer Replacements (Project 2).

The replacement of three economizers is referred to in the amended complaint, *see* AC ¶¶ 53-67, and will be referred to here as "Project 2." The project involved

replacement of the economizers on Boilers 1, 2 and 3 in 2002. They are described in DFOF ¶¶81, 83, 84, 96, 97, 99-108, 158, 166, 181, 182.

a.     Economizers and functions.

The purpose and operation of economizers in the Charter Street Plant boilers are described in DFOF ¶¶83, 102-103, 181-182. In summary, the function of an economizer on a boiler with a baghouse (i.e. particulate matter pollution control device) is to reduce exiting flue gas temperatures so that the fiberglass particulate collection bags do not catch fire and cease their function. The plant began experiencing an increased bag failure rate in the baghouse unit that serves Boilers 1, 2 and 3 that necessitated the economizer replacements. *Id.*

b.     Project 2 – Economizer replacement project.

The purpose of this project was to replace the worn out economizers on the 3 boilers. The economizers were replaced as one unit, which included economizer tubes, casing and sootblowers. Sootblowers perform on line cleaning of the tubes, located within the economizer casing. The total downtime attributable to the project was the equivalent of 27, 22, and 13 24-hour days, respectively, had full twenty-four-hour days been utilized. When the work was performed in 2002, the boilers were forty-three years old, and the baghouse, which services Boilers 1, 2 and 3, was fifteen years old.

According to *Steam* at 44-12[16] economizers have a typical replacement period of thirty-five years based on the specific design, operation, maintenance and fuel.  The plant has a record of economizer replacement periods of roughly twenty-four years due to the operational parameters for the plant.  DFOF ¶¶100, 102.  The economizers replacement project was not meant to, and did not, extend the lifespan and/or design life of the boiler.  It was performed to replace the worn out economizers and allow for continuous operation of pollution control equipment in year fifteen of the baghouse's life.  This work is expected within the lifespan of a boiler and does not define the boiler's life.  The life of the baghouse proper can be considered equal to the life of the plant.  DFOF ¶101.

Because the economizer's main purpose is to control flue gas temperatures to the baghouse and protect its ability to remove particulate matter, the economizers were not

---

[16] The treatise entitled, *Steam/Its Generation and Use*, 41st ed., edited by Kitto and Stultz, published by the Babcock and Wilcox Company (2005), is considered one of the leading treatises on coal-fired boilers.  See http://www.babcock.com/pgg/tt/steambook.html.  The Babcock and Wilcox Company manufactured three of the four boilers at issue in this case.  DFOF ¶98.  *See also, Ohio Edison*, 276 F. Supp. 2d at 839, n. 6: "The Court notes that Babcock and Wilcox, the publishers of *STEAM-Its Generation and Use*, were among the first to design and produce water tube boilers for use in the generation of electricity.  Babcock and Wilcox's first design was introduced in 1856. In this case, both Plaintiffs' and Defendants' experts agree that the text is an authoritative source on steam generation as particularly applied to the coal-fired electric utility industry. Sammis Units 5, 6 and 7 all contain Babcock and Wilcox boilers."

intended to, and did not, change boiler capacity. Boiler capacity or emissions were not affected or changed. This project was a like-kind replacement, not intended to increase throughput or production. DFOF ¶87, 88, 89, 90, 91, 92, 93, 95, 103. Although the fin-tube economizers were replaced with bare-tube economizers, they were equivalent and identical to the bare-tube economizers that came with the plant originally. DFOF ¶85, 86, 87, 88, 89. Economizers have been replaced at the plant before. Boilers 1, 2, and 3 had their economizers replaced twice, once in 1978 and again in 2002. Boiler 4 had its economizer replaced in 1994. DFOF ¶104.

The cost of replacing all 3 economizers was approximately $788,899 in 2002, less than 1% of the cost of the boilers' replacement of roughly $75,000,000. The State Controller's Office classified the project as a Building & Improvements project, and it was capitalized according to GAAP. The work was performed was by outside contractors due to the certification requirements for welding boiler parts, not due to the projects' scale (*see* discussion, *infra*). Charter Street's employees happened not to be certified for welding boiler pipes. Fabrication off site also requires an authorized facility to fabricate the economizer, again a function that CSHP has no authority to legally perform. DFOF ¶96.

c.    WDNR has regarded economizer replacement projects as RMRR.

As part of the 1999 survey conducted by WDNR's Jeffrey Hanson, WDNR concluded that an economizer replacement at the Columbia power facility involving "a

- 52 -

whole bank of steam tubes" was routine maintenance. DFOF ¶¶167, 169, 171. This is relevant and significant because the Wisconsin DNR developed and enforces the federally approved SIP, which plaintiff seeks to enforce in this case.

　　　　　　　5.　　　Charter Street Plant Generating Banks and Superheater Replacements (Project 6).

　　　　　　　　　　a.　　　Nature of Project 6.

These projects that are the subject of AC ¶¶ 106-136, on Boilers 1, 2 and 3. They are described in DFOF ¶¶147, 151, 152, 153, 154, 155, 156, 157, 159, 160, 161. The projects replaced the generating bank tubes, superheater elements, superheater headers and non-boiler pressure parts such as penthouse refractory floor, tube shields and superheater tube penetration refractory seals. Partial sections of twenty wall tubes on Boilers 1 and 2, and partial sections of twenty-three wall tubes on Boiler 3 were replaced. Also, one short section of a chill tube in Boiler 1 and two small sections of chill tubes in Boiler 3 were replaced. DFOF ¶147.

Because generating bank tubes and superheater elements are fabricated in a shop and then shipped to the site, the process work flow is beyond the scope of CSHP's capabilities. Fabrication of generating tubes and superheater elements requires an authorized ASME Code facility to fabricate, which is a function that CSHP has no authority to legally perform. DFOF ¶151.

The purpose of the projects was to repair corroded tubes. Acid cleaning of the internal boiler surfaces, various internal/external inspections, offline corrosion attack

throughout the years, and normal operation associated with the generating bank tubes and the superheater elements on the boilers showed areas where tube wall thickness were below code and requiring repair.  The Charter Street Plant was required by code to replace this area of tubes with tubes of acceptable wall thickness.  DFOF ¶152.

The total boiler downtime for the projects was the equivalent of 26, 22, and 15 24-hour days or less, respectively, had full twenty-four-hour days been utilized.  DFOF ¶153. The work was performed by outside contractors due to the certification requirements for welding boiler parts, DFOF ¶¶66, 77, not due to the projects' scale (*see* discussion, *infra*). DFOF ¶¶96, 156.

These projects were not meant to, and did not, extend the lifespan and/or design life of the boilers.  The projects were meant as repairs to allow the boiler to properly function through its expected life.  Since the project was to replace the generating bank and superheater elements with tubes of equal length, diameter and wall thickness, boiler capacity and emissions were not changed.  This project was a like-kind replacement, not intended to increase throughput or production.  DFOF ¶154.

These projects to repair and replace worn out tubes is expected to occur within the expected life span of all boilers of this type under similar operating conditions. This type project has been performed in the plant and on these boilers before.  The generating bank tubes on Boilers 1, 2 and 3 have been replaced twice, once in 1959 and again in 2003/2004.  As for the balance of the plant, Boiler 4 had one row of generating tubes replaced in 1992.  The superheater elements on Boilers 1, 2 and 3 have been replaced

three times, in 1959, 1988, and 2003/2004. As for the balance of the plant, Boiler 4 had its superheater section replaced in 1992, and Boiler 5 had its superheater section replaced in 1988 and in 2003. DFOF ¶¶154, 155.

The collective cost of this combined set of projects was approximately $1,519,348 in 2004, slightly more than 2% of the replacement costs of the boilers. The State Controller's Office classified this project as a Building & Improvements project, and it was capitalized according to GAAP. DFOF ¶157.

> b.    WDNR has regarded superheater replacement
> projects as RMRR.

As part of the 1999 survey conducted by WDNR's Jeffrey Hanson, WDNR concluded that superheater replacements are routine maintenance. DFOF ¶170. In an August 13, 2004, letter from WDNR's NSR Team Leader Steven Dunn to EPA, DNR reports, "Appleton Coated is proposing to replace 105 superheater tubes" because of "thinned tubes". The work was expected to take 15-20 days. "There have been no tube replacement projects undertaken on this boiler previously." The cost of the tube replacement was estimated at $450,000, where the boiler maintenance cost was $700,000 per year. WDNR concluded, "Based on these four factors, the Department concludes that this work should be considered routine replacement. This conclusion is based on the cost of the project being similar to that needed for normal maintenance shutdowns." DFOF ¶170.

E.    The Charter Street Plant Tube, Feeder, Economizer, and Generator Banks and Superheater Replacement Projects Were Routine Maintenance, Repair or Replacement.

Taking into account the nature, extent, purpose, frequency, cost, and other relevant factors, common sense leads to the conclusion that all of the projects that are the subject of this action at Charter Street were routine maintenance, repair or replacement.

The projects at Charter Street don't even come close to the nature, extent, scale, cost and frequency of the boiler tube replacements in *WEPCO*, *Ohio Edison* or *Cinergy*, or *East Kentucky Power*. The projects in those cases dwarf those at Charter Street. None of the Charter Street Projects were "unprecedented," "irregular or unusual," or "first of its kind," *Ohio Edison*, 276 F. Supp. 2d at 853-854, 858, 861, 888; *WEPCO*, 893 F.2d at 911. It is not like the Charter Street replacements had "never been done before," *Ohio Edison*, 276 F. Supp. 2d at 861 citing *WEPCO*, 893 F.2d at 912, or that the components at issue "had never been replaced." *Cinergy*, 495 F. Supp. 2d at 935-936.

