IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

SIERRA CLUB,

                   Plaintiff,

                                       MEMORANDUM AND ORDER
    v.                                   07-C-251-S

MICHAEL MORGAN, JAY EHRFURTH,
JOHN WILEY and KEVIN REILLY,

                   Defendants.

_____

      Plaintiff Sierra Club commenced this action against defendants
Michael Morgan ("Morgan"), Jay Ehrfurth ("Ehrfurth"), John Wiley
("Wiley") and Kevin Reilly ("Reilly") alleging that defendants were
responsible for the Charter Street Heating Plant ("CSHP") operating
in violation of the Clean Air Act, 42 U.S.C. § 7401 et seq., and
related state laws.  Jurisdiction is based on 28 U.S.C. § 1331 and
42 U.S.C. § 7604(a).  The matter is presently before the Court on
plaintiff's motion for partial summary judgment and defendants'
cross motion for summary judgment.  The following facts are
undisputed.

BACKGROUND & FACTS

      In 1977 Congress amended the Clean Air Act ("CAA") in an
effort to better control air pollution around the nation.[1]  Among
other things, these amendments revised previous New Source

---

      [1]For more background on the Clean Air Act and its amendments
see the Seventh Circuit's opinion in Wisconsin Electric Power Co.
v. Reilly, 893 F.2d 901, 904-905 (7th Cir. 1990).

Performance Standards ("NSPS") and added a program for the Prevention of Significant Deterioration ("PSD"). The PSD program was intended to ensure that owners and operators of regulated pollution emitting facilities in relatively unpolluted areas would not allow a decline in air quality to the minimum level permitted by National Ambient Air Quality Standards ("NAAQS"). One application of the PSD program was to require regulated owners and operators in areas having attained NAAQS to obtain permits before constructing or modifying pollution emitting facilities. These PSD programs require an owner or operator to take certain steps before a permit is issued, for example making sure the pollution emitting facility is subject to the best available control technology ("BACT").

Furthermore, the Environmental Protection Agency ("EPA") has enforced the CAA through the promulgation of regulations for both the NSPS and PSD programs. States also enforce the CAA once the EPA has approved the state's adoption of the PSD program into its State Implementation Plan ("SIP"). Prior to June 28, 1999 the Wisconsin Department of Natural Resources ("WDNR") was delegated authority by the EPA to issue PSD permits pursuant to EPA regulations. On June 28, 1999 Wisconsin adopted the federal PSD program into its SIP and WDNR has since been authorized to issue PSD permits in Wisconsin under its SIP.[2]

_____

[2]Although the language in the Wisconsin SIP-based PSD program regulations mirrors the language in the federal PSD program

The CSHP began operation in 1959.  The CSHP is owned and operated by the State of Wisconsin through the Department of Administration, the University of Wisconsin System, and the University of Wisconsin-Madison.  Morgan is Secretary of the Department of Administration; Ehrfurth is the State chief heating plant engineer; Wiley is Chancellor of the University of Wisconsin-Madison; and Reilly is President of the University of Wisconsin System.  The CSHP provides heating and cooling for several buildings on the University of Wisconsin-Madison campus, federal agencies, the State Historical Society, University of Wisconsin Hospital and Clinics and a private hospital.

The CSHP includes five boilers and an emergency generator. The five boilers have a combined heat input of approximately 1,000 million British Thermal Units (MMBtu) per hour.  Boilers 1, 2 and 3 were new in 1953 and purchased second hand from the Hudson Motor Division of the American Motors Corporation in Detroit Michigan and installed at the CSHP in 1958.  Those three boilers are Industrial Spreader Stoker boilers and although they can burn several fuels, coal has been the predominant fuel.  Boiler 4, also an Industrial Spreader Stoker, was installed in 1964 and uses coal as its predominate fuel. As a whole the CSHP has the "potential to emit", as that term is defined in Wisconsin Administrative Code NR §

_____

regulations, the federal regulations apply to all projects occurring prior to 1999 and the state regulations apply to all projects occurring after 1999.

3

405.02(25)(2004), in excess of 100 tons per year of each of the following pollutants: carbon monoxide, particulate matter, nitrogen oxides and sulfur dioxide.

There are 38 employees at the CSHP. The cost of maintenance, spare parts, consumables, office supplies and similar expenses are paid from the operation and maintenance budget which is approximately $700,000.00 annually. Scheduled and preventive maintenance, janitorial services, grounds keeping, including the inspection, adjustment, minor repairs, cleaning of components and equipment and other related tasks are performed by CSHP staff and funded from the operation and maintenance budget. The process for such repair projects involves an employee finding a problem and filing a work order and then the CSHP manager or superintendents determine whether to make the repair using funds from the operation and maintenance budget. On average maintenance projects requiring boiler shutdowns occur 3 to 5 days every four to six months, but some maintenance projects could take between 20 to 30 days.

Capital projects at the CSHP require that information about the project be provided to the Division of State Facilities through the UW-Madison administration and the University of Wisconsin System Administration. After which the Division of State Facilities determines whether the project is needed, estimates costs and proposes the project to the state engineer. Where approved the UW requests funding from the State Building

4

Commission.   The Building Commission oversees the planning, improvement, major maintenance and renovation of state facilities. Also, approval by the Building Commission for funding is limited to projects involving the repair and replacement of building components and systems which are necessary to extend useful life, correct code deficiencies, improve reliability, improve safety, protect the environment or decrease operating costs.

As a pollution emitting facility that was functioning prior to the passing of the 1977 amendments to the CAA, the CSHP was 'grandfathered' in from having to comply with PSD program requirements until the CSHP underwent certain modifications or replacements.  On December 4, 2006 Sierra Club provided defendants with notice of its intent to sue under the CAA.  On May 3, 2007 Sierra Club filed this citizen suit against defendants alleging that the CSHP had addressed several modifications without first obtaining the necessary permits under the CAA and pertinent state and federal regulations.  There are five projects that Sierra Club alleges to have been modifications.

## Project 1

The first project occurred in 1996 when all the rear wall tubes and casings on Boiler 4 were replaced.  This project involved the replacement of seventy-three tubes each twenty-two feet in length.  The actual work to replace the rear wall lasted 45 calendar days.  Also, outside contractors were brought in to

5

complete the work.   The project cost $97,300.00 and funds were authorized by the Building Commission through a non-enumerated small projects fund.  Boiler 4 was 31 years old at the time of this project.

<u>Project 2</u>

The second project occurred in 2001 when a segment of side wall tubes and casings on Boiler 4 were replaced.   This project involved the replacement of a seven foot segment on sixty-seven separate tubes.  The replacement required welding at both the top and bottom of each replacement segment.  The project was performed by outside contractors and work lasted 37 calendar days.   The project cost $77,000,00 and funds were generally authorized by the Building Commission.  Boiler 4 was 36 years old at the time of this project.

<u>Project 3</u>

The third project occurred in 2002 when 100% of the economizers on Boilers 1, 2 and 3 were replaced, which included the replacement of tubes and sootblowers.  The economizers are a large part on the boilers, approximately thirteen feet long, eighteen feet tall and eight feet across.  The project required a crane to remove the old economizers, was overseen by an outside engineering firm and completed by an outside contractor.  The new economizers had bare tubes, similar to those originally found in the boilers in the 1950's, instead of the fin tubes that had been put into use in

1978.  Work on Boilers 1, 2 and 3 lasted 81, 65 and 37 calendar days respectively.  The project cost $788,899.00 and the capital funding for the project was authorized by the Building Commission. The boilers were approximately 49 years old at the time of this project.