Significantly, none of the projects were "life extension" projects, (DFOF ¶187) as they were in *WEPCO*, 893 F.2d at 912; *Ohio Edison*, 276 F. Supp. 2d at 839, 840; *Cinergy*, 495 F. Supp. 2d at 915-917; or *East Kentucky Power*, 2007 WL 959162 at 3. They were not intended to and did not "upgrade[] with larger components," *East Kentucky Power*, 2007 WL 959162 at 3, or achieve "a significant increase in the operation and output of the units." *Ohio Edison*, 276 F. Supp. 2d at 834. There was no replacement of steam drums, as in *WEPCO*, 893 F.2d at 907 or *Ohio Edison*, 276 F. Supp. 2d at 852, that are boiler lifespan determinative at Charter Street. That the projects'

purposes is not life-extension beyond the plant's 60-year lifespan is evidenced by the fact that the UW-Madison with the Wisconsin Department of Administration performed a study to investigate a means to lower fuel costs and increase steam generating capacity for meeting future growth. The study projects the Charter Street Plant to have a solid fuel Circulating Fluidized Bed Boiler (CFB) boiler by 2012, thus retiring Boiler #1 and retrofitting Boiler #4 with BACT for SO2 and NOx, both well within their 60-year life spans (2019 for Boilers 1, 2 & 3; 2025 for Boiler 4). Life extension is not, and has not been, the underlying premise of the above projects. DFOF ¶¶186, 187, 188.

The projects were in-kind replacements that did not involve design changes. *See Ohio Edison*, 276 F. Supp. 2d at 858. They were not intended and did not achieve a significant increase in the operation and output of the units. *Ohio Edison*, 276 F. Supp. 2d at 834; *East Kentucky Power*, 207 WL 959162 at 3.

The costs of the projects were not the multi-million dollar projects in the reported cases that determined they were not routine. For example, *see East Kentucky Power*, 2007 WL 959162 at 3; *WEPCO*, 893 F.2d at 912; *Ohio Edison*, 276 F. Supp. 2d at 834, 861. Whether labeled as expensed or capitalized, the costs of these projects were comparatively miniscule, often less than 1% of the replacement costs of the boilers on which they were performed. Moreover the projects don't fit the capitalization criteria – that the useful life of the asset must be increased; the quantity of units produced from the asset must be increased; or the quality of the units produced must be enhanced. "An

ordinary repair that simply maintains an asset does not satisfy these criteria and is therefore treated as an expense." *Ohio Edison*, 276 F. Supp. 2d at 859-860.

With respect to Wisconsin State funding of the projects, all six projects for repair or replacement of the boiler components were and are classified by the Department of Administration Division of State Facilities as maintenance projects and treated by the State Building Commission as maintenance projects. DFOF ¶173. None of the six maintenance projects were funded with program revenues. Therefore, none of the six projects were reviewed or approved by the Board of Regents. DFOF ¶174. Three of the maintenance projects (Projects 1, 3, and 4) were small maintenance projects under Wis. Stat. § 16.87(3). Therefore, they were submitted for approval by University of Wisconsin campus employees directly to the Department of Administration, Division of State Facilities. DFOF ¶175. All three of remaining projects were submitted for approval by the UW System Administration Office of Capital Planning and Budget to the Department of Administration, Division of State Facilities. Upon review, the Department of Administration, Division of State Facilities recommended the projects as "all-agency projects," and submitted them for approval to the Wisconsin State Building Commission. DFOF ¶176.

Thus, although "capitalized," all of the projects were classified as "maintenance", none were enumerated in the state building program, none were funded by general purpose revenue, and none warranted review or approval by the Board of Regents, as required of larger projects. Although ultimately approved by the Building Commission as

most projects in the State are, it was merely to maintain, not expand, the operations of the Charter Street Plant.

Although tube and economizer replacement work was done by outside contractors, this is due to the certification requirements for welding boiler parts, DFOF ¶96, not due to the projects' scale.[17]   The fact that certified welders were subcontracted is hardly dispositive given that power plant staff can include certified welders. *Cinergy*, 495 F. Supp. 2d at 915.   Indeed, these kinds of projects have been regarded by WDNR as routine, as common sense dictates.

While these projects were more than the equivalent of a routine oil change on a car, they are no less routine than the required replacement of a worn out water pump or preventive replacement of a timing belt at 60,000 miles.   Plant lifespan determinative components of the boiler, such as steam or mud drums, perhaps most analogous to an auto engine block or transmission, were not replaced or overhauled.   These projects do not mark the points at which the owner of a power plant is expected under the law to retool the entire plant for PSD purposes.   Common sense would conclude that the replacements at Charter Street were routine maintenance, repair and replacement.

---

[17] "The large scale of the projects is further reflected by the fact that the work performed was done by outside contractors." *Ohio Edison*, 276 F. Supp. 2d at 858.

III.   ALL   SIX   PROJECTS   WERE   EXEMPT   FROM   PSD
REQUIREMENTS BECAUSE NONE CAUSED A SIGNIFICANT
NET EMISSIONS INCREASE.

A.    Introduction.

"[T]o trigger the PSD's permitting requirement and the requirement to install

pollution controls, two criteria must be satisfied:  (1) there must be a 'physical change' and

(2) there must be a 'significant net emissions increase.'"  *United States v. Duke Energy*

*Corporation,* 278 F.Supp.2d 619, 629 (M.D.N.C. 2003).  In the preceding section of this

brief the defendants demonstrated that all six projects at Charter Street constituted exempt

routine maintenance repair and replacement and therefore none should be deemed a

"physical change" or "modification" requiring PSD review and permitting.  In this section

of the brief the defendants will demonstrate that, contrary to the complaint's allegations,[18]

the plaintiff cannot make the required second showing that any of the six projects would

result in a "significant emissions increase" as that term is defined in Wis. Admin. Code §

NR 405.02(27).  Our arguments are several but related:  first, the plaintiff cannot prove

that five of the disputed six projects resulted in a significant net emissions increase under

the "actual-to-predicted-actual" test the defendants contend is applicable here, even if one

---

[18]   The plaintiff alleges that a "significant net emissions increase" is "any increase in
emissions  that  exceeds  a  threshold  value  set  forth  in  Wis.  Admin.  Code  §  NR
405.02(27)(a),  Table  A  .  .  .  ."   Amended  Complaint,  ¶  147.   Under  that  rule,  a
"significant" net emission increase is one which is equal to or greater than 40 tons per
year for Nitrogen oxides (NOx) and Sulfur dioxide (SO2), 100 tons per year for Carbon
monoxide (CO), 25 tons per year for Particulate matter (PM), and 15 tons per year for
smaller forms of Particulate matter ($PM_{10}$).

assumes the projects caused an increase in emissions; and second, because of the absence of evidence of any causal link between each project and a significant emissions increase, regardless which test[19] applies to measure the emissions, all six projects must be deemed *in*significant, therefore requiring dismissal of all claims.[20]

      **B.**     **Clean Air Act Background And The Applicability Of the "Actual-To-Predicted-Actual" Test For Measuring Emissions Increases.**

Under the terms of Wis. Admin. Code ch. NR 405 (the Wisconsin SIP's PSD rules) in effect at the time of the six disputed projects[21] a "significant net emissions increase" was defined as including:

     1. Any increase in actual emissions from a particular physical change . . . at a stationary source.

---

[19] *I.e.*, the "actual-to-predicted-actual" or the "actual to potential" tests.

[20] The defendants concede that, if proof of causation is not required in the application of the "actual-to-potential" test, all six projects at Charter Street would be deemed to have generated significant net emissions increases.

[21] Effective July 1, 2007, Wisconsin amended ch. NR 405 to expressly clarify that the "significance" of emissions increases caused by physical changes at existing facilities like Charter Street be calculated by use of an "actual-to-projected-actual" test; *i.e.*, essentially in the manner of subsection (d) of former § NR 405.02(1). *See* Wis. Admin. Code § NR 405.025(1). Wis. Admin. Register, June, 2007, No. 618. This rule making was in turn required by the federal government as part of its New Source Review reform initiative, first announced in final and proposed rule making on December 31, 2002. *See* 67 Fed. Reg. 80290.

Wis. Admin. Code § NR 405.02(24)(a)1.   A copy of the relevant sections of Wisconsin

Administrative Code chapter NR 405 then effect is attached under a tab entitled "NR 405

(2004)."  "Actual emissions," in turn, was then defined by four alternative methods:

> "Actual emissions" means the actual rate of emissions . . . as determined in
> accordance with pars. (a) through (d):
>
>     (a)  In general, actual emissions as of a particular date shall equal the
> average rate . . . at which the unit actually emitted the air contaminant
> during a 2-year period which precedes the particular date and which is
> representative of normal source operation.  . . . Actual emissions shall be
> calculated using the unit's actual operating hours, production rates, and
> types of materials processed, stored, or combusted during the selected time
> period.
>     (b)  The [DNR] may presume that [air permit emission limitations]
> for the unit are equivalent to the actual emissions . . .
>     (c)  For any emissions unit, other than an electric utility steam
> generating unit, which has not begun normal operations on the particular
> date, actual emissions shall equal the potential to emit of the unit on that
> date.
>     (d)  For an electric utility steam generating unit . . . actual emissions
> of the unit following the physical . . . change shall equal the representative
> actual annual emissions of the unit . . .

Wis. Admin. Code § NR 405.02(1)(a)-(d).  The plaintiff contends that subsection (c) –

sometimes referred to as the "past-actual-to-future-potential-to-emit" or more simply the

"actual-to-potential" test – should be applied to measure the significance of emissions

following the six Charter Street projects.   Amended Complaint, ¶ 139.   It is the

defendants' position, however, that the Charter Street Plant had begun "normal

operations" before each of the six replacement projects at issue, and therefore the "actual-

to-potential" test of subsection (c) is inapplicable here.  The defendants contend that the

significance of any change in its emissions should be measured instead by use of

- 62 -

subsection (a), under which past actual emissions are compared to post-physical change emissions, which can or could be predicted before any physical change by projecting of post-project emissions.

From the perspective of maximizing the installation of state-of-the-art pollution controls on otherwise "grandfathered" facilities, it is understandable why the plaintiff, EPA and the DNR have frequently[22] taken the position that the "actual–to-potential" test applies to all major modifications at all sources other than electric utility steam generating units.[23]  It is a test which almost never fails to yield "significant" net emissions increases, and thus would trigger PSD permitting and the installation of BACT, even if the facility's real emissions don't change at all – or even drop – as a result of the "physical change."[24]

---

[22]  Jeffrey Hanson, the head of DNR's PSD section, testified that at the direction of EPA the DNR has taken that position since the 1990s. Dosch Affidavit, ¶3; Hanson deposition transcript, at 162.