<u>Project 4</u>

The fourth project occurred in 2002 when Boiler 1's nominal 18-inch overthrow Zurn stoker feeders were replaced with nominal 27-inch underthrow Detroit stoker feeders.  Underthrow feeders sweep fuel into the boiler in an underthrow motion and overthrow feeders sweep fuel into the boiler in an overthrow motion.  This change in feeders allowed an increase in the feed of paper pellets into the boiler.  Also, the original feeders were no longer being manufactured.  This project was performed by in-house maintenance and occurred over 81 days partially in conjunction with the work performed on Boiler 1 in Project 3.  The project cost $90,700.00 and was authorized by the Building Commission.

<u>Project 5</u>

The fifth project occurred in 2004 and was labeled by the Division of State Facilities as Project Number 01L4P.  The project involved replacing: (1) all five overthrow feeders on Boiler 4 with new underthrow feeders; (2) the superheaters on Boilers 1, 2 and 3; (3) over 2,000 generating tubes at the plant; (4) the penthouse refractory floor; (5) parts of 43 waterwall tubes; and changing (6)

7

tube shields, (7) sidewall tubes, (8) frontwall and sidewall casing and (9) the furnace roof tube/superheater tube penetration refractory seals.  The project was described by the state as an "overhaul" of the boilers.  An outside consulting firm provided the engineering for the project.  Changing Boiler 4's feeders from overthrow to underthrow affected the distribution of coal in the boiler.  Also, the original feeders were no longer manufactured. The work on Boiler 4 lasted 26 calendar days.

The work on Boilers 1, 2 and 3 required the replacement of more than 40% of the boilers' tubes.  More specifically, bent left sidewall tubes were replaced with straight tubes, a casing was installed to cover a gap for a gas burner, tube shields were modified, some generating tubes were shortened and removed and the penthouse refractory floor was replaced.  The penthouse refractory floor is a poured slab made from material resembling fire brick and is approximately 10-feet by 10-feet and 2 to 4 inches thick.  It had to be broken into pieces to be removed.

Moreover, the sidewall tubes were changed to their original 1959 configuration to cover an opening that had been previously designed for a gas burner.  Also, the new superheater tubes were connected to the headers by welding as compared to previously having been rolled inside heaters.  The work on Boilers 1, 2 and 3 lasted 77, 66 and 45 calendar days respectively.  The entire project required approximately 9 months to complete.  An outside

contractor was hired to complete the work on Boilers 1, 2 and 3, but in-house maintenance was used to work on Boiler 4.  The entire project cost $1,712,348.00 and involved requesting permission and capital funding from the Building Commission.

No PSD preconstruction permits or revised operation permits were obtained in conjunction with any of the five projects.  Sierra Club alleges that all projects required PSD permits and defendants failure to obtain permits for the CSHP violates the CAA.  On September 25, 2007 Sierra Club filed a motion for partial summary judgment requesting that the Court declare that the five projects violated the CAA and order defendants to comply with the CAA.  On the same day, defendants also filed a motion for summary judgment requesting that the Court dismiss the case in their favor.

MEMORANDUM

Under Federal Rule of Civil Procedure 56 summary judgment is appropriate "when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Goldstein v. Fidelity & Guar. Ins. Underwriters, Inc., 86 F.3d 749, 750 (7th Cir. 1996) (citing Fed. R. Civ. P. 56); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The district judge's function in a summary judgment motion "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Additionally, "it is

the substantive law's identification of facts which are critical and which facts are irrelevant that governs." Id. at 248. Furthermore, all reasonable inferences from undisputed facts should be drawn in favor of the nonmoving party. Baron v. City of Highland Park, 195 F.3d 333, 338 (7th Cir. 1999).

However, the nonmoving party cannot simply rest upon the pleadings once the moving party has made a properly supported motion for summary judgment; instead the nonmoving party must submit evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Essentially, it becomes the nonmoving party's burden to demonstrate that there is a genuine issue of material fact, i.e., that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## I.   **Standing**

As a threshold issue a plaintiff must have standing under Article III of the Constitution before seeking redress in federal court.  An association may bring a case on behalf of its members should it satisfy three requirements: (1) that "[an association's] members would otherwise have standing to sue in their own right," (2) that "the interests at stake are germane to the organization's purpose, and" (3) that "neither the claim asserted nor the relief

10

requested requires the participation of individual members in the lawsuit."  Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)).

For an association to satisfy the first standing requirement it must demonstrate that it has members that would satisfy Article III's standing requirements.  Id.  Article III standing requires a plaintiff to show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 180-81 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  Furthermore, the Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  Id. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)).

In this case, defendants argue that plaintiff has failed the first association standing requirement because the evidence provided by plaintiff does not demonstrate that plaintiff's members suffered "even the most trifling of harm" (i.e., injury in fact).

11

(Defs.' Resp. Br. 33.)   Defendants do not dispute the other standing requirements.  Furthermore, based on the undisputed facts before the Court plaintiff has satisfied the standing requirements that are not in dispute (See Pl.'s Proposed Finding of Fact ¶¶ 19-26; Pl.'s Reply Br. 41-42) and accordingly the Court addresses in detail only the injury in fact requirement.

Plaintiff provided affidavits from two of its members, Annie Staten and Seth Nowak, in support of standing and defendants do not dispute the facts contained in the affidavits.  The affiants both live about a mile from CSHP and are concerned about their health due to CSHP "emitting more pollution than it should" because it allegedly made major modifications without a permit and continues to operate without the appropriate permits.  (Staten Aff. ¶¶ 3,4,5,7; Nowak Aff. ¶¶ 3,4,5,7.)  Also, both affiants affirm that they regularly visit and use areas near the CSHP and the CSHP's alleged violations of the CAA adversely impact the aesthetic and recreational values of the surrounding areas.  (See generally id.) These affiants have demonstrated that they "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of Earth, 528 U.S. at 183.  Accordingly, plaintiff has demonstrated that its members have suffered a cognizable injury in fact in satisfaction of Article III standing.  See id.; see also, N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 325-26 (2nd Cir.

2003) (holding that where a plaintiff resides close in proximity to a source of air pollution, uncertainty as to the health effects of such pollution constitutes a cognizable injury in fact).

Plaintiff's demonstration that its members have suffered a cognizable injury in fact in turn closes any issues concerning standing and accordingly plaintiff has standing to bring this suit on behalf of its members under the CAA's citizen suit provision, 42 U.S.C. § 7604(a).

## II. Defendants as proper parties

In their motion for summary judgment defendants' argue that the Court should enter judgment in their favor because even if CSHP should have obtained PSD permits defendants (1) do not have authority to obtain permits, (2) are not responsible for obtaining permits, and (3) did not authorize the changes made at CSHP and accordingly plaintiff has brought this action against the wrong parties.  Conversely, plaintiff argues that defendants are the proper parties to this action because they are responsible to and have authority to obtain the necessary permits to ensure that CSHP operates in conformance with the CAA.  The main issue in dispute concerns who may be held responsible for violations of the specific statutory and regulatory provisions under which plaintiff brought this action.