[23]  The history of the PSD program generally, and of the special rule EPA developed for the electric utility industry, is described in detail in *New York v. U.S. E.P.A.*, 413 F.3d 3, 11-18 (D.C. Cir. 2005) ("*NSR I*").  For present purposes the defendants will note that the special utility rule – as ultimately codified in former Wis. Admin. Code as § NR 405.02(1)(c) – was a product of  EPA's loss in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), where the agency had unsuccessfully tried to apply the "actual-to-potential" test to that industry. *See NSR I* at 15-16.

[24]  Only the very rare "modified" source, one which normally operates near its "potential to emit" level, would fail to yield significant emission increases under this test.  As Jeffrey Hanson testified, "I think there are very few, which was part of the reason for the December 31, 2002 reforms, to provide another sort of test which would use a representative actual period going forward, so no, there aren't too many who operate in that particular mode." DFOF ¶ 180, Dosch Affidavit, ¶3, Hanson deposition transcript, at 164.

For *new* sources or existing sources which are to be modified in ways which suggest that future emissions may not resemble those associated with pre-change operations, the use of such a test is a reasonable and perhaps necessary approach. Regulated owners and operators of *existing* facilities who wish only to replace worn parts of their existing equipment, however, have argued that applying the "potential to emit" test to their operations is unreasonable, and they have sought the application of a different test, one in which "actual emissions" would be evaluated in terms of their "real" rather than "potential" magnitude. Furthermore, EPA recently has "expressly disclaimed" that the "actual-to-potential" test is of "universal application" to all sources other than utilities. *New York v. U.S. E.P.A.*, 413 F.3d 3, 20-21 (D.C.Cir. 2005) ("*NSR I*")

The issue of which test to apply was litigated in this district in *United States v. Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054 (W.D. Wis. 2001), in which Judge Crabb ruled:

> If normal operations had not begun, an actual-to-potential test applies; otherwise, an actual-to-future-actual prediction is appropriate.
>
> Unfortunately, the regulations provide no guidance on how to determine whether a source had begun normal operations. . . . Using a literal definition of "normal operations," I conclude that each set of the changes was significant enough to make the post-construction unit effectively a new unit that had not begun normal operations at the start of construction. . . . Defendant did not simply replace old parts with equivalent new ones.

*Murphy Oil*, 143 F.Supp.2d at 1104-05 (citing, among other sources, an EPA pronouncement in the context of electric utilities that "for changes that are 'like kind replacements,' 'normal operations' have begun." 56 Fed. Reg. 27630, 27633 (Jun. 14,

1991)).  It is the defendants' position that the "actual-to-predicted-actual" test is the legally correct test for evaluating the significance of equipment replacements and that, at any rate, this is the law in this district court.

> C.    Under The Applicable "Actual-To-Predicted-Actual" Test, Five Of The Six Projects Would Not Result In Significant Net Emissions Increases Even If Proof Of Causation Were Not Required.

The affidavit of Biren Patel establishes that projects # 2 through # 6 would not yield "significant net emissions increases" for any pollutants under an "actual-to-predicted-actual" analysis.  It also establishes that applying that test to project # 1 yields a significant net increase for only one pollutant, Sulfur dioxide.   Without proof of significant net increases, there can be no "major modification" and thus no PSD violation.  For this reason alone, the claims relating to projects # 2 through # 6 should be dismissed.  DFOF ¶178.

> D.    Because The Plaintiff Cannot Prove The Six Projects Caused Significant Emissions Increases, All Claims Should Be Dismissed, Regardless Of The Test Used To Measure "Significant Net Emission Increases."

> 1.    The law regarding causation.

On its face, the Wisconsin SIP requires proof that a physical change caused an emission increase before a PSD-triggering modification may be found.  *See* Wis. Admin. Code NR § 405.02(21) (2004) ("'Major Modification' means any physical change in or change in the method of operation of a major stationary source *that would result in* a significant net emissions increase" (emphasis added) and Wis. Admin. Code § NR

405.02(24)(a)1. (a net emissions increase is "any increase . . . *from* a particular physical change . . . ") (emphasis added)).  In *WEPCO*, the Seventh Circuit Court of Appeals expressed the view that applying the "potential-to-emit" test to like-kind replacement projects was inappropriate and "circular" reasoning which "appear[s] to assume what [EPA] seek[s] to prove," namely that modified units will in the future operate at maximum physical levels.  *WEPCO*, 893 F.2d at 917.  Thus, in the context of its subsequent rule making, which included the adoption of an "actual-to-predicted-actual" test and a "demand growth" exclusion for electric utilities, EPA expressly acknowledged that the concept of causation was inherent in New Source Review:

> The NSR regulatory provisions require that the physical . . . change "result in" an increase in actual emissions in order to consider that change to be a modification. . . . In other words, NSR will not apply unless EPA finds that there is a causal link between the proposed change and *any* post-change increase in emissions.

57 Fed. Reg. at 32326 (emphasis added).  Granted, in that 1992 rule-making, EPA stopped short of then providing that emissions test and that exclusion to other industries. However, there would seem to be no logical reason why the fundamental concept that "NSR applies *only* where the emissions increase is caused by the change," *ibid.*, at 32325 (emphasis added),  should not apply to all regulated sources.  Eventually EPA *did* extend the test and the exclusion to all other sources, acknowledging that "[b]oth the statute and implementing regulations indicate that there should be a causal link between the proposed change and any post-change increase in emissions," 67 Fed. Reg. 80186, 80203

(December 31, 2002).[25]  That provision and this justification for it were upheld several years later.  *See NSR I*, 413 F.3d at 31-33.  For these reasons, it is the defendants' position that, in the absence of proof that a project caused a significant net emissions increase, there can be no PSD violation regardless of whether emissions are measured by the "actual-to-predicted-actual" or "actual-to-potential" tests.

> 2.    All Six Claims Should Be Dismissed Because The Projects Did Not Cause Emissions Increases.

As previously noted, if the "actual-to-predicted-actual" test for measuring emissions increases is applied without consideration of causation, five of the six projects – all except # 1 – do not yield "significant" levels of emission increases and are therefore PSD exempt.  If causation is considered and required under this tests, however, all six projects are exempt.  None of the projects increased the steam producing capacity of the boilers themselves.  DFOF ¶191.  For the same reasons, if the Court concludes that the "actual-to-potential" test applies here but requires proof that the projects caused significant net emissions increases, all six claims should be dismissed for lack of proof.  On the other hand, if the Court were to apply the "actual-to-potential" test without requiring proof that the projects caused any real increases in emissions, all six projects

---

[25]  The decade-long process of adopting the rule providing for general application of the "actual-to-predicted-actual" emission test and the "demand growth" exception is described in detail in *NSR I*, 413 F.3d at 16-17.  The stay issued by the reviewing court and EPA's drawn-out rule making process presumably accounted for the absence during the interim of litigation concerning the distinction in the regulatory treatment of utilities and other industries.

would fail the test for PSD exemption (DFOF ¶179), but in that event the parties would seem to be situated like those in *WEPCO* where the supposed "significant net emissions increases" associated with "like kind" equipment replacements at an existing facility were supported *only* by a presumption, not by empirical evidence or experience.  Doing so here, the defendants submit, would be no more warranted than in *WEPCO* where the Court concluded that "EPA's reliance on an assumed continuous operation as a basis for finding an emissions increase is not properly supported." *WEPCO*, 893 F.2d at 918.


## CONCLUSION

For the foregoing reasons, defendant respectfully requests the court to enter judgment for defendants and to dismiss the above-entitled action.

Dated at Madison, Wisconsin this 25th day of September, 2007.

Respectfully Submitted,

J.B. VAN HOLLEN
Attorney General

THOMAS J. DAWSON
Assistant Attorney General
State Bar No. 1046134

THOMAS L. DOSCH
Assistant Attorney General
State Bar No. 1017026

Wisconsin Dept. of Justice
PO Box 7857
Madison, WI  53707-7857
(608) 266-8987
(608) 266-0770

Attorneys for Defendants Michael Morgan,
Jay Ehrfurth, John Wiley and Kevin Reilly

- 68 -

add To # 32.

17    DEPARTMENT OF NATURAL RESOURCES    **NR 405.02**

Unofficial Text (See Printed Volume).  Current through date and Register shown on Title Page.

*OLD REGS*

# Chapter NR 405

# PREVENTION OF SIGNIFICANT DETERIORATION

| | | | |
|---|---|---|---|
| NR 405.01 | Applicability; purpose. | NR 405.09 | Source impact analysis. |
| NR 405.02 | Definitions. | NR 405.10 | Air quality models. |
| NR 405.03 | Restrictions on area classifications. | NR 405.11 | Air quality analysis. |
| NR 405.04 | Exclusions from increment consumption. | NR 405.12 | Source information. |
| NR 405.05 | Redesignation. | NR 405.13 | Additional impact analyses. |
| NR 405.06 | Stack heights. | NR 405.14 | Sources impacting federal Class I areas — additional requirements. |
| NR 405.07 | Review of major stationary sources and major modifications — source applicability and exemptions. | NR 405.15 | Public participation. |
| | | NR 405.16 | Source obligation. |
| NR 405.08 | Control technology review. | NR 405.17 | Innovative control technology. |

**NR 405.01  Applicability; purpose. (1)** APPLICABILITY. The provisions of this chapter apply to all new major stationary sources and all major modifications to major sources located in areas designated as attainment or unclassifiable.

**(2)** PURPOSE. The purpose of this chapter is to establish, pursuant to s. 285.60, Stats., the requirements and procedures for reviewing and issuing air pollution control permits to all new major stationary sources and all major modifications to major sources located in areas designated as attainment or unclassifiable.

**Note:** Throughout the proposed rule, changes have been made which result in the provisions of this PSD rule differing from 40 CFR 51.166, the federal regulation on which it is based. In this rule, the term "air contaminant" is substituted for the term "pollutant" in the federal regulation and "department" for the term "the State", "the Governor" and "reviewing authority". The federal definition for "building, structure, facility or installation" is applied to the phrase "facility, building, structure, equipment, vehicle or action" – a similar term which appears in Wisconsin's statutory provisions on air pollution. In addition, cross references in the federal regulation have been changed in the rule to comparable provisions in Wisconsin's rule (e.g., "40 CFR Parts 60 and 61" has been changed to "chs. NR 440 and 447 to 449 and subch. III of ch. NR 446"). Eliminated from the rule are provisions of the federal regulations which do not apply to the state's PSD program (i.e., provisions governing EPA approval of plan revisions).