To begin the analysis, the Court must first look to the language in the pertinent statutory and regulatory provisions and

13

then determine whether defendants can be held responsible under those provisions.  Plaintiff brought this action under the CAA's citizen suit provision, 42 U.S.C. § 7604(a), which in pertinent part provides that

> any person may commence a civil action on his own behalf-
>> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter . . .
>>
>> (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) . . . .

Although "person" is not defined in this section, it is defined in the definition section of the chapter as including

> an individual, corporation partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

42 U.S.C. § 7602(e); <u>see</u> <u>also</u> Wis. Admin. Code NR § 400.02(123)(2006).[3]  Furthermore, "emission standard or limitation under this chapter" is defined in pertinent part as

---

[3]"Person" means any individual, corporation, company, cooperative, operator, tenant, lessee, syndicate, partnership, co-partnership, firm, association, trust, estate, public or private institution, joint stock company, political subdivision of the state of Wisconsin, state agency, interstate agency, federal agency, or any legal successor, representative, agent or agency of the foregoing.

> (1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,
>
> . . .
>
> (4) any other standard . . . and any requirement to obtain a permit as a condition of operations

42 U.S.C. § 4604(f).

Based on the statutory language there are two requirements that must be met to sustain a cause of action under § 7604(a)(1)[4] of the CAA's citizen suit provision: (1) the cause of action must be brought against a "person" and (2) that "person" must be alleged to have violated or be in violation of "an emission standard or limitation under this chapter." Accordingly, a court must look to the specific emission standard or limitation cited by plaintiff to determine if the "person" can be held responsible for violating that specific emission standard or limitation.

In this case, plaintiff sued defendants in their official capacities as state officials.[5] The parties do not dispute that

---

[4]Each of the four counts alleged in plaintiff's complaint were brought under § 7604(a)(1). Additionally, count one was brought under § 7604(a)(3). Because the dispute between the parties can be properly addressed by discussing § 7604(a)(1) the Court does not discuss the details of § 7604(a)(3).

[5]Plaintiff concedes that it sued defendants as the responsible state officials instead of suing the state, the Wisconsin Department of Administration or the Board of Regents of the University of Wisconsin System because the Eleventh Amendment deprives the Court of jurisdiction over a claim against the state or state agencies but not over state officials acting in violation of federal law. See Continental Ins. Co. v. Ill. Dep't of Transp., 709 F.2d 471, 473 (7th Cir. 1983); Ex Parte Young, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908).

defendants are "persons" as defined in the statute.   Plaintiff argues that the inquiry into who is a proper party should stop with determining that defendants are "persons."   However, as the Court has already determined that § 7604(a)(1) has a second requirement.

Plaintiff alleges that defendants have violated or are in violation of four separate emission standards or limitations: (1) 42 U.S.C. § 7475(a)(1) alleging construction of a major emitting source without a permit; (2) 42 U.S.C. § 7475(a)(4) alleging construction of a major emitting source without being subject to best available control technology; (3) Wis. Stat. § 285.60 and Wis. Admin. Code ch. NR 406 alleging failure to obtain necessary construction permits; and (4) Subchapter V, 42 U.S.C. §§ 7661, et seq., alleging operation of a major emitting source without a revised operating permit.   All four alleged violations involve obtaining preconstruction permits or revised operating permits.   It follows that those "persons" who will be responsible for failing to obtain proper permits under the CAA must be the same "persons" who are responsible for actually obtaining the permits under the CAA.

The EPA's regulation concerning preconstruction PSD permitting and enforcement of such permits clearly explains who is responsible for obtaining permits:

> (r) *Source obligation*. (1) Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences

16

> construction after the effective date of these
> regulations without applying for and receiving approval
> hereunder, shall be subject to appropriate enforcement
> action.

40 C.F.R. § 52.21(r) (emphasis added).  Furthermore, 42 U.S.C. §
7661b(c) applies to "person[s] required to have a permit" and
persons required to have a permit are, as set forth in the elements
of a permit program, "the owner[s] and operator[s] of all sources
subject to the requirement to obtain a permit under this
subchapter," 42 U.S.C. § 7661a(b)(3)(A).

Also, the part of Wisconsin's administrative code that sets
forth the requirements for and enforcement of PSD construction
permits plainly sets out who is responsible:

> **Violations.** Any owner or operator who fails to
> construct a stationary source in accordance with the
> application as approved by the department; . . . or any
> owner or operator who commences construction or
> modification of a stationary source without applying for
> and receiving a permit as required under this chapter or
> ch. NR 408 shall be considered in violation of s. 285.60,
> Stats.

Wis. Admin. Code NR § 406.10 (2007).  Based on the statutes and
regulations that support plaintiff's claims, defendants must be
"owners or operators" of the source, i.e., the CSHP, to be
responsible for the CSHP being modified without the required
preconstruction or revised operating permits.

The parties do not dispute that the Board of Regents of the
University of Wisconsin System owns the CSHP and the underlying

17

land.  Accordingly, whether defendants can be responsible for the alleged permit violations turns on whether they are "operators."

Both parties resort to the persuasive authority of other district and circuit courts in helping to define "operator," and the Court relies on some of those authorities to help decide whether defendants are "operators."  However, no matter how the term is defined, the Seventh Circuit has made it clear that the CAA imposes strict liability when applied, which means that once it is determined that a party is an "owner or operator" then the CAA applies to it "regardless of how minimal the [party's] responsibilities or knowledge [concerning the violation] may actually have been."  See United States v. B&W Inv. Properties, 38 F.3d 362, 367 (7th Cir. 1994) (case involved violation of the Clean Air Act's regulation of asbestos removal).  Accordingly, if defendants are "operators" of the CSHP then they can be responsible regardless of how involved or uninvolved they were with the actual construction projects.

Although not defined in the CAA section at issue, the term "owner or operator" is defined in another section of the CAA as "any person who owns, leases, operates, controls, or supervises a stationary source."  42 U.S.C. § 7411(a)(5); see also 40 C.F.R. § 51.100(f) (defining "owner or operator" same as statute for purposes of state implementation plans); see also 40 C.F.R. § 61.02 (defining "owner or operator" same as statute for purposes of the

18

hazardous air emissions program). Also, the WDNR defines "operator" as "any person who leases, controls, operates or supervises a facility, an air contaminant source, or air pollution control equipment." Wis. Admin. Code NR § 400.02(113)(2006).

The parties do not dispute the facts surrounding each defendant's responsibility or authority over the CSHP, but instead dispute whether such authority qualifies defendants as "operators." Accordingly, the Court must examine each defendant to determine whether he qualifies as an "operator." Defendant Wiley was sued in his official capacity as Chancellor of the University of Wisconsin-Madison ("UW-Madison"). Because the CSHP is owned and operated in part by UW-Madison, plaintiff argues that Wiley controls or supervises it. Specifically, plaintiff focuses on Wiley's responsibility to administer funds through out UW-Madison as qualifying him as an "operator" of the CSHP. However, a general responsibility to administer funds through out UW-Madison which also includes administering funds used by the CSHP does not give Wiley control or supervision over the CSHP and accordingly he is not an "operator" of the CSHP and must be dismissed from this case.