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; correction in (2) made under s. 13.93 (2m) (b) 7., Stats., Register, December, 1986, No. 492.

**NR 405.02  Definitions.** The definitions contained in ch. NR 400 apply to the terms used in this chapter. In addition, the following definitions apply to the terms used in this chapter:

**(1)** "Actual emissions" means the actual rate of emissions of an air contaminant from an emissions unit, as determined in accordance with pars. (a) through (d).

(a)  In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the air contaminant during a 2–year period which precedes the particular date and which is representative of normal source operation. The department may allow the use of a different time period upon a determination that it is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(b)  The department may presume that source–specific allowable emissions for the unit are equivalent to the actual emissions of the unit unless reliable data are available which demonstrate that the actual emissions are different than the source–specific allowable emissions.

(c)  For any emissions unit, other than an electric utility steam generating unit, which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

(d)  For an electric utility steam generating unit, other than a new unit or the replacement of an existing unit, actual emissions of the unit following the physical or operational change shall

equal the representative actual annual emissions of the unit, provided the source owner or operator maintains and submits to the department, on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase. A longer period, not to exceed 10 years, may be required by the department if the department determines such a period to be more representative of normal source post–change operations.

**(2)** "Allowable emissions" means the emissions rate of a stationary source calculated using the maximum rated capacity of the source, unless the source is subject to federally enforceable limits which restrict the operating rate, or hours of operation, or both, and the most stringent of the following:

(a)  The applicable standards as set forth in chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412).

(b)  The applicable emissions limitations, as set forth in chs. NR 400 to 499.

(c)  The emissions rate specified as a federally enforceable permit condition.

**(3)** "Baseline area" means any intrastate area, and every part thereof, designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407 (d) (1) (D) or (E)) in which the major source or major modification establishing the minor source baseline date would construct or would have an air quality impact equal to or greater than 1 $\mu$g/m$^3$ (annual average) of the air contaminant for which the minor source baseline date is established. Area redesignations under section 107 (d) (1) (D) or (E) of the Act cannot intersect or be smaller than the area of impact of any major stationary source or major modification which either establishes a minor source baseline date or is subject to this chapter.

**(4)** (a)  "Baseline concentration" means that ambient concentration level which exists in the baseline area at the time of the applicable minor source baseline date. A baseline concentration is determined for each air contaminant for which a minor source baseline date is established and shall include:

1.  The actual emissions representative of sources in existence on the applicable minor source baseline date, except as provided in par. (b).

2.  The allowable emissions of major stationary sources which commenced construction before the major source baseline date, but were not in operation by the applicable minor source baseline date.

(b)  The following will not be included in the baseline concentration and will affect the applicable maximum allowable increases:

1.  Actual emissions from any major stationary source on which construction commenced after the major source baseline date.

**Unofficial Text (See Printed Volume).  Current through date and Register shown on Title Page.**

2. Actual emissions increases and decreases at any stationary source occurring after the minor source baseline date.

**(6)** "Begin actual construction" means, in general, initiation of physical on−site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying of underground pipework and construction of permanent storage structures. With respect to a change in method of operation, this term refers to those on−site activities, other than preparatory activities, which mark the initiation of the change.

**(7)** "Best available control technology" or "BACT" means an emissions limitation, including a visible emissions standard, based on the maximum degree of reduction for each air contaminant subject to regulation under the Act which would be emitted from any proposed major stationary source or major modification which the department, on a case−by−case basis, taking into account energy, environmental, and economic impacts, and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including clean fuels, fuel cleaning or treatment or innovative fuel combination techniques for control of the air contaminant. In no event may application of best available control technology result in emissions of any air contaminant which would exceed the emissions allowed by any applicable standard under chs. NR 440 and 445 to 449 and under sections 111 and 112 of the Act (42 USC 7411 and 7412). Emissions from any source utilizing clean fuels or any other means to comply with this subsection may not be allowed to increase above the levels that would have been required under this subsection as it existed prior to enactment of the 1990 clean air Act amendments on November 15, 1990. If the department determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. The standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.

**(8)** "Building, structure, facility or installation" or "facility, building, structure, equipment, vehicle or action" means all of the air contaminant emitting activities which belong to the same industrial grouping, are located on one or more contiguous or adjacent properties, and are under the control of the same person (or persons under common control) except the activities of any vessel. Air contaminant emitting activities shall be considered as part of the same industrial grouping if they are classified under the same 2−digit major group as described in the Standard Industrial Classification Manual, 1987, incorporated by reference in s. NR 484.05.

**(8m)** "Clean coal technology" means any technology, including technologies applied at the precombustion, combustion, or post combustion stage, at a new or existing facility which will achieve significant reductions in air emissions of sulfur dioxide or oxides of nitrogen associated with the utilization of coal in the generation of electricity, or process steam, which was not in widespread use as of November 15, 1990.

**(8s)** "Clean coal technology demonstration project" means a project using funds appropriated under the heading "Department of Energy−Clean Coal Technology", up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations for the U.S. environmental protection agency. The federal contribution for a qualifying project shall be at least 20% of the total cost of the demonstration project.

**(9)** "Commence" as applied to construction of a major stationary source or major modification means that the owner or operator

has all necessary preconstruction approvals or permits and has done one of the following:

(a) Begun, or caused to begin, a continuous program of actual on−site construction of the source, to be completed within a reasonable time.

(b) Entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of actual construction of the source to be completed in a reasonable time.

**(10)** "Complete" means, in reference to an application for a permit, that the application contains all the information necessary for processing the application. Designating an application complete for purposes of permit processing does not preclude the department from requesting or accepting any additional information.

**(11)** "Construction" means any physical change or change in the method of operation (including fabrication, erection, installation, demolition, or modification of an emissions unit) which would result in a change in actual emissions.

**(11m)** "Electric utility steam generating unit" means any steam electric generating unit that is constructed for the purpose of supplying more than one−third of its potential electric output capacity and more than 25 MW electrical output to any utility power distribution system for sale. Any steam supplied to a steam distribution system for the purpose of providing steam to a steam−electric generator that would produce electrical energy for sale is also considered in determining the electrical energy output capacity of the affected facility.

**(12)** "Emissions unit" means any part of a stationary source which emits or would have the potential to emit any air contaminant subject to regulation under the act.

**(13)** "Federal land manager" means, with respect to any lands in the United States, the secretary of the department with authority over such lands.

**(15)** "Fugitive emissions" means those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening.

**(16)** "High terrain" means any area having an elevation 900 feet or more above the base of the stack of a source.

**(17)** "Indian governing body" means the governing body of any tribe, band, or group of Indians subject to the jurisdiction of the United States and recognized by the United States as possessing power of self−government.

**(18)** "Indian reservation" means any federally recognized reservation established by treaty, agreement, executive order, or act of congress.

**(19)** "Innovative control technology" means any system of air pollution control that has not been adequately demonstrated in practice, but would have a substantial likelihood of achieving greater continuous emissions reduction than any control system in current practice or of achieving at least comparable reductions at lower cost in terms of energy, economics, or nonair quality environmental impacts.

**(20)** "Low terrain" means any area other than high terrain.

**(21)** "Major modification" means any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any air contaminant subject to regulation under the act.

(a) Any net emissions increase that is significant for volatile organic compounds shall be considered significant for ozone.

(b) A physical change or change in the method of operation does not include:

1. Routine maintenance, repair, and replacement.

2. Use of an alternative fuel or raw material by reason of any order under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC 791 to 798) or by

Unofficial Text (See Printed Volume).  Current through date and Register shown on Title Page.

reason of a natural gas curtailment plan pursuant to the Federal Power Act (16 USC 791a to 828c).

3.  Use of an alternative fuel by reason of an order or rule under section 125 of the Act (42 USC 7425).

4.  Use of an alternative fuel at a steam generating unit to the extent that the fuel is generated from municipal solid waste.

5.  Use of an alternative fuel or raw material by a stationary source when one of the following applies:

a.  The source was capable of accommodating the alternative fuel or raw material before January 6, 1975, unless the change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to this chapter or ch. NR 406 or 408 or under an operation permit issued pursuant to ch. NR 407.

b.  The source is approved to use the alternative fuel or raw material under any permit issued under this chapter or ch. NR 406, 407 or 408.

6.  An increase in the hours of operation or in the production rate, unless such change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975, pursuant to this chapter, ch. NR 406 or 408 or 40 CFR 52.21 or under an operation permit issued pursuant to ch. NR 407.

7.  Any change in ownership at a stationary source.

8.  The addition, replacement or use of a pollution control project at an existing electric utility steam generating unit, unless the department determines that the addition, replacement or use renders the unit less environmentally beneficial, or except when the department determines both of the following:

a.  There is reason to believe that the pollution control project would result in a significant net increase in representative actual annual emissions of any pollutant for which a national ambient air quality standard has been adopted over levels used for that source in the most recent air quality impact analysis in the area conducted for the purpose of title I of the Act (42 USC 7401 to 7515), if any.

b.  The increase will cause or contribute to a violation of any national ambient air quality standard or air quality increment, or visibility limitation.

9.  The installation, operation, cessation or removal of a temporary clean coal technology demonstration project, provided that the project complies with both of the following:

a.  The state implementation plan.

b.  Other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

10.  The installation or operation of a permanent clean coal technology demonstration project that constitutes repowering, provided that the project does not result in an increase in the potential to emit of any regulated pollutant emitted by the unit. This exemption shall apply on a pollutant−by−pollutant basis.

11.  The reactivation of a very clean coal−fired electric utility steam generating unit.

(21m)  "Major source baseline date" means:

(a)  In the case of particulate matter and sulfur dioxide, January 6, 1975.

(b)  In the case of nitrogen dioxide, February 8, 1988.

(22)  (a)  "Major stationary source" means:

1.  Any of the following stationary sources of air contaminants which emits, or has the potential to emit, 100 tons per year or more of any air contaminant subject to regulation under the act: Fossil fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (with thermal dryers), kraft pulp mills, portland cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur

recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production plants, chemical process plants, fossil fuel boilers (or combinations thereof) totaling more than 250 million British thermal units per hour heat input, petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels, taconite ore processing plants, glass fiber processing plants, and charcoal production plants.