Defendant Reilly was sued in his official capacity as President of the University of Wisconsin System ("UWS"). Because both UW-Madison and the CSHP are part of UWS plaintiff argues that Reilly controls or supervises it. Similarly to its argument concerning Wiley, plaintiff focuses on Reilly's responsibility to

administer the operating budget and building programs at UW-Madison, including the CSHP, as qualifying him as an "operator" of the CSHP. However, Reilly's responsibility over the general operating budget of UWS which ultimately involves funds used for or by the CSHP does not give Reilly control or supervision over it. Accordingly, he is not an "operator" of the CSHP and must be dismissed from this case.

Defendant Morgan was sued in his official capacity as Secretary of the Department of Administration ("DOA"). The gravamen of defendants' argument as to why Morgan is not an "operator" is that he does not "immediately" supervise the CSHP and that he cannot "alone" exercise authority over the CSHP. Plaintiff rebuts defendants' argument by pointing to Morgan's statutory authority and responsibility as Secretary of the DOA which includes (1) providing methods of operating for state owned or operated heating, cooling or power plants, Wis. Stat. § 16.85(4); (2) assuring compliance with federal and state laws and regulations as applicable to state-owned and operated heating, cooling or power plants, Wis. Stat. § 16.895(2)(d); and (3) securing permits that are required for operation of state-owned or operated heating, cooling or power plants, Wis. Stat. § 16.895(2)(g). Because the CSHP is state owned and operated plaintiff argues that Morgan as Secretary of the DOA controls and supervises the CSHP, which makes him an "operator" that could effectuate compliance with the CAA.

Defendants cite to a Ninth Circuit case that defines the term "supervisor" as used in the CAA to support their argument that they are not "supervisors" and accordingly not "operators" of the CSHP. See United States v. Pearson, 274 F.3d 1225 (9th Cir. 2001).  The Court finds the Ninth Circuit case persuasive and helpful but not supportive of defendants' position.  In Pearson, the Ninth Circuit determined that to be a "supervisor" the person must have "significant and substantial control" which meant that the person had "the ability to direct the manner in which work [was] performed and the authority to correct problems." Id. at 1231.  Furthermore, "significant and substantial control" does not mean that a person possessed "ultimate, maximal, or preeminent control" and such a person "is not limited to the individual with the highest authority." Id.  In fact, "there could be one or more supervisors." Id.

Applying this "significant and substantial control" standard to Morgan demonstrates that he is a supervisor of the CSHP. Defendants' argument that there are others that have more authority than Morgan or conversely that he has delegated some of his authority to others does not prevent him from qualifying as "supervisor" because there can be more than one "supervisor".  The statutes cited by plaintiff show that Morgan has the authority to direct the manner in which state-owned heating plants, including the CSHP, work and to correct problems either directly or through

21

delegation.   Regardless  of  the  fact  that  Morgan  may  not  have
ultimate  control  of  the  CSHP  or  be  the  individual  with  the  highest
authority  over  the  CSHP  the  statutes  provide  him  the  authority  to
exercise  significant  and  substantial  control  over  it.   As  a
"supervisor"  of  the  CSHP  Morgan  is  an  "operator"  of  the  CSHP.
Accordingly,  as  a  matter  of  law  Morgan  is  an  "operator"  of  the  CSHP
and  can  be  held  responsible  for  remedying  any  permit  violations
under  the  CAA.

Defendant  Ehrfurth  was  sued  in  his  official  capacity  as  State
Chief  Power  Plant  Engineer  under  the  DOA,  within  the  Division  of
State  Facilities.   The  parties  do  not  dispute  that  Ehrfurth

> directs and supervises the engineers and other staff who
> monitor central heating plant performance; manages air
> pollution control programs; reviews, designs and manages
> construction  projects;  and  personally  reviews  and
> approves the chief operating engineer of each state-owned
> heating plant[;] . . . supervises the staff that does
> projects  on  the  state's  heating  plants,  supports  the
> various  heating  plants  with  technical  information,
> conducts air permitting, and oversees air pollution
> compliance at the plant.

(Pl.'s Finding of Fact ¶¶ 15-16.)  Defendants argue that he does
not  have  the  ultimate  authority  to  act  alone  over  construction
projects  or  air  pollution  control  at  the  CSHP.   However,  Ehrfurth
is  not  required  to  be  the  highest  authority  or  have  ultimate
control.   He  need  only  have  "significant  and  substantial  control"
and  the  undisputed  facts  recited  above  demonstrate  that  he  has  such
control  or  authority.   Accordingly,  as  a  matter  of  law  Ehrfurth  is

an "operator" of the CSHP and can be held responsible for remedying any permit violations under the CAA.

In conclusion, as a matter of law Wiley and Reilly are dismissed from this action as in-proper defendants because they are not subject to the statutes or regulations that this action is based upon.  However, Morgan and Ehrfurth are "operators" of the CSHP under the CAA and are proper defendants that can be held responsible for remedying any permit violations under the CAA.

## III. Modification of CSHP

Both parties agree that central to plaintiff's claims is whether several construction projects at the CSHP were modifications under the CAA.  The parties cross motion for summary judgment on this issue.  Defendants argue that judgment should be entered in their favor because the construction projects were not modifications that required PSD permits but instead (1) were merely routine maintenance, repair or replacement ("RMRR"), and/or (2) did not significantly increase the amount of air pollutants emitted by the CSHP.  Conversely, plaintiff argues that judgment should be entered in its favor because the construction projects were modifications, not RMRR, based on the facts that they were physical changes that significantly increased the amount of air pollutants emitted by the CSHP.

The parties do not dispute the material facts surrounding the construction projects nor do they dispute that the CSHP is a major

23

emitting facility[6] subject to the PSD program.  Accordingly, the Court must determine as a matter of law whether the construction projects at CSHP were modifications or RMRR.  See United States v. Cinergy Corp., 495 F. Supp. 2d 909, 931-32 (S.D. Ind. 2007) (citations omitted).

A preconstruction permit and compliance with BACT emission limits are required for "[a]ny major emitting facility on which construction is commenced after August 7, 1977."  42 U.S.C. § 7475(a).  "Construction" as defined in this section "includes the modification (as defined in section 7411(a) of this title) of any source or facility."  42 U.S.C. § 7479(2)(C).  "Modification" is defined as "any physical change in . . . a stationary source which increases the amount of any air pollutant emitted by such source . . . ."  42 U.S.C. § 7411(a)(4).

The pertinent WDNR and EPA regulations for PSD programs have defined the term "major modification" as "any physical change in . . . a major stationary source that would result in a significant net emissions increase of any air contaminant . . . ."  Wis Admin. Code NR § 405.02(21)(2004);  see also 40 C.F.R. § 52.21(b)(2)(i)(1996).  Accordingly, major emitting facilities undergo a "major modification", must obtain a PSD permit and comply

_____

[6]The implementing regulations use the term "major stationary source," but the terms are defined the same.  See 42 U.S.C. § 7479(1); 40 C.F.R. § 52.21(b)(1)(i); Wis. Admin Code NR §§ 405.02(22)(a)1., 405.07 (2004).

with BACT emission limits when there is (1) any physical change; and (2) a significant increase in net emissions.  See Wis. Elec. Power Co. v. Reilly, 893 F.2d 901, 907 (7th Cir. 1990) (hereinafter WEPCO).