2.  Notwithstanding the stationary source size specified in subd. 1., any stationary source which emits, or has the potential to emit, 250 tons per year or more of any air contaminant subject to regulation under the act.

3.  Any physical change that would occur at a stationary source not otherwise qualifying under this subsection as a major stationary source, if the change would constitute a major stationary source by itself.

(b)  A major source that is major for volatile organic compounds shall be considered major for ozone.

(c)  Volatile organic compounds exclude the compounds listed under s. NR 400.02 (162) unless the compound is subject to an emission limitation under chs. NR 440 and 447 to 449 and subch. III of ch. NR 446.

(d)  Mobile source emissions indirectly caused by a source which attracts mobile source activity may not be considered in determining whether the source is a major stationary source for the purposes of this chapter.

(22m)  (a)  "Minor source baseline date" means the earliest date after the trigger date on which the owner or operator of a major stationary source or a major modification subject to 40 CFR 52.21 or to regulations approved pursuant to 40 CFR 51.166 submits a complete application under the relevant regulations. The trigger date is:

1.  In the case of particulate matter and sulfur dioxide, August 7, 1977.

2.  In the case of nitrogen dioxide, February 8, 1988.

(b)  The minor source baseline date is established for each air contaminant for which increments or other equivalent measures have been established if:

1.  The area in which the proposed source or modification would construct is designated as attainment or unclassifiable under section 107 (d) (1) (D) or (E) of the Act (42 USC 7407(d)(1)(D) or (E)) for the air contaminant on the date of its complete application under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166.

2.  In the case of a major stationary source, the air contaminant would be emitted in significant amounts or, in the case of a major modification, there would be a significant net emissions increase of the air contaminant.

(23)  "Necessary preconstruction approvals or permits" means those permits or approvals required under chs. NR 400 to 499.

(24)  (a)  "Net emissions increase" means the amount by which the sum of the following exceeds zero:

1.  Any increase in actual emissions from a particular physical change or change in the method of operation at a stationary source.

2.  Any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

(b)  An increase or decrease in actual emissions is contemporaneous with the increase from the particular change only if it occurs between the following:

1.  The date 5 years before construction on the particular change commences.

2.  The date that the increase from the particular change occurs.

(c)  An increase or decrease in actual emissions is creditable only if the reviewing authority has not relied on it in issuing a per-

**Unofficial Text (See Printed Volume).  Current through date and Register shown on Title Page.**

mit for the source under this chapter, which permit is in effect when the increase in actual emissions from the particular change occurs.

(d)  An increase or decrease in actual emissions of sulfur dioxide, nitrogen oxides or particulate matter measured as $PM_{10}$ which occurs before the applicable minor source baseline date is creditable only if it is required to be considered in calculating the amount of maximum allowable increases remaining available.

(e)  An increase in actual emissions is creditable only to the extent that the new level of actual emissions exceeds the old level.

(f)  A decrease in actual emissions is creditable only to the extent that:

1.  The old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions.

2.  It is federally enforceable at and after the time that actual construction on the particular change begins.

3.  It has approximately the same qualitative significance for public health and welfare as that attributed to the increase from the particular change.

(g)  An increase that results from a physical change at a source occurs when the emissions unit on which construction occurred becomes operational and begins to emit a particular pollutant. Any replacement unit that requires shakedown becomes operational only after a reasonable shakedown period, not to exceed 180 days.

**(24m)**  "Pollution control project" means any activity or project undertaken at an existing electric utility steam generating unit for purposes of reducing emissions from the unit. Activities or projects are limited to the following:

(a)  The installation of conventional or innovative pollution control technology, including but not limited to advanced flue gas desulfurization, sorbent injection for sulfur dioxide and nitrogen oxides controls and electrostatic precipitators.

(b)  An activity or project to accommodate switching to a fuel which is less polluting than the fuel in use prior to the activity or project, including, but not limited to, natural gas or coal re-burning, or the co-firing of natural gas and other fuels for the purpose of controlling emissions.

(c)  A permanent clean coal technology demonstration project conducted under title II, section 101 (d) of the Further Continuing Appropriations Act of 1985 (42 USC 5903 (d)), or subsequent appropriations, up to a total amount of $2,500,000,000 for commercial demonstration of clean coal technology, or similar projects funded through appropriations from the U.S. environmental protection agency.

(d)  A permanent clean coal technology demonstration project that constitutes a repowering project.

**(25)**  "Potential to emit" means the maximum capacity of a stationary source to emit an air contaminant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit an air contaminant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the potential to emit of a stationary source.

**(25g)**  "Reactivation of a very clean coal-fired electric utility steam generating unit" means any physical change or change in the method of operation associated with the commencement of commercial operations by a coal-fired utility unit after a period of discontinued operation where the unit meets all of the following criteria:

(a)  It has not been in operation for the 2-year period prior to the enactment of the clean air Act amendments of 1990 on November 15, 1990, and the emissions from the unit continue to

be carried in the department's emissions inventory at the time of enactment.

(b)  It was as equipped prior to shutdown with a continuous system of emissions control that achieves a removal efficiency for sulfur dioxide of no less than 85% and a removal efficiency for particulates of no less than 98%.

(c)  It is equipped with low-$NO_x$ burners prior to the time of commencement of operations following reactivation.

(d)  It is otherwise in compliance with the requirements of the act.

**(25m)** (a)  "Repowering" means replacement of an existing coal-fired boiler with one of the following clean coal technologies: atmospheric or pressurized fluidized bed combustion, integrated gasification combined cycle, magnetohydrodynamics, direct and indirect coal-fired turbines, integrated gasification fuel cells, or as determined by the administrator, in consultation with the federal secretary of energy, a derivative of one or more of these technologies, and any other technology capable of controlling multiple combustion emissions simultaneously with improved boiler or generation efficiency and with significantly greater waste reduction relative to the performance of technology in widespread commercial use as of November 15, 1990.

(b)  Repowering shall also include any unit fired by oil or gas or both which has been awarded clean coal technology demonstration funding as of January 1, 1991, by the federal department of energy.

(c)  The department shall give expedited consideration to permit applications for any source that satisfies the requirements of this subsection and is granted an extension under section 409 of the Act (42 USC 7651h).

**(25s)**  "Representative actual annual emissions" means the average rate, in tons per year, at which the source is projected to emit a pollutant for the 2-year period after a physical change or change in the method of operation of a unit, or a different consecutive 2-year period within 10 years after that change, where the department determines that such period is more representative of normal source operations, considering the effect any such change will have on increasing or decreasing the hourly emissions rate and on projected capacity utilization. In projecting future emissions the department shall:

(a)  Consider all relevant information, including but not limited to, historical operational data, the company's own representations, filings with the state or federal regulatory authorities, and compliance plans under title IV of the act.

(b)  Exclude, in calculating any increase in emissions that results from the particular physical change or change in the method of operation at an electric utility steam generating unit, that portion of the unit's emissions following the change that could have been accommodated during the representative baseline period and is attributable to an increase in projected capacity utilization at the unit that is unrelated to the particular change, including any increased utilization due to the rate of electricity demand growth for the utility system as a whole.

**(26)**  "Secondary emissions" means emissions which occur as a result of the construction or operation of a major stationary source or major modification, but do not come from the major stationary source or major modification itself. For the purposes of this chapter, secondary emissions must be specific, well defined, quantifiable, and impact the same general areas as the stationary source or modification which causes the secondary emissions. Secondary emissions include emissions from any offsite support facility which would not be constructed or increase its emissions except as a result of the construction or operation of the major stationary source or major modification. Secondary emissions do not include any emissions which come directly from a mobile source, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel.

Unofficial Text (See Printed Volume). Current through date and Register shown on Title Page.

**(27)** (a) "Significant" means, in reference to a net emissions increase or the potential of a source to emit any of the air contaminants in Table A, a rate of emissions that would equal or exceed any of the rates in Table A.

### Table A
### Pollutant and Emissions Rate

1. Carbon monoxide: 100 tons per year (tpy)
2. Nitrogen oxides: 40 tpy
3. Sulfur dioxide: 40 tpy
4. Particulate matter: 25 tpy
5. $PM_{10}$: 15 tpy
6. Ozone: 40 tpy of volatile organic compounds
7. Lead: 0.60 tpy
8. Mercury: 0.10 tpy
9. Fluorides: 3.0 tpy
10. Sulfuric acid mist: 7.0 tpy
11. Hydrogen sulfide ($H_2S$): 10 tpy
12. Total reduced sulfur (including $H_2S$): 10 tpy
13. Reduced sulfur compounds (including $H_2S$): 10 tpy
14. Municipal waste combustor (MWC) acid gases (measured as total sulfur dioxide and hydrogen chloride): 40 tpy
15. MWC metals (measured as particulate matter): 15 tpy
16. MWC organics (measured as total tetra– through octa–chlorinated dibenzo–p–dioxins and dibenzofurans): $3.5 \times 10^{-6}$ tpy
17. CFCs 11, 12, 112, 114, 115: any emission rate
18. Halons 1211, 1301, 2402: any emission rate

(c) "Significant" means any emissions rate in reference to a net emissions increase or the potential of a source to emit an air contaminant subject to regulation under the Act other than air contaminants listed in par. (a) or under section 112 (b) of the Act (42 USC 7412 (b)).

(d) Notwithstanding par. (a), "significant" means any emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 µg/$m^3$ (24–hour average).

**(28)** "Stationary source" means any building, structure, facility or installation which emits or may emit any air contaminant subject to regulation under the act.