>   **A.   RMRR exemption**

The Seventh Circuit has accepted a broad definition of "any physical change" that would include even "the most trivial activities – the replacement of leaky pipes, for example . . . ." Id. at 905.  Because of this broad definition the EPA and WDNR have made routine maintenance, repair and replacement exempt from the definition of modification.  Wis. Admin. Code NR § 405.02(21)(b)(i)(2004); 40 C.F.R. § 52.21(b)(2)(iii)(1996).  This regulatory exemption from a statutory definition has been interpreted narrowly to apply to de minimis changes, i.e., excluding changes of trivial regulatory concerns, see New York v. Environmental Protection Agency, 443 F.3d 880 (D.C. Cir. 2006), because if it were interpreted broadly then "the exemption would swallow both the rule and specific provision of the Clean Air Act" which would put the regulation "in direct conflict with the superceding and controlling language of the Clean Air Act," United States v. Ohio Edison Co., 276 F. Supp. 2d 829, 855 (S.D. Ohio 2003); see also United States v. Southern Indiana Gas & Electric Co., 245 F. Supp. 2d 994, 1009 (S.D. Ind. 2003)("Giving the routine maintenance exemption a broad reading could postpone the

application of NSR to many facilities, and would flout the
Congressional intent evidenced by its broad definition of
modification.").

Furthermore, in WEPCO the Seventh Circuit chose to follow the
EPA's application of the RMRR exemption in determining whether a
proposed project at a facility falls within the exemption.  893
F.2d at 910.  This RMRR exemption analysis specifically involves "a
case-by-case determination by weighing the nature, extent, purpose,
frequency, and cost of the work, as well as other relevant factors,
to arrive at a common-sense finding."  Id. (citation omitted).
Based on the court's application of the RMRR exemption in WEPCO the
focus of the analysis has been on four central factors: (1) the
nature and extent (2) purpose (3) frequency and (4) cost of the
project.  Id. at 911; Ohio Edison Co., 276 F. Supp. 2d at 855.

In applying the RMRR exemption analysis district courts have
attempted to bring clarity to application of these undefined
factors.  For example some courts have explained that "[t]he
frequency factor includes a consideration of how frequently a type
of repair or replacement is done at a particular unit as well as
how frequently it is done within the industry." Cinergy Corp., 495
F. Supp. 2d at 930-31 (citation omitted).  Another court has tried
to simplify the analysis by addressing circumstances that would and
would not tend to show RMRR:

> [r]outine maintenance, repair and replacement occurs
> regularly, involves no permanent improvements, is

26

> typically limited in expense, is usually performed in
> large plants by in house employees, and is treated for
> accounting purposes as an expense.   In contrast to
> routine maintenance stand capital improvements which
> generally involve more expense, are large in scope, often
> involve outside contractors, involve an increase in value
> to the unit, are usually not undertaken with regular
> frequency, and are treated for accounting purposes as
> capital expenditures on the balance sheet.

Ohio Edison Co., 276 F. Supp. 2d at 834.  Furthermore, courts have

noted that "no single factor is dispositive." Id. at 931 (citation

omitted).

Moreover, undergirding the RMRR exemption analysis are three

hallmarks that should be kept in mind during the analysis:

> First, the exemption applies to a narrow range of
> activities, in keeping with the EPA's limited authority
> to exempt activities from the [CAA].   Second, the
> exemption applies only to activities that are routine for
> a generating unit.   The exemption does not turn on
> whether the activity is prevalent within the industry as
> a whole.   Third, no activity is categorically exempt.
> [The] EPA examines each activity on a case-by-case basis,
> looking at the nature and extent, purpose, frequency, and
> cost of activity.

Id. (alteration in original) (quoting SIGECO, 245 F. Supp. 2d at

1008 (emphasis removed)).  Finally, based on the general rule that

the party claiming the benefit of exemption from a statute bears

the burden of proof, the party asserting the RMRR exemption must

prove that the work done at its major emitting facility satisfies

the RMRR exemption, i.e., are exempt from CAA compliance.  Ohio

Edison Co., 276 F. Supp. 2d at 856; see also United States v. E.

Ky. Power Coop., Inc., 498 F. Supp. 2d 976, 995 (E.D. Ky. 2007);

but see United States v. Duke Energy Corp., 278 F. Supp. 2d 619,

639-40 (M.D.N.C. 2003) <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>Envtl. Defense v.</u>
<u>Duke Energy Corp.</u>, --- U.S. ---, 127 S. Ct. 1423, 167 L. Ed. 2d 295
(2007) (applying the burden oppositely to the party proving
"modification").

In this case, the Court must apply the RMRR exemption analysis
to the undisputed facts concerning each of the five CSHP
construction projects to determine whether or not each project was
exempt from CAA compliance as RMRR. Because defendants are
claiming the benefit of the RMRR exemption the burden falls on
defendants' to show that the projects are exempt from CAA
compliance. However, if defendant fails to prove that a project is
RMRR then plaintiff must also prove a significant increase in net
emissions for the project to be a "modification".

### 1.   1996 Boiler 4 Project (Project 1)

#### a. Nature and Extent

In summary, the 1996 project on Boiler 4 ("Project 1")
involved replacing the rear wall of the boiler, i.e., 73 waterwall
tubes and casing that compose the rear wall of the boiler. Based
on the undisputed facts, the scope of Project 1 was not massive and
it did not involve any extensive remodeling or improvements. <u>Cf.</u>
<u>Cinergy Corp.</u>, at 933-34, 937-38. Also, there is no indication
that Project 1 came close to being any sort of complete renovation.
<u>Cf.</u> <u>id.</u> Although Project 1 required 45 days to perform compared to
the normal 3 to 5 day outage every 4 to 6 months for general

inspections and cleaning it is not to far outside the permitted average 20 to 30 days of outage time to accomplish some maintenance project. Furthermore, despite using outside contractors, Project 1 did not require any extensive pre-project planning. Accordingly, the lesser magnitude of the project supports that Project 1 was RMRR.

b. Purpose

Although any replacement will necessarily extend how long something can be used, the purpose of Project 1 was not for life extension. The purpose was to maintain the pressure integrity of the boiler by repairing wear and tear on the boiler tubes. There is no evidence to support that the tube replacement was to change the boiler's capacity or efficiency. Also, there is no evidence that Project 1 was initiated based on frequent tube failures affecting the reliability of Boiler 4. Accordingly, the purpose behind Project 1 supports that it was RMRR.

c. Frequency

Project 1 was not unprecedented and did not involve the replacement of original parts because Boiler 4's rear wall had been previously replaced back in 1979. Also, other boilers at the CSHP have had large numbers of waterwall tubes replaced at different times. However, Project 1 is the type of project that is expected to be performed only once or twice during the boiler's life cycle. Such infrequency cannot be considered "routine". See Ohio Edison

<u>Co.</u>, at 861.  Accordingly, replacing an entire tube wall on Boiler 4 although not unprecedented occurs infrequently and does not support that Project 1 was RMRR.