**(29)** "Temporary clean coal technology demonstration project" means a clean coal technology demonstration project that is operated for a period of 5 years or less, and which complies with the state implementation plans for the state in which the project is located and other requirements necessary to attain and maintain the national ambient air quality standards during the project and after it is terminated.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (27) (a) Register, December, 1988, No. 396, eff. 1–1–89; am. (intro.), (22) (c), (27) (b) and (28), cr. (27) (d), Register, May, 1992, No. 437, eff. 6–1–92; emerg. am. (7) and (27) (a) and (b), eff. 11–15–92; am. (intro.), (3) (c), (7), (10), (27) (a), (b), (b)m., (b)n., (8x), (11m), (21) (b)x to 11, (24m), (25g), (26m), (26x) and (29), renum. (1) to be NR 405.02 (9) and am. (1), (24) (b) (intro.), 1, 2 and intro., and (25g) (intro.), (37m), corrections made by, intro. and (25g) (a) (code under s. 13.93 (2m) (b) 7. and 6, Stats. Register, May, 1993, No. 449; am. (1) (bm) (2) (a), Chapter, (7) (b), (21) (b) (iv), (25) (b), (25m) (b) (iv), Register, April, 1995, No. 472, eff. 5–1–95;(am) (intro.) (a) (2) (intro.), (a) (3) (intro.), 1. and 2., (b) 1. and 2., (7), (8), (21), (21) (intro.), (b) x. 5. a. and b., (8, 9), (22), (a) 1 and 2., (24) (m), (25) (b), (26), (intro.) and (a), (27) (a) and (b), (25) (b) and (26m), (a) (25m). Register, December, 2005, No. 480, eff. 1–1–06; am. (5), (intro.) (7) (b) (intro.), (21) (b) x. 5. a. and b. intro. (22) (b) 1., (24) (b) (intro.) 1., 2. and intro. (a) (25g) and (26m) cr. (3) (a), (3m), Register, December, 1996, No. 492, eff. 1–1–97; am. (24) (b) (intro.) 1., 5. and (22) (c), Register, October, 1999, No. 526, eff. 11–1–99; CR 01–081: am. (22) (e) Register September 2004 No. 585, eff. 10–1–04.

### NR 405.03 Restrictions on area classifications.
**(1)** All of the following areas which were in existence on August

7, 1977, shall be Class I areas and may not be redesignated by the department:

(a) International parks.

(b) National wilderness areas which exceed 5,000 acres in size.

(c) National memorial parks which exceed 5,000 acres in size.

(d) National parks which exceed 6,000 acres in size.

**(2)** Any other area, unless otherwise specified in the legislation creating such an area, is initially designated Class II, but may be redesignated as provided in this chapter.

**(3)** The following areas may be redesignated only as Class I or II:

(a) An area which as of August 7, 1977, exceeded 10,000 acres in size and was a national monument, a national primitive area, a national preserve, a national recreational area, a national wild and scenic river, a national wildlife refuge, a national lakeshore or seashore.

(b) A national park or national wilderness area established after August 7, 1977, which exceeds 10,000 acres in size.

**(4)** The extent of the areas referred to in subs. (1) and (3) shall conform to any changes in the boundaries which have occurred subsequent to August 7, 1977.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; emerg. cr. (4), eff. 11–15–92; cr. (4), Register, May, 1993, No. 449, eff. 6–1–93.

### NR 405.04 Exclusions from increment consumption. 
**(1)** All of the following concentrations shall be excluded in determining compliance with a maximum allowable increase:

(a) Concentrations attributable to the increase in emissions from stationary sources which have converted from the use of petroleum products, natural gas, or both by reason of an order in effect under sections 2 (a) and (b) of the Energy Supply and Environmental Coordination Act of 1974 (15 USC 791 to 798) over the emissions from such sources before the effective date of such an order.

(b) Concentrations attributable to the increase in emissions from sources which have converted from using natural gas by reason of a natural gas curtailment plan in effect pursuant to the Federal Power Act (16 USC 791a to 828c) over the emissions from such sources before the effective date of the plan.

(c) Concentrations of particulate matter attributable to the increase in emissions from construction or other temporary emission–related activities of new or modified sources.

(d) The increase in concentrations attributable to new sources outside the United States over the concentrations attributable to existing sources which are included in the baseline concentration.

(e) Concentrations attributable to the temporary increase in emissions of sulfur dioxide, nitrogen dioxide or particulate matter from stationary sources which are affected by plan revisions approved by the administrator as meeting the criteria specified in sub. (4).

**(2)** No sources which have concentrations which are excluded from increment consumption under sub. (1) (a) and (b) may any longer have those concentrations excluded 5 years after the effective date of the order to which sub. (1) (a) refers or the plan to which sub. (1) (b) refers, whichever is applicable. If both such order and plan are applicable, no such exclusion may apply more than 5 years after the later of such effective dates.

**(4)** For purposes of excluding concentrations pursuant to sub. (1) (e), the administrator may approve a plan revision that:

(a) Specifies the time over which the temporary emissions increase of sulfur dioxide, nitrogen dioxide or particulate matter would occur. Such time is not to exceed 2 years in duration unless a longer time is approved by the administrator.

(b) Specifies that the time period for excluding certain contributions in accordance with par. (a) is not renewable.

(c) Allows no emissions increase from a stationary source which would cause either of the following:

**Unofficial Text (See Printed Volume). Current through date and Register shown on Title Page.**

1. Impact a Class I area or an area where an applicable increment is known to be violated.

2. Cause or contribute to the violation of a national ambient air quality standard.

(d) Requires limitations to be in effect at the end of the time period specified in accordance with par. (a) which would insure that the emissions levels from stationary sources affected by the plan revision would not exceed those levels occurring from such sources before the plan revision was approved.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1) (e), (2), (3) and (4) (a), Register, May, 1992, No. 437, eff. 6–1–92; am. (1) (a) and (e), (4) (intro.) and (a), r. (3), Register, December, 1995, No. 480, eff. 1–1–96; am. (1) (intro.), (a), (b), (4), (c) (intro.), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.05 Redesignation. (1)** All areas of the state, except as otherwise provided under s. NR 405.03, shall be designated either Class I, Class II, or Class III. Any designation other than Class II shall be subject to the redesignation procedures of this section. Any redesignation must be approved by the administrator as a revision to the applicable state implementation plan.

**(2)** The department may redesignate areas of the state Class I or Class II if the following criteria are met:

(a) At least one public hearing has been held in the area affected.

(b) Other states, Indian governing bodies, and federal land managers whose lands may be affected by the proposed redesignation are notified at least 30 days prior to the public hearing.

(c) A discussion of the reasons for the proposed redesignation, including a satisfactory description and analysis of the health, environmental, economic, social and energy effects of the proposed redesignation, is prepared and made available for public inspection at least 30 days prior to the hearing and the notice announcing the hearing contained appropriate notification of the availability of such discussion.

(d) Prior to the issuance of notice respecting the redesignation of an area that includes any federal lands, the department shall provide written notice to the appropriate federal land manager and the federal land manager shall be allowed 30 days to confer with the department respecting the redesignation and to submit written comments and recommendations. In redesignating any area with respect to which any federal land manager submits written comments and recommendations, the department shall publish a list of any inconsistency between such redesignation and such comments and recommendations (together with the reasons for making such redesignation against the recommendation of the federal land manager).

(e) The department proposes the redesignation after consultation with the elected leadership of local and other substate general purpose governments in the area covered by the proposed redesignation.

**(3)** Any area other than an area to which s. NR 405.03 refers may be redesignated as Class III if the following criteria are met:

(a) The redesignation meets the requirements of provisions established in accordance with sub. (2).

(b) The redesignation, except any established by an Indian governing body, is specifically approved by the department.

(c) The redesignation does not cause, or contribute to, a concentration of any air contaminant which exceeds any maximum allowable increase permitted under the classification of any other area or any national ambient air quality standard.

(d) Any permit application for any major stationary source or major modification subject to provisions established in accordance with s. NR 405.10, which can receive a permit only if the area in question is redesignated as Class III, and any material submitted as part of that application is available, insofar as is practicable, for public inspection prior to any public hearing on redesignation of any area as Class III.

**(4)** Lands within the exterior boundaries of Indian reservations may be redesignated only by the appropriate Indian governing body. The appropriate Indian governing body may submit to the administrator a proposal to redesignate areas Class I, Class II, or Class III provided that the following conditions are met:

(a) The Indian governing body has followed procedures equivalent to those required of the department under subs. (2) and (3) (c) and (d).

(b) Such redesignation is proposed after consultation with the state in which the Indian reservation is located and which border the Indian reservation.

**(5)** If the administrator disapproves a proposed redesignation, the classification of the area shall be that which was in effect prior to the disapproval of the redesignation.

**(6)** If the administrator disapproves any proposed area redesignation, the department or Indian governing body, as appropriate, may resubmit the proposal after correcting the deficiencies noted by the administrator.

Note: The time period provided for a federal land manager's comments on the federal regulations is not in excess of 60 days) is specified as 30 days in sub. (2) (d).

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1), (4) (intro.), (5) and (6), Register, December, 1995, No. 480, eff. 1–1–96; am. (3) (intro.), (4) (intro.), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.06 Stack heights.** The degree of emission limitation required for control of any air contaminant under chs. NR 400 to 499 may not be affected in any manner by:

**(1)** So much of a stack height, not in existence before December 31, 1970, as exceeds good engineering practice, or

**(2)** Any other dispersion technique not implemented before then.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87.

**NR 405.07 Review of major stationary sources and major modifications — source applicability and exemptions. (1)** No major stationary source or major modification may begin actual construction unless the requirements of ss. NR 405.08 to 405.16 have been met.

**(2)** The requirements of ss. NR 405.08 to 405.16 shall apply to any major stationary source and any major modification with respect to each air contaminant that it would emit, except as this chapter would otherwise allow.

**(3)** The requirements of ss. NR 405.08 to 405.11 apply only to any major stationary source or major modification that would be constructed in an area which is designated as attainment or unclassifiable under section 107 (a) (1) (D) or (E) of the Act (42 USC 7407(a)(1)(D) or (E)).

**(4)** A major source or major modification is exempt from the requirements of ss. NR 405.08 to 405.16 if any of the following apply:

(a) The source or modification would be a major stationary source or major modification only if fugitive emissions, to the extent quantifiable, are considered in calculating the potential to emit of the stationary source or modification and such source does not belong to any of the following categories:

1. Coal cleaning plants (with thermal dryers).

2. Kraft pulp mills.

3. Portland cement plants.

4. Primary zinc smelters.

5. Iron and steel mills.

6. Primary aluminum ore reduction plants.

7. Primary copper smelters.

8. Municipal incinerators capable of charging more than 250 tons of refuse per day.

9. Hydrofluoric, sulfuric, or nitric acid plants.

10. Petroleum refineries.

11. Lime plants.

12. Phosphate rock processing plants.

**Unofficial Text (See Printed Volume). Current through date and Register shown on Title Page.**

13. Coke oven batteries.

14. Sulfur recovery plants.

15. Carbon black plants (furnace processes).

16. Primary lead smelters.

17. Fuel conversion plants.

18. Sintering plants.

19. Secondary metal production plants.

20. Chemical process plants.

21. Fossil fuel boilers (or combination thereof) totaling more than 250 million British thermal units per hour heat input.