### d. Cost

Project 1 cost $97,300.00 and was paid with capital funds from the Building Commission, not from CSHP's annual operating and maintenance budget of $700,000.00.  However, the specific fund was based on the Building Commission's approval of general funding for non-enumerated small projects.  Also, Project 1 was treated as an expense, not capital expenditure, under Generally Accepted Accounting Principles (GAAP).  Moreover, the cost was not in the millions or even the hundreds of thousands.  Accordingly, the cost of Project 1 weighs in favor of it having been RMRR.

### e. Conclusion on Project 1

The nature and extent, purpose and cost of Project 1 weigh in favor of it having been RMRR but its infrequency weighs against such a determination.  Based on all the factors, the Court's common sense finding is that Project 1 was RMRR and cannot be a "modification" under the CAA.

## 2.   2001 Boiler 4 Project (Project 2)

### a. Nature and Extent

In summary, the 2001 project on Boiler 4 ("Project 2") involved replacing a segment of side wall tubes and casing, i.e., a 7 foot segment on 67 tubes.  Similar to Project 1, Project 2 did

30

not involve extensive remodeling, improvements or renovation. However, Project 2 required welding at the top and bottom of the segments which necessitated hiring outside contractors. Also, no part of any of the 67 sidewall tubes had ever been replaced before. Although Project 2 falls outside the average maintenance time for boilers, the time was less than the time used for the replacement of tubes Project 1. Accordingly, the nature and extent of replacing the tube segments in Boiler 4 supports that it was RMRR.

### b. Purpose

Prior to Project 2, Boiler 4 had suffered numerous boiler tube failures. Project 2 had to be performed to allow Boiler 4 to operate free from the danger of tube failures. Project 2 was to increase the availability and reliability of Boiler 4. Cf. Ohio Edison Co., at 860. Unlike Project 1 where it appears that the tubes were replaced because it was merely time for replacement, Project 2 was made necessary due to the numerous tube failures in Boiler 4. Accordingly, the purpose was beyond mere maintenance of Boiler 4 and does not support that it was RMRR.

### c. Frequency

Never before during the 36 years of Boiler 4's life had its 67 sidewall tubes been worked on as one project. Also, replacement of 67 sidewall tubes had never been performed on any of the boilers at the CSHP. Furthermore, a project like Project 2 is expected to occur only 2 maybe 3 times in the life of a boiler. Accordingly,

31

never having to previously addressed a project like Project 2 on Boiler 4 contradicts it having been RMRR.

### d. Cost

Project 2 cost $77,000.00 and it was paid from a spending authorization and not from the CSHP's annual maintenance and operating budget.  Although it cost less than Project 1, Project 2 was treated as a capital expenditure under GAAP.  Accordingly, the capitalizing of the cost and how it was paid for weigh against Project 2 having been RMRR.

### e. Conclusion on Project 2

Although the nature and extent of Project 2 weigh slightly in favor of it having been RMRR, the purpose, frequency and cost of Project 2 tilts the balance against it having been RMRR.  Based on all the factors, the Court's common sense finding is that Project 2 was not RMRR and cannot be exempt from the CAA.

### 3. 2002 Boilers 1, 2 & 3 Project (Project 3)

#### a. Nature and Extent

In summary, the 2002 project on Boilers 1, 2, and 3 ("Project 3") involved replacing 100% of the economizers, i.e., economizer tubes, casing and sootblowers.  Project 3 was massive in scope, requiring a crane be brought to remove the old economizers and fabrication of the new economizers off-site.  Although the project was completed in 2002, pre-construction planning began in 1999.

Furthermore, an outside engineering firm was brought in to oversee Project 3 and outside contractors were brought in to complete the project because the work on Project 3 was outside the scope of the work that could be performed by CSHP staff.  Project 3 required 81 days on Boiler 1, 65 days on Boiler 2 and 37 days on Boiler 3 to complete the project.  Whether individually or combined (i.e., 183 days for the entire project), the time for the project was beyond any normal 3 to 5 day inspection and cleaning or even any 20 to 30 day maintenance project.  Accordingly, the large magnitude of Project 3 weighs heavily against it having been RMRR.

      b. Purpose

Prior to replacement the economizers had experienced numerous leaks and many repairs were needed to keep the economizers working so that the boilers could continue to operate reliably.  To fix an economizer tube leak the boiler would have to be shut down, the access door opened, the boiler pressurized to find the leak, and the area around the leak cleaned and patched with weld or the tube replaced.  This process would take 3 to 8 days.  However, since Project 3 there have been no economizer tube leaks that were required to be fixed.

Furthermore, should the economizers have not been replaced the baghouses on the boilers could not have continued to operate. Also, the new economizers contained a different designed sootblower from those in the old economizers.  The new designed sootblowers

33

were intended to regain the original sootblower effectiveness for the boilers.  The purpose behind Project 3 was to increase the reliability and availability of the boilers and to regain original sootblower effectiveness.  Without Project 3 the boilers would not have been able to remain in operation.  Accordingly, the purpose behind Project 3 was not for mere maintenance, which contradicts RMRR.

### c. Frequency

Economizers were expected to be replaced every 24 years at the CSHP, which would project two replacements within the life span of the boilers.  The economizers on Boilers 1, 2 and 3 had been changed once before in 1978.  Also, one other boiler at the CSHP had undergone an economizer replacement.  Such infrequent replacement can hardly be considered "routine".  Accordingly, the infrequency of projects like Project 3 opposes it having been RMRR.

### d. Cost

Project 3 cost $788,899.00 and this amount of funding required specific authorization by the Building Commission and review by the University of Wisconsin System Administration Office of Capital Budget and Planning.  The money was not from the CSHP's annual operating and maintenance budget and in fact the cost would have exceeded the entire annual budget by $88,899.00.  Furthermore, the cost was treated as a capital expenditure under GAAP.  Accordingly,

the facts surrounding the cost and how funds were obtained weighs heavily against it having been RMRR.

### e. Conclusion on Project 3

The nature and extent, purpose, frequency and cost of Project 3 all weigh against it having been RMRR.  Based on all the factors, the Court's common sense finding is that Project 3 was not RMRR and cannot be exempt from the CAA.

### 4.   2002 Boiler 1 Project (Project 4)

#### a. Nature and Extent

In summary, the 2002 project on Boiler 1 ("Project 4") involved replacing its stoker feeders, i.e., replacing Zurn, nominal 18-inch, overthrow feeders with Detroit, nominal 27-inch, underthrow feeders.  Although not massive in scope, Project 4 led to improvements that would allow the boiler to operate at maximum capacity.  Also, although Project 4 required 81 days to complete, which is far above any average maintenance time, it was performed by in-house maintenance.  Accordingly, the nature and extent of Project 4 neither supports nor disproves that it was RMRR.

#### b. Purpose

Project 4 was intended to permit Boiler 1 to operate at maximum capacity.  Also, prior to Project 4 the feeders on Boiler 1 had been in continuous need of repair.  After repairs the feeders remained troublesome because they caught coal dust, plugged and were unable to deliver coal properly to Boiler 1 which resulted in

the boiler being unable to produce enough steam.  The purpose behind Project 4 was to increase boiler efficiency and decrease the amount of time the boiler needed repair, i.e., increasing availability and reliability.  Accordingly, the purpose behind Project 4 was not mere maintenance but an intention to improve the functionality, availability and reliability of Boiler 1, all of which contradicts having been mere RMRR.