22. Petroleum storage and transfer units with a total storage capacity exceeding 300,000 barrels.

23. Taconite ore processing plants.

24. Glass fiber processing plants.

25. Charcoal production plants.

26. Fossil fuel fired steam electric plants of more than 250 million British thermal units per hour heat input.

27. Any other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act (42 USC 7411 or 7412).

(b) The major source or major modification is a portable stationary source which has previously received a permit under requirements in ss. NR 405.08 to 405.16 and all of the following conditions are met:

1. The source proposes to relocate and emissions of the source at the new location would be temporary.

2. The emissions from the source would not exceed its allowable emissions.

3. The emissions from the source would impact no Class 1 area and no area where an applicable increment is known to be violated.

4. Reasonable notice is given to the department prior to the relocation identifying the proposed new location and the probable duration of operation at the new location. Such notice shall be given to the department not less than 30 days in advance of the proposed relocation unless a different time duration is previously approved by the department.

(5) The requirements of ss. NR 405.08 to 405.16 do not apply to a major stationary source or major modification with respect to a particular air contaminant if the owner or operator demonstrates that, as to that air contaminant, the source or modification is located in an area designed as nonattainment under section 107 of the Act (42 USC 7407).

(6) The requirements contained in ss. NR 405.09, 405.11, and 405.13 do not apply to a proposed major stationary source or major modification with respect to a particular air contaminant, if the allowable emissions of that air contaminant from a new source, or the net emissions increase of that air contaminant from a modification, would be temporary and impact no Class 1 area and no area where an applicable increment is known to be violated.

(7) The requirements contained in ss. NR 405.09, 405.11, and 405.13 as they relate to any maximum allowable increase for a Class II area do not apply to a modification of a major stationary source that was in existence on March 1, 1978, if the net increase in allowable emissions of each air contaminant from the modification after the application of best available control technology would be less than 50 tons per year.

(8) The department may exempt a proposed major stationary source or major modification from the requirements of s. NR 405.11 with respect to monitoring for a particular air contaminant if one of the following applies:

(a) The emissions increase of the air contaminant from a new stationary source or the net emissions increase of the air contaminant from a major modification would cause, in any area, air quality impacts less than the following amounts:

1. Carbon monoxide — 575 µg/m³, 8–hour average.

2. Nitrogen dioxide — 14 µg/m³, annual average.

3. $PM_{10}$ — 10 µg/m³, 24–hour average.

4. Sulfur dioxide — 13 µg/m³, 24–hour average.

5. Ozone.

**Note:** No de minimis air quality level is provided for ozone. However, any source with a net increase of 100 tons per year or more of volatile organic compounds subject to regulation under this chapter would be required to perform an ambient impact analysis, including the gathering of ambient air quality data.

6. Lead — 0.10 µg/m³, 3–month average.

7. Mercury — 0.25 µg/m³, 24–hour average.

8. Beryllium — 0.0010 µg/m³, 24–hour average.

9. Fluorides — 0.25 µg/m³, 24–hour average.

10. Vinyl chloride — 15 µg/m³, 24–hour average.

11. Total reduced sulfur — 10 µg/m³, 1–hour average.

12. Hydrogen sulfide — 0.20 µg/m³, 1–hour average.

13. Reduced sulfur compounds — 10 µg/m³, 1–hour average.

(b) The concentrations of the air contaminant in the area that the source or modification would affect are less than the concentrations listed in par. (a).

(c) The air contaminant is not listed in par. (a).

**Note:** The advance notice requirement for relocation of a portable source in the federal regulations (not less than 10 days advance notice) has been changed to not less than 30 days in sub. (4) (b).

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; corrections in (6) to (8) made under s. 13.93 (2m) (b) 7., Stats., Register, April, 1988, No. 388; am. (8) (a) 3., Register, April, 1995, No. 472, eff. 5–1–95; am. (1), (4) (intro.), (5) and (6), Register, December, 1995, No. 480, eff. 1–1–96; am. (3), (5), (8) (intro.), (a) 6., 8, 12, renum. (4) (b) and (c) to be (4) (a) and (b) and am. (4) (a) 27., (b) (intro.), Register, December, 1996, No. 492, eff. 1–1–97; am. (8) (a) 9., Register, October, 1999, No. 526, eff. 11–1–99.

**NR 405.08   Control technology review. (1)** A major stationary source or major modification shall meet each applicable emissions limitation under chs. NR 400 to 499 and under sections 111 and 112 of the Act (42 USC 7411 and 7412).

**(2)** A new major stationary source shall apply best available control technology for each air contaminant that it would have the potential to emit in significant amounts.

**(3)** A major modification shall apply best available control technology for each air contaminant for which it would be a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the air contaminant would occur as a result of a physical change or change in the method of operation in the unit.

**(4)** For phased construction projects, the determination of best available control technology shall be reviewed and modified as appropriate at the latest reasonable time which occurs no later than 18 months prior to commencement of construction of each independent phase of the project. At such time, the owner or operator of the applicable stationary source may be required to demonstrate the adequacy of any previous determination of best available control technology for the source.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1), Register, April, 1995, No. 472, eff. 5–1–95; am. (3), Register, December, 1995, No. 480, eff. 1–1–96

**NR 405.09   Source impact analysis.** The owner or operator of the proposed major source or major modification shall demonstrate that allowable emission increases from the proposed major source or major modification, in conjunction with all other applicable emissions increases or reduction, including secondary emissions, would not cause or contribute to air pollution in violation of either of the following:

**(1)** Any national ambient air quality standard in any air quality control region.

Unofficial Text (See Printed Volume). Current through date and Register shown on Title Page.

(2) Any applicable maximum allowable increase over the baseline concentration in any area.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (intro.), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.10 Air quality models. (1)** All estimates of ambient concentrations required under this chapter shall be based on the applicable air quality models, data bases, and other requirements specified in the Guideline on Air Quality Models (Revised) in Appendix W of 40 CFR part 51, incorporated by reference in s. NR 484.04.

(2) Where an air quality impact model specified in the Guideline on Air Quality Models in Appendix W of 40 CFR part 51 is inappropriate, the model may be modified or another model substituted.

(3) A substitution or modification of a model shall be subject to the public comment procedures set forth in s. NR 405.15.

(4) Written approval of the administrator shall be obtained for any modification or substitution.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1) and (5), Register, April, 1988, No. 388, eff. 5–1–88; am. (1) and (5), r. (6), Register, May, 1992, No. 437, eff. 6–1–92; am. (1) to (3), r. (5), Register, April, 1995, No. 472, eff. 5–1–95; am. (4), Register, December, 1995, No. 480, eff. 1–1–96.

**NR 405.11 Air quality analysis. (1)** PREAPPLICATION ANALYSIS. (a) Any application for a permit under this chapter shall contain an analysis of ambient air quality in the area that the major stationary source or major modification would affect for each of the following air contaminants:

1. For the major source, each air contaminant that it would have the potential to emit in a significant amount.

2. For the major modification, each air contaminant for which it would result in a significant net emissions increase.

(b) For any air contaminant for which no national ambient air quality standard exists, the analysis shall contain such air quality monitoring data as the department determines is necessary to assess ambient air quality for that air contaminant in any area that the emissions of that air contaminant would affect.

(c) For any air contaminant for which a standard does exist, the analysis shall contain continuous air quality monitoring data gathered for purposes of determining whether emissions of that air contaminant would cause or contribute to a violation of the standard or any maximum allowable increase.

(d) In general, the continuous air monitoring data that is required shall be gathered over a period of one year and shall represent the year preceding receipt of the application, except that, if the department determines that a complete and adequate analysis can be accomplished with monitoring data gathered over a period shorter than one year (but not to be less than 4 months), the data that is required shall be gathered over at least that shorter period.

(e) The owner or operator of a proposed major stationary source or major modification of volatile organic compounds who satisfies all conditions of 40 CFR part 51, Appendix S, section IV, incorporated by reference in s. NR 484.04, may provide post–approval monitoring data for ozone in lieu of providing pre-construction data as required under this section.

(2) POST–CONSTRUCTION MONITORING. The owner or operator of a major stationary source or major modification shall, after construction of the stationary source or modification, conduct such ambient monitoring as the department determines is necessary to determine the effect emissions from the stationary source or modification may have, or are having, on air quality in any area.

(3) OPERATION OF MONITORING STATIONS. The owner or operator of a major stationary source or major modification shall meet the requirements of Appendix B to 40 CFR part 58, incorporated by reference in s. NR 484.04, during the operation of monitoring stations for purposes of satisfying this section.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (1) (b), (c), (e) and (2), Register, May, 1992, No. 437, eff. 6–1–92; am. (1) (e) and (2), Register, December, 1995, No. 480, eff. 1–1–96.

**NR 405.12 Source information. (1)** The owner or operator of a proposed major source or major modification shall submit all information necessary to perform any analysis or make any determination required under procedures established in accordance with this chapter.

(2) Such information shall include:

(a) A description of the nature, location, design capacity, and typical operating schedule of the major source or major modification, including specifications and drawings showing its design and plant layout.

(b) A detailed schedule for construction of the major source or major modification.

(c) A detailed description as to what system of continuous emission reduction is planned by the major source or major modification, emission estimates, and any other information as necessary to determine that best available control technology as applicable would be applied.

(3) The owner or operator shall also provide information on all of the following:

(a) The air quality impact of the major source or major modification, including meteorological and topographical data necessary to estimate such impact.

(b) The air quality impacts and the nature and extent of any or all general, commercial, residential, industrial and other growth which has occurred since August 7, 1977, in the area the major source or major modification would affect.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (3) (intro.), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.13 Additional impact analyses. (1)** The owner or operator shall provide an analysis of the impairment to visibility, soils, and vegetation that would occur as a result of the major source or major modification and general commercial, residential, industrial and other growth associated with the major source or major modification. The owner or operator need not provide an analysis of the impact on vegetation having no significant commercial or recreational value.