### c. Frequency

The feeder replacement in Project 4 was the second time Boiler 1's feeders had been replaced.  Replacement of feeders were expected approximately every 25 years, which would allow for two replacements in the life of a boiler.  Several of the other boilers at the CSHP had undergone feeder replacement.  However, Project 4 was not a general feeder change but involved new feeders that had a new design and style.  Such infrequent changes do not support that Project 4 was "routine".  Accordingly, the infrequent replacement of feeders lends its weight against Project 4 having been RMRR.

### d. Cost

Project 4 cost $90,700.00 and was paid with funds authorized by the Building Commission, not funds from the CSHP's operating and maintenance budget.  Although the cost was not in the hundreds of thousands, it was treated as a capital expenditure under GAAP.

Accordingly, such cost factors weigh against Project 4 having been RMRR.

### e. Conclusion on Project 4

Although the nature and extent of project 4 is a neutral factor, the purpose, frequency and cost of Project 4 all weigh against it having been RMRR.  Based on all the factors, the Court's common sense finding is that Project 4 was not RMRR and cannot be exempt from the CAA.

### 5.   2004 Boilers 1, 2, 3 & 4 Project (Project 5)

#### a. Nature and Extent

In summary, the 2004 project on Boilers 1, 2, 3 and 4 ("Project 5") involved replacing Boiler 4's five overthrow feeders with underthrow feeders and changing the generating banks and superheaters on Boilers 1, 2 and 3.  The scope of Project 5 was very large with the planning process beginning in 2001 and the project not being completed until 2004.  The building request for Project 5 refers to the project as an "overhaul" of the boilers and the outside consulting firm, TC Group, that provided the engineering for Project 5 estimated that its engineering services alone would take 2,032 hours and cost $178,000.00.

Moreover, typical repairs on superheater elements (e.g., on superheater tubes) occurred approximately once per year per boiler at the CSHP and a typical tube repair would take 3 to 5 days.  Fixing generating tubes would typically take 10 days for a welded

patch or 3 to 5 days for plugging.  Conversely, the work on Boiler 4 took 26 days and the work on the other three boilers took 77, 66 and 45 days respectively for a total project time of approximately 9 months.  Although in-house CSHP staff did the work on Boiler 4, outside contractors were hired to perform the work on the other boilers.  Also, the generating bank tubes and superheater elements had to be fabricated off-site because the project was more complex than the in-house staff at the CSHP could undertake.  Accordingly, the nature and extent of Project 5 contradict that it had been mere RMRR.

### b. Purpose

Prior to Project 5, $10,000 to $15,000 and 200 to 300 hours were spent annually to maintain feeders on Boiler 4 and the boiler had been unable to reach its peak load when burning alternate fuels.  The newly designed feeders that were installed during Project 5 were meant to allow the boiler to burn many different fuels at full load.

Prior to Project 5, the superheater tubes on Boilers 1, 2 and 3 had been experiencing multiple failures with increasing frequency.  Without a superheater the CSHP's boilers could not be operated for long periods of time and should the superheater not been replaced the only option was to retire the energy plant.  The replacements on Boilers 1, 2 and 3 involved replacing wholly worn parts that had reached the end of their useful life.  The

replacements would reverse the trend of increasing boiler tube
failure that had required more frequent boiler outages due to
repairs. In fact, after the replacement there was a noticeable
decrease in tube leaks. These facts demonstrate that the purpose
behind Project 5 was to increase the productivity, efficiency,
availability and reliability of the boilers. Accordingly, the
purpose of Project 5 weighs against it having been RMRR.

### c. Frequency

The feeders on Boiler 4 had never been replaced before. The
superheaters on Boilers 1, 2 and 3 had been replaced twice before
in 1959 and 1988. However, the superheater inlet header and outlet
headers on Boilers 1, 2 and 3 had never been replaced before.
Furthermore, the only time the generating bank tubes had been
replaced on Boilers 1, 2 and 3 was in 1959 when the boilers were
being reconstructed at CSHP after being disassembled in Detroit and
shipped to Wisconsin. Although some of the replaced components in
Project 5 had been previously replaced, none had been replaced more
than twice and several were never replaced before. Accordingly,
such minimal frequency weighs against Project 5 having been RMRR.

### d. Cost

Replacement of the feeders on Boiler 4 cost approximately
$193,000.00 and all the work done on Boilers 1, 2 and 3 totaled a
cost of $1,519,348.00, for a total project cost of $1,712,348.00.
The Building Commission authorized the capital funding for the

39

project after a joint request for the project was made by the Wisconsin Department of Administration, the University of Wisconsin System and the University of Wisconsin-Madison.  Project 5 was not paid through CSHP's annual operating and maintenance budget of $700,000.00.  The project was treated as a capital expenditure under GAAP.  Accordingly, the cost and treatment of the cost of Project 5 weighs heavily against it having been RMRR.

e. Conclusion on Project 5

Of all the projects involved in this action, application of the factors to Project 5 weigh heavily against it falling within the RMRR exemption.  Based on all the factors, the Court's common sense finding is that Project 5 was not RMRR and cannot be exempt from the CAA.

6.   Overall determination of RMRR exemption

Based on the preceding analysis the Court finds as a matter of law that Project 1 falls within the RMRR exemption to the CAA requirements, but Projects 2, 3, 4 and 5 do not fall within the RMRR exemption.  Accordingly, defendants' request that they be granted summary judgment concerning Project 1 being RMRR and exempt from the CAA requirements is granted, and plaintiff's request that it be granted summary judgment concerning Projects 2, 3, 4 and 5 not being exempt from the CAA requirements as RMRR is granted.

**B.   Significant increase in net emissions**

For "any physical change" to be considered a "modification" it must not be exempt as RMRR and there must be a significant increase

40

in net emissions. Wis. Admin. Code NR §§ 405.02(21), 405.07(1)(2004); see also Ohio Edison Co., at 855. The parties do not dispute any material facts surrounding the CSHP's net emissions. The dispute is over what test or equation should be used to determine whether the CSHP's net emissions were significant or not. Accordingly, should the applicable test be the "actual to potential" test then there is no dispute that the projects resulted in[7] significant increases in net emissions, but if the applicable test is the "actual to projected actual" test[8] then there is no dispute that the projects did not result in significant increases in net emissions.

In pertinent part, a "net emissions increase" is defined as

the amount by which the sum of the following exceeds zero:

---

[7]Defendants also raise a "causation" issue. However, causation in these circumstances is merely "but for" causation, i.e., but for the physical changes in facility there would not have been a significant increase in net emissions. See 57 Fed. Reg. 32,314, at 32,326 (July 21, 1992) (explaining that "[i]ncreased operations (and resultant increases in actual emissions) that could not physically and legally be accommodated during the representative baseline period but for the proposed physical or operational change should be considered to result from the change.") (emphasis added). Plaintiff has demonstrated that the projects done on the CSHP were done to improve reliability and availability by cutting down on how often the boilers had to be shut down for repairs. Accordingly, plaintiff has shown that the increased operations and increases in actual emissions could not physically have been accomplished during the representative baseline periods but for the proposed, and now completed, physical changes.

[8]This test has also been referred to as the "actual to future actual" test or "actual to predicted actual" test or "actual to actual" test.

1. Any increase in actual emissions from a particular physical change or change in method of operation at a stationary source. . . .