(2) The owner or operator shall provide an analysis of the air quality impact projected for the area as a result of general, commercial, residential, industrial and other growth associated with the major source or major modification.

History: Cr. Register, January, 1987, No. 373, eff. 2–1–87.

**NR 405.14 Sources impacting federal Class I areas — additional requirements. (1)** NOTICE TO EPA. The department shall transmit to the administrator a copy of each permit application relating to a major stationary source or major modification and provide notice to the administrator of every action related to the consideration of such permit.

(2) FEDERAL LAND MANAGER. The federal land manager and the federal official charged with direct responsibility for management of Class I lands have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands and to consider, in consultation with the administrator, whether a proposed source or modification would have an adverse impact on such values.

(3) DENIAL — IMPACT ON AIR QUALITY RELATED VALUES. The department shall allow the federal land manager of any Class I lands the opportunity to present to the department after the department's preliminary determination required under procedures developed in accordance with s. NR 405.16, a demonstration that the emissions from the proposed major source or major modification would have an adverse impact on the air quality related values (including visibility) of any federal mandatory Class I lands, notwithstanding that the change in air quality resulting from emissions from such source or modification would not cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the department concurs with such demonstration, the permit may not be issued.

Unofficial Text (See Printed Volume).  Current through date and Register shown on Title Page.

**(4)** CLASS I VARIANCES.  The owner or operator of a proposed major source or major modification may demonstrate to the federal land manager that the emissions from the source would have no adverse impact on the air quality–related values, including visibility, of these lands, notwithstanding that the change in air quality resulting from emissions from the source or modification would cause or contribute to concentrations which would exceed the maximum allowable increases for a Class I area. If the federal land manager concurs with this demonstration and so certifies to the department, the department may, provided that applicable requirements of this chapter are otherwise met, issue the permit with such emission limitations as may be necessary to assure that emissions of particulate matter measured as $PM_{10}$, sulfur dioxide and nitrogen dioxide would not exceed the following maximum allowable increases over minor source baseline concentration for these air contaminants.

| Pollutant | Maximum allowable increase ($\mu g/m^3$) |
|---|---|
| $PM_{10}$ | |
| Annual arithmetic mean | 17 |
| 24–hour maximum | 30 |
| Sulfur dioxide | |
| Annual arithmetic mean | 20 |
| 24–hour maximum | 91 |
| 3–hour maximum | 325 |
| Nitrogen dioxide | |
| Annual arithmetic mean | 25 |

**(5)** SULFUR DIOXIDE VARIANCE BY DEPARTMENT WITH FEDERAL LAND MANAGER'S CONCURRENCE.  (a)  The owner or operator of a proposed major source or major modification which cannot be approved under procedures developed pursuant to sub. (4) may demonstrate to the department that the source or modification cannot be constructed by reason of any maximum allowable increase for sulfur dioxide for periods of 24–hours or less applicable to any Class I area and, in the case of federal mandatory Class I areas, that a variance under this subsection would not adversely affect the air quality related values of the area (including visibility).

(b)  The department, after consideration of the federal land manager's recommendation (if any) and subject to his or her concurrence, may grant, after notice and an opportunity for a public hearing, a variance from such maximum allowable increase.

(c)  If such variance is granted, the department shall issue a permit to such major source or major modification in accordance with provisions developed pursuant to sub. (7), provided that the applicable requirements of this chapter are otherwise met.

**(6)** VARIANCE BY THE DEPARTMENT WITH THE CONCURRENCE OF THE PRESIDENT OF THE UNITED STATES.  (a)  The recommendations of the department and the federal land manager shall be transferred to the president in any case where the department recommends a variance in which the federal land manager does not concur.

(b)  The president may approve the department's recommendation if he or she finds that such variance is in the national interest.

(c)  If such variance is approved, the department shall issue a permit in accordance with provisions developed pursuant to the requirements of sub. (7), provided that the applicable requirements of this chapter are otherwise met.

**(7)** EMISSION LIMITATIONS FOR PRESIDENTIAL DENIAL OR DEPARTMENTAL VARIANCE.  In the case of a permit issued under procedures developed pursuant to sub. (5) or (6), the major source or major modification shall comply with emission limitations as may be necessary to assure that emissions of sulfur dioxide from the major source or major modification would not, during any day on which the otherwise applicable maximum allowable increases are exceeded, cause or contribute to concentrations which would exceed the following maximum allowable increases over the

baseline concentration and to assure that such emissions would not cause or contribute to concentrations which exceed the otherwise applicable maximum allowable increase for periods of exposure of 24 hours or less for more than 18 days, not necessarily consecutive, during any annual period.

**Unofficial Text (See Printed Volume). Current through date and Register shown on Title Page.**

Maximum Allowable $SO_2$ Increase

($\mu g/m^3$)

| Period of exposure | Terrain areas | |
|---|---|---|
| | Low | High |
| 24-hour maximum | 36 | 62 |
| 3-hour maximum | 130 | 221 |

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (4) and (7), Register, May, 1992, No. 437, eff. 6–1–92; am. (4), Register, April, 1995, No. 472, eff. 5–1–95; am. (1), (2) and (4), Register, December, 1995, No. 480, eff. 1–1–96; am. (7), Register, December, 1996, No. 492, eff. 1–1–97.

**NR 405.15 Public participation. (1)** The department shall notify all applicants within 20 days as to the completeness of the application or any deficiency in the application or information submitted. In the event of such a deficiency, the date of receipt of the application shall be the date on which the department received all required information.

**(2)** Within 205 business days after receipt of a complete application, the department shall:

(a) Make a preliminary determination whether construction should be approved, approved with conditions, or disapproved.

(b) Make available in at least one location in each region in which the proposed source would be constructed a copy of all materials the applicant submitted, a copy of the preliminary determination, and a copy or summary of other materials, if any, considered in making the preliminary determination.

(c) Notify the public, by advertisement in a newspaper of general circulation in each region in which the proposed source would be constructed, of the application, the preliminary determination, the degree of increment consumption that is expected from the source or modification, and of the opportunity for comment at a public hearing, as well as written public comment.

(d) Send a copy of the notice of public comment to the applicant, the administrator and to officials and agencies having cognizance over the location where the proposed construction would occur as follows: any other state or local air pollution control agencies; the chief executives of the city and county where the source would be located; any comprehensive regional land use planning agency; and any state, federal land manager, or Indian governing body whose lands may be affected by emissions from the major source or major modification.

(e) Provide opportunity for a public hearing for interested persons to appear and submit written or oral comments on the air quality impact of the source, alternatives to it, the control technology required, and other appropriate considerations.

(f) Consider all written comments submitted within a time specified in the notice of public comment and all comments received at any public hearing in making a final decision on the approvability of the application. The department shall make all comments available for public inspection in the same locations where the department made available pre–construction information relating to the proposed major source or major modification.

(g) Make a final determination whether construction should be approved, approved with conditions, or disapproved.

(h) Notify the applicant in writing of the final determination and make such notification available for public inspection at the same location where the department made available pre–construction information and public comments relating to the source.

**Note:** The requirement that a final permit determination be accomplished within one year of receipt of a permit application in the federal regulations has been changed to within 205 business days of receipt of application in this subsection.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (2) and (3), Register, December, 1995, No. 480, eff. 1–1–96; am. (2) (intro.), Register, August, 2005, No. 596, eff. 9–1–05.

**NR 405.16 Source obligation. (1)** Approval to construct does not relieve any owner or operator of the responsi-

bility to comply fully with applicable provisions of the chs. NR 400 to 499 and any other requirements under local, state or federal law.

**(2)** At such time that a particular source or modification becomes a major stationary source or major modification solely by virtue of a relaxation in any enforceable limitation which was established after August 7, 1980, on the capacity of the source or modification otherwise to emit an air contaminant such as a restriction on hours of operation, then the requirements of ss. NR 405.08 to 405.17 shall apply to the source or modification as though construction had not yet commenced on the major source or major modification.

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87.

**NR 405.17 Innovative control technology. (1)** An owner or operator of a proposed major stationary source or major modification may request the department to approve a system of innovative control technology.

**(2)** The department may, with the consent of the governor of any other affected state, determine that the major source or major modification may employ a system of innovative control technology if all of the following conditions are met:

(a) The proposed control system would not cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function.

(b) The owner or operator agrees to achieve a level of continuous emissions reduction equivalent to that which would have been required under s. NR 405.08 (2) no later than 3 years from the time of start–up or 6 years from the date of permit issuance.

(c) The source or modification would meet the requirements equivalent to those in ss. NR 405.08 and 405.09 based on the emissions rate that the stationary source employing the system of innovative control technology would be required to meet on the date specified in par. (b).

(d) The major source or major modification would not before the date specified do any of the following:

1. Cause or contribute to any violation of an applicable national ambient air quality standard.

2. Impact any Class I area.

3. Impact any area where an applicable increment is known to be violated.

(e) All other applicable requirements including those for public participation have been met.

**(3)** The department shall withdraw any approval to employ a system of innovative control technology made under this section, if any of the following occurs:

(a) The proposed system fails by the specified date in sub. (2) (b) to achieve the required continuous emissions reduction rate.

(b) The proposed system fails before the specified date in sub. (2) (b) so as to contribute to an unreasonable risk to public health, welfare, or safety.

(c) The department decides at any time that the proposed system is unlikely to achieve the required level of control or to protect the public health, welfare or safety.

**(4)** If a major source or major modification fails to meet the required level of continuous emissions reduction within the specified time period, or if the approval is withdrawn in accordance with sub. (3), the department may allow the source or modification up to an additional 3 years to meet the requirement for the application of best available control technology through use of a demonstrated system of control.

**Note:** The deadline for achieving the required continuous emissions reduction through innovative control technology in the federal regulations not later than 3 years to achieve time of start–up or 7 years from permit issuance has been changed to no later than 3 years from start–up or 6 years from the date of permit issuance in sub. (2) (b).

**History:** Cr. Register, January, 1987, No. 373, eff. 2–1–87; am. (intro.) and (2) (intro.), Register, December, 1996, No. 492, eff. 1–1–97.