Wis. Admin. Code NR § 405.02(24)(a)(2004). "Actual emissions" is also a specially defined term meaning

the actual rate of emissions of an air contaminant from an emissions unit, as determined in accordance with pars. (a) through (d):
(a) In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the air contaminant during a 2-year period which precedes the particular date and which is representative of normal source operation. . . . Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

. . .

(c) For any emissions unit, other than an electric utility steam generating unit, which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

Wis. Admin. Code NR § 405.02(1)(2004).

Defendants argue that the court in <u>United States v. Murphy Oil USA, Inc.</u> created a rule that an "actual to projected actual" test applies to all "like-kind replacements" (i.e., the replacement of old parts with new parts that do not change the design of the equipment). 143 F. Supp. 2d 1054, 1104-05 (W.D. Wis. 2001). This interpretation of <u>Murphy Oil</u> is incorrect. The court implicitly reasoned that such a blanket rule concerning the applicability of an "actual to projected actual" test could not be established because the case and agency comments that discussed an "actual to projected actual" test had a narrow scope covering only electric

utility steam generating units.[9]  Id.  Instead the court determined that the relevant question before it concerning a sulfur recovery unit was whether the changes "were sufficiently significant to support a finding that normal operations had not begun before the [changes]."  Id. at 1104.

Furthermore, based on other EPA comments any physical change not excluded from the CAA under some exemption like RMRR is presumed to be sufficiently significant to support a finding that normal operations had not begun before the physical change occurred and fall under the "actual to potential" test.  See 63 Fed. Reg. 39,857, at 39,859 (July 24, 1998).  Also, showing that the physical change is a "like-kind replacement" is not determinative but a factor that weighs in favor of normal operations having begun before the change.  See generally, Murphy Oil, at 1105 (explaining that modifications that do not change the method of operation are a factor in determining whether normal operation had begun). Accordingly, in general when a major emitting source undergoes a physical change, as opposed to routine maintenance, the modified source does not begin "normal operations" until the change is

_____

[9]The EPA has since specifically extended the "actual to projected actual" test beyond electric utility steam generating units.  67 Fed Reg. 80,186-01 (Dec. 31, 2002).  Also, Wisconsin has recently incorporated an "actual to projected actual" test for non-utility sources.  72 Fed. Reg. 19,829 (Apr. 20, 2007).  However, neither of those changes apply in this case because the applicable regulation would be the Wisconsin regulation which was not promulgated until after the pertinent projects.

complete requiring application of the "actual to potential" test under Wis. Admin. Code NR § 405.02(1)(c)(2004).

In this case, Projects 2, 3, 4 and 5 are physical changes that are not excluded from the CAA as RMRR exemptions. This determination produces the presumption that the projects were sufficiently significant to support a finding that normal operations had not begun before the physical changes occurred. Defendants rebut the presumption by arguing that the projects were not sufficiently significant because they were "like-kind replacements".

### 1.   Project 2

Project 2 involved the changing of old tubes with new tubes without any change in the design or functionality of the tubes. This supports it having been a "like-kind replacement" and as such the presumption in favor of Project 2 having been sufficiently significant is defeated.  Accordingly, the applicable test for Project 2 is the "actual to projected actual" test and it is undisputed that under that test Project 2 would not produce a significant increase in net emissions.

### 2.   Project 3

Project 3 involved more than replacing old parts with new ones.  The old economizers contained old sootblowers that were replaced in the new economizers by newly designed sootblowers which were intended to regain the original sootblower effectiveness for the boilers.  The design and effectiveness of the economizers were

44

modified by Project 3, which prevents it from having been a mere "like-kind replacement". The presumption in favor of Project 3 having been sufficiently significant remains in place. Accordingly, the applicable test for Project 3 is the "actual to potential" test and it is undisputed that under that test Project 3 would produce a significant increase in net emissions.

### 3.   Project 4

Project 4 involved replacing Boiler 1's 19-inch overthrow feeders with 27-inch underthrow feeders. The design, style and size of feeders were modified by Project 4, which support that it could not have been a "like-kind replacement". The presumption in favor of Project 4 having been sufficiently significant is not defeated. Accordingly, the applicable test for Project 4 is the "actual to potential" test and it is undisputed that under that test Project 4 would produce a significant increase in net emissions.

### 4.   Project 5

Project 5 involved more than the replacement of old parts with new parts. First, the old feeders were replaced with newly designed feeders to allow the burning of many different fuels at a full load. Second, the sidewall tubes, which had been previously replaced with tubes that were designed differently, were replaced to change back to an original design that covered openings designed

for gas burners.[10]   Also, the connection of superheater tubes was changed from being rolled inside the heater to being connected by welding.   Even assuming that some of the other changes in Project 5 were "like-kind replacements" the large magnitude of the project further weighs against it being labeled as an overall "like-kind replacement".   Accordingly, the applicable test for Project 5 is the "actual to potential" test and it is undisputed that under that test Project 5 would produce a significant increase in net emissions.


IV.   **Conclusion**

Plaintiff has associational standing to bring this action on behalf of its members.   Defendants Wiley and Reilly are not proper defendants in this action and are dismissed with prejudice, but defendants Morgan and Ehrfurth are proper defendants in this action.   Defendants cannot be in violation of the CAA for Project 1 as it is exempt from the definition of "modification" under the CAA as routine maintenance, repair and replacement.   Defendants cannot be in violation of the CAA for Project 2 as it was a complete "like-kind replacement" and application of the "actual to projected actual" test provides that Project 2 did not result in a

_____

[10]Regardless of the fact that the tubes were changed back to an original configuration, the design of tubes changed from what they had been previously.

46

significant increase in net emissions and therefore it was not a "modification". However, defendants are in violation of the CAA under 42 U.S.C. § 7604 for Projects 3, 4 and 5 because they were physical changes at the CSHP that resulted in significant increases in net emissions, i.e., "modifications", that were done without having obtained the required preconstruction permit under 42 U.S.C. § 7475(a).

Furthermore, the parties agree that if defendants were responsible for the CSHP being modified without a preconstruction PSD permit then (1) under Count 2 of the complaint the CSHP must be subject to the best available control technology; (2) under Count 3 of the complaint defendants are also responsible for the CSHP being modified without having obtained the necessary preconstruction permits under Wisconsin law; and (3) under Count 4 of the complaint defendants must also apply for a revised operating permit for the CSHP. Accordingly, based on the undisputed facts plaintiff is entitled to judgment as a matter of law on Counts 1 through 4 as they apply to Projects 3, 4 and 5 against defendants Morgan and Ehrfurth. Moreover, based on the undisputed facts defendants are entitled to judgment as a matter of law dismissing defendants Wiley and Reilly with prejudice and dismissing Counts 1 through 4 as they apply to Projects 1 and 2 against all defendants.

Sierra Club v. Michael Morgan, et al.
Case No. 07-C-251-S

ORDER

IT IS ORDERED that plaintiff's motion for partial summary judgment is GRANTED in part and DENIED in part in accordance with the above.

IT IS FURTHER ORDERED that defendants' motion for summary judgment is GRANTED in part and DENIED in part in accordance with the above.

Entered this 7th day of November, 2007.

BY THE COURT:

/s/

_____
JOHN C. SHABAZ
District Judge

48